## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IDEANOMICS, INC., *et al.*,[1] | Case No. 24- 12728 (CTG) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF ALPESH A. AMIN IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Alpesh A. Amin, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am a Senior Managing Director at Riveron Management Services, LLC ("RMS") and I have been retained as the Chief Restructuring Officer of Ideanomics, Inc. ("Ideanomics") and its debtor affiliates (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I am authorized by each of the Debtors to submit this declaration (this "First Day Declaration").

2.     As the Debtors' Chief Restructuring Officer, I am responsible for, and am materially engaged with, the Debtors' operational and financial management including, among other things: (a) all restructuring activities and initiatives of the Company; (b) cash management and liquidity forecasting; (c) the development of, or revisions to, the Company's business plan, including assistance with the sale process described herein; (d) engagement with creditors and other stakeholders; and (e) providing contingency planning.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or state identification number are, are: Ideanomics, Inc. (8374); Wireless Advanced Vehicle Electrification, LLC (6793); Solectrac, Inc. (4653); Timios Holdings Corp. (0190); Justly Holdings Inc. (3657); Justly Markets LLC f/k/a Delaware Board of Trade Holdings, Inc. (5107); VIA Motors International, Inc. (7063); and VIA Motors, Inc. (0185). The headquarters for the above-captioned Debtors is located at 1441 Broadway, 5th Floor, Suite 5116, New York, New York 10018.

3.      RMS is a business advisory firm specializing in a myriad of services including interim management, crisis management, mergers and acquisitions, corporate restructurings, operations improvement, dispute resolution, financial reporting and valuation for both healthy and distressed companies.  RMS has extensive experience working with and for distressed companies in complex financial and operational restructurings, both out of court and in chapter 11 proceedings throughout the United States.  RMS Professionals have provided restructuring services to debtors, creditors, and equity constituents in numerous reorganizations, which services have included financial analysis and budgeting, forecasting, cash management and, operational assessments and improvements.  RMS and the RMS Professionals have been involved in numerous chapter 11 and international bankruptcies in a variety of capacities, including (a) as advisor to (i) official committees of creditors, (ii) official equity committees, (iii) secured and unsecured holders of debt, (iv) debtors, and (b) serving as interim management, including providing personnel to act as chief restructuring officer.

4.      RMS has extensive experience and an excellent reputation in providing high quality interim management and restructuring advisory services to debtors and various secured and unsecured classes of creditors in bankruptcy reorganizations and other restructurings. Professionals currently employed by RMS have provided interim management and restructuring services to and in connection with the following matters, among others: *Jordan Health Products I, Inc.*, Case No. 24-12271 (TMH) (Bankr.D. Del. Oct. 8, 2024; *Edgio International, Inc.*, Case No. 24-11986 (KBO) (Bankr. D. Del. Sept. 10, 2024); *In re Meier's Wine Cellars Acquisition, LLC*, Case No. 24-11575 (MFW) (Bankr. D. Del. Sept. 3, 2024); *In re New rue21 Holdco, Inc.*, No. 24-10939 (BLS) (Bankr. D. Del. May 2, 2024); *In re WOM S.A.*, No. 24-10628 (KBO) (Bankr. D. Del. April 1, 2024); *In re Mercon Coffee Corporation*, No. 23-11945 (MEW) (Bankr. S.D.N.Y.

2

Dec. 6, 2023); *In re Water Gremlin*, No. 23-11775 (LSS) (Bankr. D. Del. Oct. 27, 2023); *In re MVK FarmCo, LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Oct. 13, 2023); *In re Noble House Home Furnishings, LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. September 11, 2023); *In re AeroCision Parent, LLC*, No. 23-11032 (KBO) (Bankr. D. Del. July 31, 2023); *In re Eagle Valley Energy Partners, LLC*, No. 23-10034 (SMR) (Bankr. W. Tex. Jan. 27, 2023); *In re Crédito Real, S.A.B. de C.V., SOFOM, E.N.R.*, No 22-10630 (TMH) / No. 22-10696 (TMH) (Bankr. D. Del June 22, 2022); *In re Stimwave Tech., Inc.*, No. 22-10541 (KBP) (Bankr. D. Del. Jun. 15, 2022); *In re Armstrong*, No. 22-10426 (MFW) (Bankr. D. Del. May 8, 2022); *In re Aluminum Shapes, LLC*, No. 21-16520 (Bankr. N.J. Aug. 15, 2021); *In re TECT Aerospace Grp. Holdings, Inc.*, No. 21-10670 (KBO) (Bankr. Del. April 5, 2021); *In re Remora Petroleum, L.P.*, No. 20-34037 (DRJ) (Bankr. S.D. Tex. Sep. 17, 2020); *In re Whiting Petroleum Corp.*, No. 20-32021 (DRJ) (Bankr. S.D. Tex. Jun. 10, 2020); *In re LATAM Airlines Grp., SA*, No. 20-11254 (JLG) (Bank. S.D.N.Y. May 26, 2020); *In re Ravn Air Grp., Inc.*, No. 20-10755 (BLS) (Bankr. D. Del. May 18, 2020).

5.      I am a seasoned turnaround executive, specializing in providing interim management and turnaround management services to distressed and underperforming businesses. Across numerous industries, I have led turnarounds in interim management roles including AAA Sales & Engineering, Inc.; Central Grocers, Inc.; Currency Capital, LLC; Earth Fare, Inc.; GameTech International Inc.; Oneida Hospitality Group; Refco, LLC; Strack & Van Til Supermarkets, Inc.; Supply Source Enterprises, Inc; United Furniture Industries, Inc; .and Wickes, Inc.  I have extensive experience in strategic planning, business plan development and analysis, cash flow and liquidity management, mergers and acquisitions advisory, debt/equity capital raises, and transaction services.  I have advised both companies and their stakeholders involved in complex transformational phases such as business model redesign, profit enhancement, partial or

3

entire company sale, capital raises, and mergers and acquisitions.

6.      On November 22, 2024, RMS and the Debtors executed that certain engagement letter, dated November 21, 2024, that designated me as Chief Restructuring Officer effective as of the Petition Date.  This engagement letter followed and replaced a prior engagement by the Debtors of RMS' affiliate and fellow Riveron entity, Riveron RTS, LLC ("Riveron RTS") for financial advisory services, essentially adding the Chief Restructuring Officer role.

7.      Since my appointment, I have worked daily and closely with the Debtors' officers and employees and with the professionals already engaged by the Debtors in anticipation of a chapter 11 filing – Foley & Lardner LLP ("Foley"), Riveron, and SSG Advisors, LLC ("SSG").

8.      Except as otherwise indicated, I base all facts set forth in this First Day Declaration on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operational and financial condition.  If called to testify, I would testify competently to the facts set forth in this First Day Declaration, which I am authorized to submit on behalf of the Debtors.

9.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for bankruptcy relief in the United States Bankruptcy Court for the District of Delaware (the "Court").  The first such petition was filed by Ideanomics' subsidiary, Wireless Advanced Vehicle Electrification, LLC ("WAVE"), a limited liability company organized under the laws of the state of Delaware.  The Debtors intend to continue to operate their active businesses and manage their properties as debtors in possession during the pendency of these Chapter 11 Cases and through a value-maximizing sales transaction that will be marketed by the Debtors and their professionals pursuant to the terms of Court-approved bid procedures.

10.      I submit this First Day Declaration on behalf of the Debtors in support of the

Debtors' (a) voluntary petitions for bankruptcy relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and (b) "first day" pleadings, which are being filed concurrently herewith (collectively, the "First Day Motions"). The Debtors seek the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses and operations. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

11.      Part I of this First Day Declaration provides detailed information regarding (a) the Debtors' corporate history, businesses and operations, organizational structure, capital structure, and significant prepetition indebtedness; (b) the Debtors' financial performance and the events leading to the filing of these Chapter 11 Cases; and (c) the goals of these Chapter 11 Cases.[2] Part II sets forth the relevant facts in support of the First Day Motions.

## PART I

### I.    The Debtors' Corporate History

12.      Ideanomics, the parent of the other Debtors, was incorporated in the State of Nevada on October 19, 2004. Ideanomics has been headquartered in New York state since 2018, when it relocated its headquarters from Beijing, China.

13.      Ideanomics has operated with a focus on different industries, trends and growth opportunities throughout its corporate history. During prior iterations of its business, Ideanomics was formerly known as "Wecast Network, Inc.," and "Seven Star Cloud Group, Inc.," before

---

[2] Many of the financial figures presented in this First Day Declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their businesses. The Debtors reserve all rights to revise and supplement the figures presented herein.

changing its name to Ideanomics, Inc. in August 2018.

14.     From 2010 through 2017, Ideanomics' primary business activity was providing premium content video on demand services, with operations chiefly in China through subsidiaries and variable interest entities under the brand names of China Broadband and, later, You-on-Demand.  It was during this time that Mr. Shane McMahon, the Debtor's current Chairman, became involved in the Debtors and their earlier business iterations.  Ideanomics closed the You-on-Demand business in 2019.

15.     Starting in 2017, Ideanomics transitioned its business model to pursue market opportunities in the financial technology ("Fintech") space.  Ideanomics built a network of businesses, operating principally in the trading of petroleum products and electronic components, which the company believed had significant potential to recognize benefits from blockchain and artificial intelligence technologies.  The Fintech operations also included providing title and escrow services throughout the United States, through the acquisition of Timios Holdings Corp and its affiliates ("Timios") in January 2021.  Further, Justly Holdings Inc. and Justly Markets LLC were the Debtors' FINRA-registered broker dealer destination for ESG and thematic investments.

16.     In the second half of 2018, Ideanomics began identifying opportunities in the Chinese Electric Vehicle ("EV") industry to facilitate the large-scale conversion of fleet vehicles from internal combustion engines to EV.  Recognizing substantial potential growth opportunities in the nascent EV space, the Debtors pivoted to focus on EV and EV-adjacent markets.  To concentrate on its EV business, the Debtors divested and/or wound down the Fintech businesses in 2022 and 2023.

17.     From 2021 through 2023, the Debtors identified opportunities outside of China, more specifically in the United States and Europe, and formulated an acquisition strategy to

6

acquire EV and technology assets to complete the foundation for the development of four product-focused EV verticals comprised of off-highway, two-wheeler, and on-highway vehicles, and associated energy and electric charging services.  These transactions included the acquisitions of WAVE, Solectrac, Inc. ("Solectrac"), US Hybrid Corporation ("US Hybrid"), Tree Technologies Sdn. Bhd. ("Tree Technologies"), Via Motors International, Inc. and its affiliates ("VIA Motors"), and the majority ownership of Energica Motor Company, S.P.A. ("Energica").  The Debtors financed these acquisitions through cash on hand and the issuance of common stock and convertible notes.  Collectively, the Debtors spent approximately $320 million to fund these acquisitions.[3]

18.    The majority of these investments, however, were unsuccessful, or continue to remain a substantial liquidity drain on the Debtors as the Debtors seek profitability in the relatively new and growing EV industry which has faced well-publicized challenges and crises in recent years.  Indeed, in keeping with the performance of their industry peers, revenues of the Debtors' EV businesses never came close to the costs required to operate and develop the businesses.  Therefore, to consolidate around their most promising business, that of WAVE, the Debtors engaged in various divestitures and business winddowns.  In 2023, the Debtors decided to wind down the Tree Technologies, culminating in a sale of leasehold land acquired by that business (sale closed in January, 2024), and the company's remaining China-based operations, at that time focused on the financing of commercial EVs to fleet operators, due to the excessively competitive Asian EV market.  The Debtors also sold the Timios business (in July 2023) and US Hybrid (in January 2024) for no material gain or loss.  The Debtors also attempted to sell the Energica, VIA

---

[3]    To further support this initiative, the Debtors entered into a lease agreement for a facility in New Jersey to serve a center of excellence to promote education and advocacy of electric and hydrogen powered vehicles to commercial fleet operators.  The Debtors stopped using this facility in 2023 and recorded an impairment loss of $3 million.

Motors, and Solectrac businesses, but were unable to come to economic terms or transactions that were viable.

## II.  The Debtors' Businesses and operations

### a.  The Debtors' Active Businesses

19.    Each of the Debtors' businesses are considered "growth" companies at various stages of maturity, in new markets that are still in their initial stages of development.  As such, substantial working capital continues to be required to develop them.

20.    Following the divestitures and winding down of certain of the Debtors' businesses, the Debtors currently have one operating entity, WAVE.  The Debtors' other remaining business lines – VIA Motors, Solectrac, and Energica – have been shuttered or are left without supporting funding from Ideanomics and the public market.

### i.  WAVE

21.    WAVE was founded in 2011 and is headquartered in Salt Lake City, Utah.  WAVE is a leading provider of high-power wireless inductive charging solutions for medium and heavy-duty EVs.  Embedded in-route on public roads and at depot facilities, the WAVE system automatically charges vehicles during scheduled stops without the inconvenience of cable-based systems.  The hands-free WAVE system improves operational efficiency of electric vehicles and enables fleets to achieve extended duty cycles comparable to those of traditional internal combustion engine ("ICE") commercial vehicles.  This is believed to be a key step in enabling perpetual operations for fleets, and an enabling technology for autonomous freight and autonomous warehouse operations.

22.    Deployed since 2012, WAVE has demonstrated the capability to develop and integrate high-power charging systems into heavy-duty EVs from leading commercial EV manufacturers, such as, among others, BYD, Kenworth, and Cummins.  WAVE provides custom

8

fleet solutions for mass transit, logistics, airport and campus shuttles, drayage fleets, and off-road vehicles at ports and industrial sites.  Currently, WAVE's wireless charging system is being utilized by, among others, the Antelope Valley Transit Authority ("AVTA"), the only fully electric transit authority in the United States, which serves the cities of Palmdale, California, Lancaster, California, and Northern Los Angeles County.  At this time, the AVTA is the largest system of high-powered wireless vehicle charging deployed globally anywhere in the world, covering 200 square miles – and serves as a showcase of WAVE's marketing leading technology.

23.    Since acquiring WAVE in January 2021, the Debtors have continued investing in engineering, facilities and production resources, including continuous development programs improving technology, reducing cost and scaling manufacturing.  These investments and programs are necessary to meet current and anticipated demand for WAVE's high power inductive wireless charging products.  WAVE has continued to develop its high-powered induction capabilities beyond their initial power and speed levels, successfully delivering systems at 125kW and 500kW. Further, WAVE has over 40 patents issued, 21 patents published, and 25 patents pending for its hardware and software patents in North America, Europe, and China.  Specifically, WAVE allows for EV to charge at depot facilities without the inconvenience of cable-based charging systems.  Among other things, this technology presents opportunities for the autonomous EVs of the future to charge on their routes, at all hours, without human assistance

24.    To support widespread adoption, WAVE has developed relationships with additional OEM partners to facilitate the integration of its vehicle-side hardware.  Additionally, WAVE is pursuing interoperability between its systems so WAVE-enabled vehicles may access wireless charging regardless of the power level of a given WAVE system.  Indeed, the Debtors have also negotiated business relationships for several large companies in the United States and

9

the Middle East to utilize the WAVE wireless charging system.

    ii.  <u>VIA Motors</u>

25.    Ideanomics acquired VIA Motors in January 2023, following its initial investment in the business in 2021.  VIA Motors is a commercial EV company in the Class 2 to Class 5 commercial EV segment.  The VIA Motors EV is built on a modular proprietary "skateboard" tailored to the rigors and needs of commercial customers.  This skateboard platform allows for the upfitting of the vehicle as a box truck, walk-in van, service truck, skate truck, bus, shuttle, step van, or other form.  The VIA Motors platform was developed with commercial drivers in mind – utilizing durable steel frames, cost-effective materials, and ergonomic features.

26.    Although VIA Motors has industry-leading technology, the business required significant capital to develop the products, maintain operations, and achieve meaningful cash inflows.  Unfortunately, the Debtors ran out of necessary cash to continue operating the VIA Motors segment and, in 2024, ceased operating the business.  Therefore, the Debtors recorded approximately $198 million in impairment losses related to VIA Motors. Furthermore, in 2024, VIA Motors ceased to use its lease in Michigan, resulting in an impairment loss of $4.4 million.

    iii.  <u>Solectrac</u>

27.    In June 2021, Ideanomics acquired Solectrac, a California-based assembler and distributor of electric powered tractors.  Solectrac is a certified B Corp.  Founded in 2012, Solectrac was the first North American company to offer fully battery-powered, all-electric tractors for agriculture and utility applications.  As a first mover, Solectrac built a leadership position in the North American electric tractor market.  Solectrac's products include 25, 50 and 75 horsepower electric tractors, and an innovative electric 2-wheel tractor / tiller under development.

28.    Due to shifting EV market conditions, Solectrac moved its focus away from building a national dealer/distributor network to a direct-to-customer strategy supported by a small

number of dealers in geographic regions where adoption of the technology is greater. Solectrac's direct customer sales have been further supported by government programs designed to incentivize electrification.

29.    Like VIA Motors, the cash flows needed to continue operating Solectrac and developing products were significant and the Debtors have not been able to raise sufficient funds to continue operations. As of June 2024, the Debtors have shuttered Solectrac and are currently offering it for sale to third parties. Again, similar to industry trends in commercial on-road EV, Solectrac's peers have also been subjected to a lack of capital availability and have publicly announced rounds of workforce reduction, suspension of contracting manufacturing, and a focus on licensing their technologies as a means to survive.

iv.    Energica

30.    In March 2022, Ideanomics acquired over 70% ownership in Energica, an electric motorcycle company based in Modena, Italy, that has been recognized with multiple awards as one of the world's leading electric motorcycle manufacturers. In addition to its popularity with motorcycle enthusiasts, Energica was building its reputation as an electric motorcycle provider to law enforcement.

31.    To date, the Debtors have recorded approximately $42 million in impairment losses related to Energica. In addition to the tightening market for electric vehicles that compromised investment capabilities, Energica faced challenges from the from the downturn in the automotive market and supply chain, being particularly affected as a small and medium-sized enterprise. Further, Energica faced issues inherent to the EV motorcycle market, which remains limited despite the variety of models that are available at this time, with the current offerings still effectively sharing a limited buyer base versus that of gasoline-powered motorcycles.

32.    The Debtors ran an extensive process in an attempt to find a buyer for Energica but

11

were unsuccessful given the turmoil in the EV market and its supply chain challenges. Energica entered into an Italian bankruptcy judicial liquidation on October 14, 2024.

**b.  The Debtors' Competitive Environment**

33.     The markets in which the Debtors participate are dynamic and highly competitive, requiring companies to react quickly to capitalize on opportunity.  The Debtors encounter significant domestic and international competition across all the Debtors' business segments.  This competitive environment involves both (a) sales competition and (b) employee competition, as competitive businesses are searching to utilize the same talent base to develop their products.  To remain competitive, the Debtors are required to obtain and expend significant capital to research, manufacture, market, and deliver its products to the end users.

34.     Further, the Debtors' businesses depend on a ready supply of components and parts that are sourced domestically and internationally and any interruption to the supply of these could have an adverse impact.  The Debtors' suppliers that manufacture components and parts, which specifically includes products to build the WAVE wireless charging systems, depend on a ready supply of raw materials and components.  Consequently, a shortage of raw materials or components could adversely impact their manufacturing process the ability to complete orders. The Debtors experienced supply chain constraints in 2021 that limited their ability to manufacture and deliver products to customers starting in 2022 and continuing through today.

**c.  Government Regulations.**

35.     The Debtors and their products are subject to various federal, provincial, state, and local laws and regulations.  For example, some of the Debtors' vehicles are subject to regulation by the National Highway Traffic Safety Administration ("NHTSA"), including all Federal Motor Vehicle Safety Standards and NHTSA bumper standards.  The Debtors' vehicles sold outside of the United States are subject to similar foreign compliance, safety, environmental, and other

regulations.  The Debtors, through their legacy Chinese business that is winding down, are also subject to Chinese regulations and laws.

### III.    The Debtors' Prepetition Corporate and Capital Structure

#### A.    Corporate Structure

36.    Ideanomics is the ultimate corporate parent company of the Debtors, the issuer of publicly traded common stock, and the issuer of certain tranches of preferred stock.  Ideanomics maintains seven (7) operational subsidiaries, of which only WAVE is currently operating.  The remaining subsidiaries are either holding companies or dormant subsidiaries that ceased operations or remain unliquidated solely for the purpose of compliance with administrative formalities, or in the wind down process and are expected to be liquidated.

37.    For the convenience of the Court and all parties in interest, the Debtors' organizational structure is set forth in the chart attached hereto as **Exhibit A**.

#### B.    Debt Capital Structure

38.    Prior to the Petition Date, the Debtors entered into various financing arrangements to funds the Debtors' operations.  Each of the financing facilities and the amounts owed thereunder is described in further detail below.

4875-9580-7218.11

| Funded Debt | Maturity | Total Amount Outstanding[4] |
|---|---|---|
| Prepetition Tillou Promissory Notes | May 2024 | $14,347,850.64 |
| Secured Debenture Purchase Agreement | Variable | $4,524,500 |
| Mitsubishi Financing Arrangements | Variable | $9,174,213 |
| NFS Leasing Financing Arrangements | Variable | $1,475,069 |
| Small Business Association Paycheck Protection Program | April 2025 | $133,256 |
| Therese Note | June 2023 | $865,006 |
| **TOTAL FUNDED DEBT** | | **$30,519,894.64** |

### i.     Prepetition Tillou Promissory Notes

39.     Debtor Ideanomics is party to several prepetition financing arrangements with Tillou Management and Consulting LLC (in its capacity as the lender under the Prepetition Loan Documents, the "Prepetition Lender"), including that certain Promissory Note, dated December 13, 2022, by and between Ideanomics and the Prepetition Lender in the original principal amount of $2,000,000; that certain Promissory Note, dated March 19, 2023, by and between Ideanomics and the Prepetition Lender, in the original principal amount of $2,000,000; that certain Amended and Restated Promissory Note, dated April 25, 2024, by and between Ideanomics and the Prepetition Lender, in the original principal amount of $4,137,095; that certain Amended and Restated Promissory Note, dated May 29, 2024, by and between Ideanomics and the Prepetition Lender, in the original principal amount of $7,217,095; that certain Amended and Restated Promissory Note, dated June 18, 2024, by and between Ideanomics and the Prepetition Lender, in the original principal amount of $7,862,095; that certain Amended and Restated Promissory Note, dated July 19, 2024, by and between Ideanomics and the Prepetition Lender, in the original principal amount of $8,638,095; that certain Amended and Restated Promissory Note, dated August 9, 2024, by and between Ideanomics and the Prepetition Lender, in the original principal

---

[4] Amounts include the accrued interest and approximate fees and expenses due and owing under the applicable debt instruments.

amount of $10,382,095; that certain Amended and Restated Promissory Note, dated November 5, 2024, by and between Ideanomics and Tillou, in the original principal amount of $13,835,911.64; and that certain Amended No. 1 to Amended and Restated Promissory Note, dated November 25, 2024, by and between Ideanomics and the Prepetition Lender, which increased the original principal amount to $14,347,850.64 (together, with all other amendments, amendments and restatements, supplements, and all documentation entered in connection therewith, the "Prepetition Promissory Notes").  Each of the Debtors have guaranteed all obligations under the Prepetition Promissory Notes.  Upon information and belief, Shane McMahon is not an officer, director, managing member or manager of Tillou. Upon information and belief, Shane McMahon's father, Vince McMahon, controls Tillou.  Each of the Debtors have guaranteed all obligations under the Prepetition Promissory Notes. Obligations under the Prepetition.

ii.      **Secured Debenture Purchase Agreement**

40.      Pursuant to that certain *Secured Debenture Purchase Agreement* (the "SDPA") dated as of October 25, 2022 by and between Ideanomics and YA II PN, Ltd. ("Yorkville"), Ideanomics issued to Yorkville, and Yorkville purchased from Ideanomics, the Specified Debentures (as defined in the SDPA).  Pursuant to that certain *Assignment and Assumption Agreement* (the "Assignment and Assumption Agreement," together with the Prepetition Promissory Notes, the "Prepetition Debt Documents"), dated October 29, 2024, by and among Yorkville, the Prepetition Lender, and Ideanomics, Prepetition Lender purchased from Yorkville, and Yorkville assigned to the Prepetition Lender, all of Yorkville's rights to and interests in, and assumed any of Yorkville's obligations under, the Specified Debentures and the other Debenture Documents, as defined in the Assignment and Assumption Agreement (this assigned and assumed indebtedness, along with the indebtedness issued under the Prepetition Promissory Notes, the "Prepetition Loans").  As of October 23, 2024, the amount owed to the Prepetition Lender,

15

under the SDPA was $4,524,500. Each of the Debtors, along with certain non-debtor affiliates, guaranteed the obligations under the SDPA. Obligations under the SDPA are secured by a first priority lien on substantially all of the Debtors' assets.

### iii.    Mitsubishi Financing Arrangements

41.    Debtor Solectrac entered into two separate agreements providing financing from Mitsubishi: (a) *The Floorplan and Security Agreement* and (b) the *Vendor Agreement* (collectively, the "Mitsubishi Loans"). The aggregate amount outstanding under the Mitsubishi Loans is $9,174,213. The Mitsubishi Loans are secured by the specific goods and equipment financed by the Mitsubishi Loans and described further below.

    a.    *Floorplan Financing Agreement*. On December 21, 2022, Solectrac entered into the Floorplan and Security Agreement ("FPSA") with Mitsubishi HC Capital America, Inc ("Mitsubishi"). The FPSA is guaranteed by Ideanomics, Inc. There are currently two Lines of Credit open with Mitsubishi under the FPSA.

    b.    *Vendor Agreement*. On March 9, 2022, Solectrac, Mitsubishi HC Capital America, Inc ("MHCC-US"), Mitsubishi HC Capital Canada, Inc. ("MHCC-Canada" and together with MHFCC-US, collectively "MHCC") entered into that certain Vendor Agreement (US & Canada) (the "Vendor Agreement"). Pursuant to the Vendor Agreement, MHCC provides loans and other financing to dealers and distributors located in the United States and Canada for the benefit of Solectrac.

    c.    *Intercreditor Agreement*. Mitsubishi and the Prepetition Lender entered into that certain Intercreditor Agreement (the "Mitsubishi Intercreditor Agreement") dated as of December 22, 2022. Pursuant to the Mitsubishi Intercreditor Agreement, he Prepetition Lender's security interest in any Collateral granted under the FPSA is junior to that of Mitsubishi. Under the FPSA, Collateral consists of all inventories of Borrower that is financed by the Mitsubishi with the proceeds of advances made by Mitsubishi to Borrower; leases and accounts related thereto, and cash and insurance proceeds of any of the foregoing.

### iv.    NFS Leasing Master Equipment Finance Agreement

42.    On November 22, 2022, Ideanomics and WAVE entered into the Master Equipment Finance Agreement ("MEFA") with NFS Leasing, Inc. ("NFS"). The MEFA is secured by the

equipment and other goods financed by the funds advanced by NFS.  As of the Petition Date, $1,475,069 is outstanding under the MEFA.

### v.      SBA Paycheck Protection Program

43.      On April 10, 2020, Ideanomics borrowed $300,000 at an annual rate of 1.0% from a commercial bank through the Small Business Association Paycheck Protection Program.  The loan is currently payable monthly commencing on September 10, 2021, with a final payment due on April 10, 2025.  As of the Petition Date, there is approximately $133,256 outstanding under the SBA loan.

### vi.      Therese Note

44.      On April 6, 2023, Ideanomics entered into that certain Secured Negotiable Promissory Note in the amount of $1,000,000 made payable to Therese Lee Carabillo (the "Therese Note"). The Therese Note is secured by a personal guaranty from Shane McMahon.  The Therese Note was initially set to mature on June 6, 2023.  Shane McMahon entered into that certain *Guaranty* dated as of April 6, 2023, which guaranteed all amounts under the Therese Note. On April 25, 2024, Carabillo and Stephen Skoller, as Trustee of The Vincent K. McMahon 2008 Irrevocable Trust dated December 23, 2008 (the "McMahon Trust") entered into that certain *Note Purchase Agreement* (the "Carabillo NPA") whereby Carabillo sold the Therese Note to the McMahon Trust for $923,601.00.  In accordance with the Carabillo NPA, the parties also executed that certain *Assignment and Acceptance* by which Carabillo assigned the Therese Note to the McMahon Trust. As of the Petition Date, $865,006 remains outstanding under the Therese Note.

### C.      Equity Capital Structure

45.      Ideanomics has utilized several sources of equity as sources of cash flow to fund operations.  The value of Ideanomics' equity has varied throughout the years.  The stock peaked at $618.13 per share on February 5, 2021, and has decreased to $0.20 per share as of December 3,

2024.

### i.    Common Stock

46.    Ideanomics is a public company and its common stock is listed on the OTC Markets' OTCQX® market tier under the symbol "IDEX." Ideanomics is authorized to issue 1.5 billion shares of common stock with a par value of $0.001. On August 25, 2023, Ideanomics executed a 125:1 reverse stock split (the "Reverse Split") that became effective on the common stock. As of the Petition Date, Ideanomics has approximately 21,850,000 of issued and outstanding shares of common stock. As of June 13, 2024, there was approximately 735 holders of record of the common stock.

### ii.    Convertible Preferred Stock Series A

47.    Ideanomics board has authorized 60.0 million shares of convertible preferred stock, $0.001 par value, issuable in series. As of the Petition Date, 7,000,000 shares of Series A redeemable and convertible preferred stock were issued and outstanding. Each share of Series A Preferred Stock is convertible into ten fully paid and nonassessable shares of Common Stock.

### iii.    Convertible Preferred Stock Series C

48.    In 2023, the Ideanomics board authorized 2.0 million shares of Preferred Stock Series C. Following the Reverse Split, each share of Preferred Stock Series C is convertible, at the option of the holder thereof, at any time, into 0.16 shares of common stock (i.e., 185,484 shares of common stock).

## IV.    Events Leading to the Commencement of the Chapter 11 Cases

49.    As noted above, various factors led to the commencement of these Chapter 11 Cases. The Debtors simply have been unable to maintain and generate sufficient liquidity to fund operations. In 2020 and 2021, the Debtors raised over $717 million in cash through the issuance of common stock and convertible notes. The vast majority of these proceeds went towards

$320 million in EV industry or EV industry-adjacent acquisitions that began in 2021. As these businesses are considered pre-profitable, growth businesses, they required additional capital to fund, among other things, research and development, operations, manufacturing, and sales. The Debtors' businesses did not become cash flow positive.

**A.      Financial and Operational Issues**

**i.      Negative Financial Performance**

50.      As outlined in the chart below, the Debtors have experienced significant operating losses that have significantly outpaced revenues - generating cumulative operating losses of over $800 million in five years.

| Year | Revenue | Operating Expenses | Loss from Operations | Ending Cash Balance |
|---|---|---|---|---|
| 2019 | $44,566,000 | $111,682,000 | $(68,574,000) | $2,633,000 |
| 2020 | $26,759,000 | $97,701,000 | $(95,644,000) | $165,764,000 |
| 2021 | $114,080,000[5] | $282,785,000 | $(259,557,000) | $269,863,000 |
| 2022 | $19,015,000 | $209,276,000 | $(212,634,000) | $2,914,000 |
| 2023 | $15,459,000 | $214,740,000 | $(217,454,000) | $1,249,000 |
| **Cumulative Loss from Operations** | | | **$(853,883,000)** | |

51.      Further, the Debtors cash balance decreased from a high of $269 million as of December 31, 2021 to $1.2 million as of December 31, 2023. As of today, the Debtors have approximately $189,000 in cash remaining. Simply put, the Debtors' businesses were not financially sustainable without receiving substantial influxes of new financing.

52.      Given negative trends and headwinds in the growth EV space in recent years, and

---

[5] The 2021 revenue was incorrectly listed in the 10-K and resulted in a restatement for 2021 and 2022.

the fact that the Debtors' operations consumed significantly more cash than they generated, the Debtors undertook a number of restructuring initiatives to try to boost liquidity and right-size the business (see, e.g., paragraphs 18, 56-60).   Ultimately, these initiatives did not yield sufficient financial changes to avoid the Chapter 11 filings.

ii.        **Qualified Audit Opinions**

53.    As a result of the Debtors' financial performance and negative cash flows, the Debtors' independent auditors began issuing qualified opinions regarding the Debtors' long-term financial viability.  Beginning in 2021, the Debtors publicly disclosed that there was substantial doubt about the Debtors' ability to continue as a going concern.  These disclosures were the result of the Debtors' recurring losses from operations and the lack of liquidity to sufficiently fund operations and the acquisitions that the Debtors executed.

iii.        **Nasdaq De-Listing**

54.    Further, prior to the Petition Date, Ideanomics' stock price and market capitalization was out of compliance with The Nasdaq Stock Market LLC's ("Nasdaq") listing rules.  On July 9, 2024, Ideanomics was notified by Nasdaq that Ideanomics would be delisted from The Nasdaq Capital Market, effective as of July 11, 2024, due to Ideanomics' noncompliance with Nasdaq Listing Rules 5550(a)(2) and 5550(b)(2).[6]  Ideanomics common stock is still quoted on the OTC Markets' OTCQX® market tier under the trading symbol "IDEX".

55.    The Nasdaq delisting had a significant negative impact on the Debtors' ability to raise capital to fund operations.

B.        **Prepetition Initiatives to Boost Liquidity**

56.    Based on their financial performance, operational issues, and public reporting

---

[6]    Ideanomics first started receiving notices from the Nasdaq in May 2022 regarding Ideanomics' failure to satisfy Nasdaq's continued listing requirements and rules.

concerns, the Debtors' ability to tap the equity market for funding has all but dried up.  With limited sources of capital and continuing operating losses, the Debtors began to implement initiatives to lower costs and improve liquidity.  In late 2023, the Debtors engaged Foley, as legal counsel, and Riveron RTS, LLC, as financial advisor, to assist the Debtors in reviewing their financial situation and restructuring alternatives.  In October 2024, the Debtors retained SSG, as investment banker, to further assist in these efforts.

57.     At an operational level, the Debtors have ceased operations of their business lines except for WAVE.  The Debtors also laid off the vast majority of their employees, and currently have 17 full-time employees and 1 part-time employee.  These decisions were made to focus remaining capital and assets on WAVE – the business most ready for market.

58.     Since Fall 2023 and through the Petition Date, the Debtors, considered and pursued a range of possible options, including (i) seeking to raise financing from new financing sources and existing stakeholders; (ii) soliciting interest in strategic transactions; (iii) attempting to market and sell all or a portion of their assets and/or operations to third parties; and (iv) negotiating with stakeholders around potential in- and out-of-court restructuring options that would enable the Company to continue as an operating business. The Company went to great lengths to pursue all such options. Unfortunately, notwithstanding these comprehensive efforts, the Company was delisted from NASDAQ on July 11, 2024, and subsequently lost access to funding that it had relied upon. The Company concluded that, based on its deteriorating financial condition, the value maximizing pathway was to identify a purchaser for its valuable assets and establish a market-tested auction sale process.

59.     In parallel with its various prepetition initiatives, the Debtors, with the assistance of their advisors, engaged in extensive good faith, arm's-length negotiations over the terms of the

DIP Facility (as defined below) with Tillou, as also described in the DIP Motion.[7]

**V.    The Debtors' Intended Path for Value-Maximizing Chapter 11 Cases**

60.    As set forth in the DIP Motion, these Chapter 11 Cases are on a quick timeline to ensure that value is maximized for the Debtors' assets and that these Chapter 11 Cases do not linger.  Thus, these Chapter 11 Cases contemplate a marketing process and sale, followed by a chapter 11 plan of liquidation through which any sale proceeds and other available proceeds would be distributed in accordance with the Bankruptcy Code.

**a.    The Marketing Process, the Bid Procedures Motion, and the Stalking Horse Bid**

61.    The Debtors intend to utilize these Chapter 11 Cases to effectuate a value-maximizing sale of the Debtors' assets following the commencement of the Debtors' sale process led by SSG.[8]

62.    In October 2024, the Debtors engaged SSG to begin a formal sale process for the Debtors' remaining assets in connection with these Chapter 11 Cases, while also negotiating with Tillou to serve as potential stalking horse bidder to set a floor for the potential sale and provide financing for the sale process.  This marketing process is focused on identifying strategic and financial buyers of the Debtors' assets.  As of now, SSG has identified over 200 potential acquirers (collectively, the "Potential Acquirers").  Following the Petition Date, the Debtors will continue this marketing process during the pendency of these Chapter 11 Cases.

63.    Following extensive negotiations between the Debtors' and Tillou's advisors,

---

[7] The Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion") and related declaration is support concurrently herewith.

[8] As of the Petition Date and beginning as early as 2023, the Debtors marketed the Solectrac and Energica businesses for sale.

Tillou, as the prepetition secured lender and the proposed DIP Lender, offered to credit bid the full amount of its prepetition and postpetition secured debt and serve as the stalking horse bidder (in such capacity, the "Stalking Horse Bidder") for the purchase of substantially all of the Debtors' assets [other than those of Via Motors and Solectrac NTD: SUBJECT TO FINAL APA WHICH MAY EXCLUDE SOLECTRAC AND VIA] pursuant to an asset purchase agreement (the "Stalking Horse APA") and a sale process subject to higher and better bids under section 363 of the Bankruptcy Code (the "Stalking Horse Bid").

64.    The Debtors, with their advisors, determined that the Stalking Horse Bid constituted the highest or otherwise best offer received to date by the Debtors, and the best path for maximizing value.  The Debtors intend to file a motion seeking, among other things, (a) approval of bidding procedures for the sale of substantially all of the Debtors' assets, (b) approval of the sale to the Stalking Horse Bidder on the terms of the Stalking Horse APA, subject to higher and better bids, (c) approval of certain stalking horse protections for the Stalking Horse Bidder, including an expense reimbursement, and (d) establishment of dates related to the marketing of the Debtors' assets to other potential bidders, including scheduling an auction and the hearing to approve a sale (the "Bid Procedures Motion").

65.    The bidding procedures contemplate a postpetition marketing process led by SSG seeking higher and better offers for the Debtors' assets, either collectively or in multiple transactions for specific assets.  In my opinion, the sale process under section 363 of the Bankruptcy Code contemplated by the Debtors represents the best chance for maximizing value and for, at minimum, WAVE to continue as a going concern – preserving the jobs of those Employees who will maintain employment with the Stalking Horse Bidder should it be the successful bidder.

23

66.     The Debtors believe, and I agree based on my professional experience, that completing the sale through chapter 11 and on a relatively quick basis will provide the best chance of success for the Debtors' businesses and estate.  As discussed above, the Debtors operate in an evolving, growing and challenging market, requiring companies to react quickly to capitalize on opportunity.  To remain competitive, the Debtors are required to obtain and expend significant capital to research, manufacture, market, and deliver its products to the end users.  A long, drawn-out sale process creates a risk that the Debtors' technology becomes usurped by competitors – decreasing value.  As such, I believe that an expedited sale process will benefit all parties-in-interest.

### b.  The DIP Loan

67.     For the foregoing reasons, the Debtors concluded, in their business judgment, that filing the Chapter 11 Cases and seeking approval of the sale process will maximize the value of their estates.  However, the Debtors require immediate access to liquidity to provide sufficient working capital to operate the Debtors' business and to administer the Debtors' estates in the Chapter 11 Cases.  It is also vitally important that the Debtors' message to their customers, employees, and vendors is clear: that it is business as usual, and that the Debtors have sufficient liquidity to seamlessly and quickly transition their business on a going-concern basis – even if the only going concern is WAVE.

68.     Accordingly, and as discussed in further detail in the DIP Motion, and the pleadings submitted in support thereof, each filed contemporaneously herewith, Tillou has agreed to provide a new senior secured superpriority debtor-in-possession financing facility (the "DIP Facility").  I believe that the DIP Facility is appropriate and in the Debtors' and their estates' best interests.

69.     More specifically, Tillou has agreed to fund a "new money" term loan in the aggregate principal amount of $11,619,000 (the "New Money Term Loans"), as more fully

described in the DIP Motion.  The DIP Facility is intended to provide the Debtors with necessary financial runway and flexibility to run a thorough sale process.  The DIP Facility also contains a wind-down budget, which would be used in accordance with the terms of the DIP Facility to complete the orderly liquidation and wind down of the Debtors' businesses, which the Debtors hope would include a liquidating plan after the sale.

70.     Immediate access to the interim funding provided under the DIP Facility and the continued use of Cash Collateral (as defined in the DIP Motion) is necessary to avoid immediate and irreparable harm to the Debtors and is critical to the Debtors' efforts to maximize value for their stakeholders.  More specifically, I believe the DIP Facility is necessary to, among other things: (a) ensure payments to employees, third-party vendors, utilities, and taxing authorities, among others, who provide essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of Chapter 11 administrative expenses; and (c) present a positive image to the market that the Chapter 11 Cases are sufficiently funded, which is critical ensure confidence in the Debtors from their customers, employees, and vendors and the success of the sale process.

71.     RMS, certain of the Debtors' officers, and I together with Foley and SSG, reviewed and analyzed the Debtors' projected cash needs and prepared a Budget (as defined in the DIP Motion).  I believe the Budget accurately reflects the Debtors' funding requirements and will allow the Debtors to meet their obligations, including administrative expenses, in the Chapter 11 Cases. I believe the Budget is fair, reasonable, and appropriate under the circumstances.

72.     Importantly, through the DIP Facility, Tillou has agreed, subject to the conclusion of a marketing and sales process, to fund and support a process to confirm a chapter 11 plan of liquidation in these Chapter 11 Cases.

## PART II

73.     In furtherance of their restructuring objectives, the Debtors have sought approval of the First Day Motions and related orders (the "Proposed Orders"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

74.     I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruption and disruption to their business or loss of productivity or value and (b) constitutes a critical element in the Debtors' ability to achieve their restructuring objectives in chapter 11 and maximize value for the benefit of the Debtors' estates and all stakeholders.

## I.      Administrative and Procedural Pleadings

### A.      Joint Administration Motion

75.     The Debtors seek the joint administration of their Chapter 11 Cases, eight (8) in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.  I also believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

B.      **Creditor Matrix Motion**

76.     Pursuant to the Creditor Matrix Motion, the Debtors seek, among other things, authority to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' thirty largest unsecured creditors; and (c) seal certain personal identifiable information for the Debtors' individual creditors and interest holders.

77.     Because the Debtors have many hundreds, if not thousands, of creditors, equity holders, and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.  Moreover, the Debtors, working together with Epiq, have already prepared a single, consolidated list of the Debtors' creditors in electronic format.

78.     Because the Debtors operations are limited, the Debtors request authority to file a single, consolidated list of their thirty largest general unsecured creditors.  Compiling separate top twenty creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  Further, the Debtors believe a single, consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

79.     The Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of the Debtors' individual creditors and interest holders because such information could be used, among other things, to perpetrate identity theft or locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts.  Absent such relief, the Debtors would unnecessarily render individuals more susceptible to identity theft and could

27

jeopardize the safety of individuals who, unbeknownst to the Debtors, are survivors of domestic violence or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures.

### C.    Retention Applications

80.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, in connection with these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Foley, as co-counsel; (b) Ashby & Geddes, P.A., as co-counsel; (c) RMS, as financial advisor; (d) SSG, as investment banker; and (e) Epiq Corporate Restructuring, LLC, as claims, noticing, soliciting, and balloting agent.  I believe that the above professionals are well-qualified to perform the services contemplated by their various retention applications; the services are necessary for the success of these Chapter 11 Cases; and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

## II.    Business Operation Motions

### A.    Cash Management Motion

81.    The Debtors use an integrated Cash Management System to collect, transfer, and disburse funds generated by operations. The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of seven (7) bank accounts (collectively, the "Bank Accounts").  Only Ideanomics, the parent holding company, and WAVE, the sole remaining operating Debtor, maintain bank accounts.

82.    I believe that the cash management system is similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of

funds among multiple entities. I believe that any disruption of the Cash Management System would be materially detrimental to the Debtors' operations because their businesses requires prompt access to cash and accurate cash tracking.

83.     I understand that the cash management system is tailored to meet the Debtors' operating needs, thereby enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

84.     The Cash Management Motion sets forth tables indicating the purpose of each operating bank account held at either Ideanomics or WAVE. The Cash Management Motion also identifies the inactive bank accounts that the Debtors currently have open, but not utilized.

85.     Broadly, I understand that cash moves though the Debtors' cash management system as follows:

- **Receipts:** WAVE primarily receives cash receipts from its customers related to the products and services it sells to those customers. These funds are received into the WAVE Operating Account. Excess funds in the WAVE Operating Account are transferred to the Vectra Operating Account for payroll and benefit payments. WAVE also receives funds through the Reserve Account. This account collects receipts from Amazon that are used to pay amounts outstanding to NFS Leasing. If there are additional funds in the Reserve Account after paying NFS Leasing, those funds are transferred to the WAVE Operating Account.

- **Disbursements:** The WAVE Operating Account funds all of WAVE's operating expenses, including payment of trade creditors, operating expenses, and debt payments. Certain funds are also transferred from the WAVE Operating Account to the Vectra Operating Account to pay payroll costs for IDEX-specific employees.

86.     The Debtors incur periodic service charges and other fees in connection with the maintenance of the cash management system (the "<u>Bank Fees</u>"). The Bank Fees are paid monthly and are automatically deducted from the Bank Accounts as they are assessed by their respective

Banks.  I understand that there are not any prepetition Bank Fees outstanding, but request that the Banks be granted the authority to continue deducting Bank Fees, including unknown prepetition Bank Fees, from the Bank Accounts in the ordinary course.

87.    The Debtors also use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "Books and Records").

88.    I believe that a significant disruption to their business operations would occur if the Debtors were unable to continue using all Business Forms and Books and Records in use immediately before the Petition Date, and were instead required to order or print new Business Forms and creating new Books and Records referencing their status as chapter 11 debtors in possession immediately upon entry into these Chapter 11 Cases.  Without such relief, the Debtors would be forced to reconstruct their cash management system in its entirety, which would prove unnecessarily cumbersome during a critical time for the Debtors.  I believe the Debtors' employees would need to focus their efforts on immediately opening new bank accounts and working to establish controls for cash to flow properly, thereby diverting their attention from stabilizing their operations and their daily responsibilities, all of which would have a negative impact on the Debtors' ability to operate their business.

89.    I understand that the Debtors will use reasonable efforts when reordering checks or reprinting Business Forms or other related documents, to require the designation "Debtor in Possession" and the corresponding bankruptcy case number on such checks, Business Forms, and related documents; provided further that, with respect to checks which the Debtors or their agents

print themselves, the Debtors shall begin printing the "Debtor in Possession" legend and the bankruptcy case number on such items within 15 days of the date of entry of the final order approving the Cash Management Motion.

90.     I believe the Debtors' cash management system constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors.  The Debtors' cash management system has historically reduced the Debtors' expenses by enabling them to use funds in an optimal and efficient manner.  Thus, I believe the Debtors' continued use of their cash management system without interruption is vital to the Debtors' business operations and the success of these Chapter 11 Cases.  Accordingly, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and should be granted.

### B.    Wages Motion

91.     Through the Wages Motion, the Debtors are requesting the authority, but not the obligation, to (a) pay prepetition wages, salaries, commissions, other compensation, and reimbursable employee expenses, and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

92.     As of the Petition Date, the Debtors employ 16 full-time employees and 1 part-time employee (the "Employees").  None of the Employees are union members.  The Employees, as with any business entity, perform a variety of critical functions for the Debtors, and their knowledge, skills, and understanding of the Debtors' infrastructure, business operations, and vendor relations is essential to the success of these Chapter 11 Cases.  I believe that without the continued service and dedication of the Employees, it will be difficult, if not impossible, to operate the Debtors' businesses without interruption, and resulting prejudice to the Debtors' ability to maximize the value of their estates.  Thus, to successfully accomplish the foregoing, to minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations

31

are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time, I believe that it is necessary and in the best interest of their estates and all stakeholders to seek the relief requested in the Wages Motion.

93.    ***Employee Compensation.***  In the ordinary course, the Debtors incur obligations to their Employees for, among other things, wages, salaries, overtime, sales commissions, and other obligations described herein (collectively, the "Employee Compensation").  The Debtors pay hourly Employees on a bi-weekly basis and salaried Employees semi-monthly.  As of the Petition Date, the Debtors believe they owe approximately $61,000 in unpaid Employee Compensation earned by WAVE and Ideanomics Employees for the prior to the Petition Date (the "Unpaid Compensation").[9]  Specifically, the Unpaid Compensation reflects the compensation periods from November 16, 2024 through the Petition Date (the "Unpaid Compensation Payroll Period").

94.    However, the Debtors may find that certain Employees had Unpaid Compensation as of the Petition Date when the Debtors reconcile their books and records.  As described above, loss of the Unpaid Compensation that the Employees are owed could cause such Employees to experience financial hardship.  In light of the substantial benefit the Employees will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.

95.    ***Withholding Obligations.***  In addition, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

96.    In addition to the Deductions, certain federal and state laws require that the Debtors

---

[9]    The Unpaid Compensation does not include amounts for (a) deferred executive compensation owed to certain of the Debtors' executives or (b) Unpaid Compensation for certain of the Debtors' former Employees that was outstanding as of the Petition Date.  The Debtors are not seeking the payment of such compensation in this Motion.

withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

97.    As of the Petition Date, the Debtors estimate that they owe approximately $42,000 in unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations"). This includes (a) $16,000 in Withholding Obligations during the Unpaid Compensation Payroll Period and (b) approximately $26,000 in Payroll Taxes owed for Wireless Advanced Vehicle Electrification, LLC's payroll for the period ending September 2024 (the "WAVE Payroll Taxes") – both of which are due within the first 21 days of these Chapter 11 Cases.[10]  As a result of timing issues, the WAVE Payroll Taxes have not yet been paid and the Debtors are working with Paylocity to finalize this payment.

98.    Through the Wages Motion, I understand that the Debtors seek authority, but not direction, on an interim basis, to pay the Withholding Obligations in a manner consistent with historical practice, subject to a collective cap of $42,000 and to continue to honor the Withholding Obligations in the ordinary course during the administration of these Chapter 11 Cases. Further, on a final basis, I understand that the Debtors seek authority, but not direction, to continue to honor

---

[10]    The Debtors also have unpaid Payroll Taxes related to Solectrac, Inc., which the Debtors are not requesting authority to pay.

the Withholding Obligations in the ordinary course during the administration of these Chapter 11 Cases.

99.     ***Payroll Processing***.  Certain Withholding Obligations for the Debtors' Employees are processed by Paylocity.  The Debtors pay $17.48 per Employee, per pay period for such services (the "Payroll Processing Fees").  By this Wages Motion, the Debtors seek authority, but not direction, to pay the Payroll Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing in the ordinary course during the administration of these Chapter 11 Cases

100.     ***Reimbursable Expenses.***     In the ordinary course of business, the Debtors reimbursed Employees or paid credit card invoices of certain Employees for approved expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").  The Reimbursable Expenses are largely on account of costs incurred related to employee travel for reasonable business-related purposes.  The monthly amount varies depending on the amount of travel incurred by Employees.  Employees who pay up front for Reimbursable Expenses apply for reimbursement by submitting an expense report to the Debtors.  Once they have determined that the charges are for legitimate reimbursable business expenses, the Debtors reimburse Employees for these expenses.  It is my understanding that on average, the Debtors pay Reimbursable Expenses of approximately $20,000 per month in the aggregate.  I believe that the Debtors' inability to reimburse such expenses could impose hardship on such individuals, where such individuals otherwise incurred obligations for the Debtors' benefit.

101.     ***Employee Benefits.***  The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, vision and dental plans, life insurance, accidental death and dismemberment insurance, disability

34

benefits, workers' compensation, retirement plans, incentive programs, paid time off, severance, and other employee benefit plans (collectively, the "Employee Benefits Programs").

102.    The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including medical, vision, and dental plans (collectively, the "Health Plans"). The Debtors pay for premiums on the Health Benefit Plans through employee contributions. Specifically, the Debtors provide the following:

- Medical Plan:  The Debtors' offer Employees and their families medical plans (collectively, the "Medical Plans") offered through Cigna.  The Medical Plan offered through Cigna include options such as Open Access Plus (OAP) Premier Plan, OAP Standard Plan, OAP Value Plan, and High Deductible Health Plans in either the Premier or Standard category.[11]

- Dental Plan: Additionally, the Debtors offer their Employees the option of participating in a dental plan (the "Dental Plan"), which is administered by Cigna. The Dental Plan is a basic preferred provider organization ("PPO") option that covers both in- and out-of-office network care.

- Vision Plan:  In addition to the eye exam offered under the Medical Plans, the Debtors also offer their Employees the option of participating in a vision plan (the "Vision Plan") administered by Cigna.  The Vision Plan is a basic PPO option that covers both in- and out-of-office network care.

103.    Effective January 1, 2025, the Debtors are transitioning to new insurance provided by United HealthCare Insurance Company ("UHC").  The Debtors were not able to maintain the current insurance coverage under Cigna due to the Debtors' current employee size.  As such, the Debtors negotiated insurance coverage through UHC.  The insurance coverage provided by UHC will be substantially the same as that previously provided by Cigna.  The Debtors pay approximately $39,000 per month in premiums covering the Medical Plan, Dental Plan, and Vision Plan, which is billed on a monthly basis.  As of the Petition Date, the Debtors estimate that they

---

[11] The cost of these healthcare plans is split between the Employee and the Debtors as follows (Employee/Employer Premium Split): (a) OAP Premier – 72/26 split; (b) OAP Standard – 81/19 split; (c) OAP Value – 85/15 split; HDHP HSA Premier – 73/27 split; HDHP HSA Standard – 85/15 split.

owe approximately $4,000 for prepetition amounts on account of the Health Benefit Plan premiums, which will become due within the first 21 days of these Chapter 11 Cases.

104.    The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

105.    ***Flexible Spending Accounts***.  For those Employees who participate in the medical plans, the Debtors provide access to a flexible spending account (the "FSA"), administered by Paylocity.  The FSA allows such Employees to contribute pre-tax dollars for eligible healthcare and/or dependent care expenses, depending on the participant's medical plan.  The Debtors do not make any contributions to the FSAs but will remit payments on the Employee's behalf for authorized FSA expenses.

106.    Because the Debtors do not contribute to Employees' FSAs, the Debtors believe the FSA amounts are generally held in trust by the Debtors and are not property of their estates. However, over the course of each year, Employees may utilize the FSA amounts held by the Debtors to pay for a wide variety of health and dependent care not otherwise covered by the Health Benefit Plans.  Employees utilized their FSA amounts through either a debit card at the point of purchase or the submission for reimbursement from Paylocity after providing proof of purchase. Those amounts are paid by Paylocity from the individual employee's FSA account.  As of the Petition Date, the Debtors estimate that there are approximately $1,000 in accrued amounts to be remitted on account of the FSA (the "Unremitted FSA Amounts"), of which all will be required to be remitted within 2l days of the Petition Date.

107.    Further, the Debtors pay a monthly administration fee of $5.75 per month, per

participant to Paylocity on account of the FSA program (the "FSA Fees"). There are currently approximately 120 participants in the FSA, for a monthly approximate amount of $690 in FSA Fees. As of the Petition Date, I believe that the Debtors are current on account of accrued but unpaid FSA Fees.

108.    ***Health Savings Accounts.*** For certain Employees who participate in the HDHP Plan, a high deductible health plan, the Debtors offer access to a health savings account (the "HSA") through Paylocity. Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the IRS. The Debtors do not make any contributions to the HSAs.

109.    Employees can contribute up to $3,850/individual or $7,750/family a year (the "Unremitted HSA Amounts"). Because the Debtors do not contribute to Employees' HSAs, the Debtors believe the HSA amounts are generally held in trust by the Debtors and are not property of their estates. However, over the course of each year, Employees may utilize the HSA amounts held by the Debtors to pay for a wide variety of health and dependent care medical expenses that would be otherwise out-of-pocket.

110.    As of the Petition Date, the Debtors believe they owe approximately $1,000 in Unremitted HSA Amounts (collectively, the "HSA Amounts"), all of which becomes due within 21 days of the Petition Date.

111.    ***401(k) Plan.*** Debtors automatically enroll eligible Employees in the Ideanomics 401(k) Plan – a 401(k) plan (the "401(k) Plan") – offered through Fidelity Investments ("Fidelity"). The Debtors retain Fidelity to act as a 401(k) administrator and record keeper. All administrative fees for the 401(k) Plan are paid by 401(k) Plan participants. Such fees are

incorporated in the 401(k) Plan fee structure.  The Debtors do not pay any administrative fees to Fidelity for administering the 401(k) Plan.

112.    Under the 401(k) Plan, an eligible Employee may contribute a portion of his or her eligible earnings each year through pre-tax contributions to the 401(k) Plan, subject to limits imposed by federal law. The Debtors have the discretion to match an Employee's 401(k) Plan contributions, and have matched 25% of the first 8% of Employee contributions (not to exceed 2.0% of eligible earnings) (the "401(k) Contributions").  Each pay period, the Debtors deduct the Employees' 401(k) Plan contributions from the Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to Fidelity Investments.  As of the Petition Date, the Debtors believe they owe approximately $6,000 in 401(k) Deductions, all of which becomes due within 21 days of the Petition Date.[12]

113.    Many Employees' retirement savings solely consist of the 401(k) Plan.  Thus, I believe that continuing the 401(k) Plan is essential to maintaining Employee morale and protecting Employee expectations.  In addition, I believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

114.    ***Workers Compensation.***    For the Debtors' WAVE Employees, the Debtors maintain workers' compensation insurance at the statutorily required level for each U.S. state in which the Debtors have Employees (collectively, the "Workers' Compensation Program").  The Debtors maintain coverage for the Workers' Compensation Program through Sentry Insurance. The Debtors pay approximately $31,000 in premiums, expenses, and fees annually to maintain the Workers' Compensation Program

---

[12]    In addition to the 401(k) Deductions sought to be paid pursuant to this Motion, the Debtors owe certain 401(k) Contributions and 401(k) Deductions to certain 401(k) Plan participants.  The Debtors are not seeking authority to pay those amounts in this Motion and reserve the right to pay such amounts during the pendency of these Chapter 11 Cases.

115.    I understand that the Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  I further understand that the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the restructuring process.

116.    ***Unlimited PTO.***  In the ordinary course of business, the Debtors provide unlimited paid time off and vacation to their Employees (the "Unlimited PTO").  The Debtors do not maintain an accrual for Unlimited PTO and Employees do not accrue a balance.  As such, Employees who leave the Debtors' employment do not receive any compensation related to the Unlimited PTO.

117.    I believe that the continuation of Unlimited PTO is essential to maintaining Employee morale during these chapter 11 cases.  Further, the policies are broad-based programs upon which all Employees have come to depend.  The Debtors anticipate that their Employees will utilize any Unlimited PTO in the ordinary course of business.

118.    I believe the Employees, as with any business entity, perform a variety of critical functions for the Debtors, and their knowledge, skills, and understanding of the Debtors' infrastructure, business operations, and vendor relations is essential to the success of these Chapter 11 Cases.  Without the continued service and dedication of the Employees, I believe it will be difficult, if not impossible, to operate the Debtors' businesses without an unexpected or inopportune interruption, and to prosecute these Chapter 11 Cases in a manner that will maximize the value of the Debtors' estates.

4875-9580-7218.11

119.     Thus, to successfully accomplish the foregoing, to minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time, I believe that it is necessary and in the best interest of the Debtors' estates and all stakeholders that the Court grant the Wages Motion.

### C.    Tax Motion

120.     In the ordinary course of business, the Debtors incur or collect and remit a variety of taxes, including, without limitation, (a) sales taxes, (b) use taxes, (c) property taxes, (d) franchise taxes, and (e) certain other miscellaneous taxes (collectively, the "Taxes"), to various federal, state, local, foreign taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies thereof.[13]  The Debtors also incur various fees for business licenses and permits and various other fees and assessments (collectively, the "Fees," and together with the Taxes, the "Taxes and Fees") in connection with the operation of their business.  The Debtors remit the Taxes and Fees to the Authorities in accordance with applicable law.

121.     The Debtors estimate that, as of the Petition Date, the total amount of prepetition Taxes and Fees currently owed to the Authorities does not exceed approximately $100,000 in the aggregate, related to prepetition Taxes and Fees that have accrued but not assessed against the Debtors.

122.     I understand that many Authorities impose personal liability on directors and/or

---

[13] In addition to the Taxes discussed herein, the Debtors are required by law to withhold from their employees' pay amounts related to, among other things, federal, state, and local income taxes and social security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Employee Payroll Taxes, the "Payroll Taxes").  Any relief requested with respect to the Payroll Taxes is requested in the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, filed contemporaneously herewith.

responsible officers of entities responsible for collecting or paying certain taxes or fees to the extent that such taxes or fees are not remitted.  Although I believe that all taxes and fees for which the Debtors' directors and/or responsible officers may be personally liable are described in the Tax Motion, it is possible that other prepetition obligations similar in nature (and in threat of personal liability) may be discovered by the Debtors subsequent to the filing of the Tax Motion.  To the extent that such prepetition obligations exist, the Debtors will consider such obligations "Taxes and Fees," as that term is defined and used in the Tax Motion, and request the authority to pay such Taxes and Fees as they may arise in the ordinary course of their business.

123.    I believe that the timely payment of the Taxes and Fees is critical to the Debtors' ability to preserve and maximize value for the benefit of all stakeholders.  Failure to pay these obligations could damage the Debtors' relationships with the Authorities and cause the Authorities to take precipitous action, including, among other things, conducting audits, asserting liens, attempting to revoke licenses and permits, seeking to impose liability against the Debtors and their officers and directors and, if applicable, seeking to lift the automatic stay, all of which could disrupt the Debtors' restructuring efforts and impose significant costs on the Debtors' estates.  I believe that payment of the Taxes and Fees will avert these potentially detrimental and costly governmental actions and potential interest charges and penalties that would be incurred if the Taxes and Fees are not timely paid.  Thus, I believe that granting the relief requested in the Tax Motion will maximize the value of the Debtors' estates and benefit their creditors.

124.    Moreover, I believe that any failure to pay the Taxes and Fees could impair the Debtors' ability to continue their business operations, and any unexpected or damaging interruption of the Debtors' operations during the course of these Chapter 11 Cases could diminish estate value and frustrate the Debtors' restructuring efforts.  Therefore, I believe that the Debtors

41

can only meet their fiduciary duties as debtors in possession by paying the Taxes and Fees in the ordinary course of business.

125.    Furthermore, the Authorities might assert that certain of the Taxes and Fees are so-called "trust fund" taxes that the Debtors are required to collect from third parties and hold in trust for the benefit of the Authorities.  To the extent that the Debtors collect the Taxes and Fees on behalf of the Authorities, those Taxes and Fees may not constitute property of the Debtors' bankruptcy estates.  As payment of trust fund taxes would not prejudice the rights of any of the Debtors' other creditors or other parties in interest, I believe that the Court should authorize the Debtors to pay the Taxes and Fees that constitute trust fund taxes.

126.    In the event that the Debtors fail to pay "trust fund" taxes, my understanding is that the Debtors' directors and officers could be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases to the extent of non-payment.  Such potential lawsuits would be extremely disruptive for the Debtors, for the named officers and directors whose attention to the chapter 11 process is required, and for the Court, as the Court might be asked to entertain various requests for injunctions with respect to the potential state court actions against such individuals.  Even the possibility of any such lawsuit or criminal prosecution would distract the Debtors and their directors and officers, and impede their respective efforts in these Chapter 11 Cases.  Furthermore, the Authorities may audit the Debtors if the Taxes and Fees are not timely paid.  I believe that payment of the Taxes and Fees will, therefore, prevent a loss of focus on the part of the Debtors' directors, officers, and other employees resulting from the risk of personal liability and/or audits.

127.    For the foregoing reasons, I believe that granting the relief requested in the Tax Motion is appropriate and in the best interests of the Debtors' estates and creditors.

### D.    Insurance Motion

128.    ***The Debtors' Insurance Policies***.    In connection with the operation of their business, the Debtors maintain workers' compensation,[14] directors' and officers' liability, general liability, property, automobile, umbrella liability, cyber, and workers compensation (collectively, the "Insurers") under the insurance contracts (collectively, the "Insurance Policies") listed on Exhibit B attached to the Insurance Motion.  I believe that all of the Insurance Policies are essential to the protection and continued operation of the Debtors' business – specifically the operations at Ideanomics, the public holding company, and WAVE, the Debtors' only remaining operating entity.

129.    Under the Insurance Policies, the Debtors are required to pay premiums based on fixed rates set by the Insurers.  The annual premiums for the Insurance Policies amount to approximately $587,000 (the "Insurance Obligations").  When obtaining the Insurance Policies, Debtors paid the premiums in full and are not financing the payment of any premiums or broker fees.  As such, the Debtors are current on all Insurance Policies as of the Petition Date.

130.    I am informed and believe that the Debtors are current on all Insurance Policies as of the Petition Date.

131.    ***Broker Fees***.    In connection with the Insurance Policies, the Debtors have historically utilized obtain brokerage services to market and source insurance policies (collectively, the "Brokers").  These Brokers assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations by, among other things, assisting the Debtors with

---

[14] A further description of the Debtors' workers' compensation program, including authority to continue such program, can be found in the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefit Programs and (II) Granting Related Relief,* filed contemporaneously herewith.

the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.  I understand that the fees paid to Brokers (the "Broker Fees") depends on the scope of the Insurance Policies needed for the Debtors business and have varied significantly in the past several years due to the Debtors winding down certain business operations.

132.    Maintaining the Debtors' insurance coverage under the Insurance Policies is a crucial ordinary-course-of-business transaction.  I believe that authority to pay any prepetition amounts that may be due and owing related to the Insurance Policies—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits, or proceeds provided under the Insurance Policies—is necessary, as the insurance coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and state and federal laws that govern the Debtors and their business.  Further, I understand that, under the *Operating Guidelines for Chapter 11 Cases*, dated January 1, 2018, issued by the United States Trustee for the District of Delaware pursuant to 28 U.S.C. § 586(a)(3), the Debtors are obligated to maintain certain types of insurance coverage during these Chapter 11 Cases, which coverage is provided by certain of the Insurance Policies.

133.    In addition, I understand that the Debtors will likely need to renew or replace certain of their Insurance Policies during the pendency of these Chapter 11 Cases.  I believe that the nonpayment of any premiums, deductibles, or related fees under any of the Insurance Policies could result in one or more of the Insurers increasing future insurance premiums, declining to renew the Insurance Policies, or refusing to enter into new insurance agreements with the Debtors.

44

If the Insurance Policies lapse without renewal, the Debtors may be exposed to substantial liability for first-party property claims and third-party liability claims, to the detriment of all parties in interest in these Chapter 11 Cases.

134.    Similarly, I believe that the services provided by the Brokers are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates, and the Brokers have significant institutional knowledge regarding the Debtors' insurance needs.  If the Debtors were forced to replace the Brokers, the Debtors would necessarily be required to spend time, energy, and resources engaging new insurance brokers and apprising them of the Debtors' insurance needs.

135.    As described above, I believe that maintaining the Insurance Policies is necessary to preserve the value of the Debtors' assets, thereby ensuring the protection of the Debtors' property and maximizing value for all parties in interest in these Chapter 11 Cases.  I believe that failing to maintain the Insurance Policies would expose the Debtors and their estates to significant risk of loss and adversely affect the ability of the Debtors to maximize the value of their estates.

E.    **Utilities Motion**

136.    In connection with the operation of their businesses and the management of their facilities, various utility companies (each, a "Utility Company," and collectively, the "Utility Companies") provide natural gas, electricity, waste disposal, and IT and other similar services (collectively, the "Utility Services") to the Debtors.  Attached to the Utilities Motion as Exhibit A[15] is a list (the "Utility Company List") of Utility Companies providing services to the Debtors

---

[15] The Debtors have endeavored to identify all of the Utility Companies and list them on Exhibit A attached to the Utilities Motion.  However, inadvertent omissions may have occurred, and the omission from Exhibit A attached to the Utilities Motion of any entity providing Utility Services to the Debtors shall not be construed as an admission, waiver, acknowledgement, or consent that section 366 of the Bankruptcy Code does not apply to such entity.  In addition, the Debtors reserve the right to assert that any of the entities now or hereafter included on the Utility Company List are not "utilities" within the meaning of section 366 of the Bankruptcy Code.

as of the Petition Date.  The Utility Companies service the Debtor Wireless Advanced Vehicle Electrification ("WAVE") in Salt Lake City, Utah and Ideanomics Inc.  WAVE is the Debtors only remaining operating entity that requires Utility Services for daily operations.  I believe that the Debtors could not operate their businesses or serve their customers in the absence of continuous Utility Services.  Thus, I believe that any interruption in such services would disrupt the Debtors' day-to-day operations and undermine their ability to remain profitable on a go-forward basis.

137.    Historically, the Debtors have paid on average approximately $48,000 per month on account of the Utility Services.  I believe that the termination or cessation (even if only temporary) of any of the Utility Services will result in disruption to the Debtors' businesses, as well as a potential loss of revenue and profits.  Any interruption of the Utility Services would diminish or impair the Debtors' efforts to preserve and maximize the value of their estates and to successfully prosecute these Chapter 11 Cases.  It is therefore critical, in my view, that the Utility Services continue uninterrupted.

138.    The Debtors intend to pay undisputed post-petition charges for the Utility Services when due in the ordinary course of business.  Nevertheless, to provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit a sum of $23,725 (the "Utility Deposit"), which, as I understand it, represents approximately two (2) weeks of the Debtors' estimated aggregate cost for the Utility Services to be incurred after the Petition Date, into a segregated account (the "Utility Deposit Account") held at Citizens Bank, NA within twenty (20) days of the Petition Date, to be maintained during the pendency of these Chapter 11 Cases in the manner provided for in the Utilities Motion and the proposed orders granting the relief requested therein.

139.    I believe that the Utility Deposit constitutes adequate assurance of payment to the

Utility Companies.  However, the Debtors propose to establish additional adequate assurance of future payment to the Utility Companies (the "Assurance Procedures"), pursuant to which a Utility Company may request additional adequate assurance of payment (an "Additional Assurance Request").  If any Utility Company believes additional assurance is required, it may make an Additional Assurance Request pursuant to the Assurance Procedures.  The proposed Assurance Procedures are set forth with particularity in the Utilities Motion.

140.    In addition to establishing the Assurance Procedures, the Debtors are seeking a final hearing (the "Final Hearing") on the Utilities Motion to be held within twenty-five (25) days of the Petition Date to ensure that, if a Utility Company argues it can unilaterally refuse service to the Debtors on the thirty-first (31st) day after the Petition Date, the Debtors will have the opportunity, to the extent necessary, to request that the Court make such modifications to the Assurance Procedures in time to avoid any potential termination of the Utility Services.

141.    It is possible that, despite the Debtors' efforts, certain Utility Companies have not yet been identified by the Debtors or included on the Utility Company List (each, an "Additional Utility Company," and collectively, the "Additional Utility Companies").  Thus, promptly upon the discovery of an Additional Utility Company, the Debtors will increase the Utility Deposit by an amount equal to approximately two (2) weeks of the Debtors' estimated aggregate utility expense for each Additional Utility Company identified after the Petition Date.  In addition, the Debtors are requesting that the Court mandate that any Additional Utility Companies identified after the Petition Date be subject to the terms of the proposed orders granting the relief requested in the Utilities Motion (including the Assurance Procedures) once entered by the Court.

142.    I believe that the Debtors' proposed method of furnishing adequate assurance of payment for postpetition Utility Services is not prejudicial to the rights of any Utility Company,

and is in the best interests of the Debtors, their estates, and creditors.  As uninterrupted Utility

Services are vital to the Debtors' businesses and, consequently, to the success of these Chapter 11

Cases, I believe that the relief requested in the Utilities Motion is necessary and in the best interests

of the Debtors, their estates, and creditors.  Such relief, in my view, will ensure that the Debtors'

business operations will not experience any unexpected and damaging interruptions during the

pendency of these Chapter 11 Cases, and will provide the Utility Companies and the Debtors with

an orderly and fair procedure for determining adequate assurance of payment.

143.    For the foregoing reasons, I believe that granting the relief requested in the Utilities

Motion is appropriate and in the best interests of the Debtors' estates and creditors.

**F.    NOL Motion**

144.    The Debtors have generated, and are currently generating, a significant amount of

U.S. federal and state tax attributes, including, but not limited to, significant net operating loss

carryforwards ("NOLs" and, collectively with any capital losses, unrealized built-in losses, and

certain other tax and business credits and other tax attributes, the "Tax Attributes").  As of the

Petition Date, the Debtors have approximately $176 million of NOLs, as well as other valuable

Tax Attributes, such as certain tax credits.

145.    I believe the Tax Attributes are a valuable asset because the Debtors generally can

carry forward their Tax Attributes to reduce or eliminate their income tax liability.  In particular,

the Tax Attributes may be available to the Debtors to offset taxable income generated by ordinary

course activity and other transactions completed during the course of these Chapter 11 Cases.

Additionally, it is my understanding that the Debtors can carry forward the NOLs and credits to

reduce their future tax liability.

146.    I believe that implementation of the procedures established in the NOL Motion is

necessary and appropriate to enforce the automatic stay, and critically, to preserve the value of the

48

Tax Attributes for the benefit of the Debtors' estates. I understand that Section 382 of the Internal Revenue Code ("Section 382") limits the amount of taxable income that can be offset by a corporation's Tax Attributes in taxable years (or portions thereof) following an ownership change. If an ownership change were to occur during the course of these Chapter 11 Cases, Section 382 would limit the amount of taxable income that the Debtors could offset by their pre-change losses in taxable years (or portions thereof) to an annual amount equal to the value of the corporation prior to the ownership change multiplied by the long-term tax-exempt rate. Thus, I understand that the formulaic limitation under Section 382 can severely restrict the ability to use pre-change losses because the value of the equity of a distressed company may be quite low.

147.    I understand that the problem facing the Debtors, and the reason for the NOL Motion, is that if certain equity holders transfer Ideanomics common stock, or certain worthless stock deductions are made with respect thereto, such transfers or deductions may trigger an ownership change that would not fall within the ambit of special relief provisions applicable to an ownership change resulting from a confirmed chapter 11 plan, because such an ownership change would not occur pursuant to such a plan. I believe that an ownership change occurring during the pendency of these Chapter 11 Cases is of particular concern because it could likely result in a Section 382 Limitation. Subsequent to such an ownership change, the Debtors' ability to utilize their Tax Attributes both during and after these Chapter 11 Cases could be limited.

148.    Through the NOL Motion, the Debtors seek the ability to monitor and object to changes in ownership of, or certain claims of worthlessness with respect to, Ideanomics common stock so that they may prevent an ownership change during the pendency of these Chapter 11 Cases, and so preserve (a) the ability to utilize their Tax Attributes during the pendency of these Chapter 11 Cases to offset taxable income and any potential prepetition tax claims that may be

49

asserted; and (b) the flexibility in crafting a possible plan of reorganization, depending on facts and circumstances as they develop.  I believe that the NOL Motion maximizes the Debtors' ability to reduce federal income taxes by offsetting their income earned during these Chapter 11 Cases and thereafter with current Tax Attributes.

149.    I also believe that the procedures seeking to limit transfers of or declarations of worthlessness with respect to Ideanomics' common stock are narrowly tailored and designed to only monitor those types of trading in equity securities and the taking of worthless stock deductions that pose a serious risk under the Section 382 ownership-change test, so as to preserve the Debtors' ability to seek substantive relief if it appears that a proposed trade of equity securities or worthless stock deduction will jeopardize the use of their Tax Attribute.  I believe that proposed procedures in the NOL Motion would permit most trading in equity securities to continue subject only to Bankruptcy Rules 3001(e) and 3002 and applicable securities, corporate, and other laws.  The restrictions on claiming deductions for worthless stock would apply only to 50% shareholders, and even then, would not prohibit such deductions entirely, but would merely require them to be postponed to taxable years ending after the Debtors emerge from chapter 11 protection.  Because of the Tax Attributes' importance to the Debtors' restructuring, and thus all parties in interest, I believe that implementation of the requested relief outweighs subjecting a limited number of transfers and/or worthless stock deductions to the procedures described in the NOL Motion.

150.    I understand that once a Tax Attribute is limited under Section 382, its use may be limited forever.  Thus, I believe the relief sought in the NOL Motion is necessary to avoid an irrevocable loss or reduction in the availability of the Tax Attributes and the irreparable harm which could be caused by unrestricted trading in Ideanomics' equity securities and the Debtors' resulting inability to offset taxable income freely with their Tax Attributes.

G.      **Critical Vendors Motion**

151.    Pursuant to the Critical Vendor Motion, the Debtors seek: (a) authority to pay, in their discretion, certain prepetition amounts owed (the "Critical Vendor Payments") to certain vendors, suppliers, service providers, and similar entities that provide goods and services critical to the ongoing operation of the Debtors' business (the "Critical Vendors"), including certain Critical Vendors which provided goods received by the Debtors in the ordinary course of the Debtors' business within twenty days of the Petition Date; and (b) related relief.

152.    The Debtors see no viable path forward as a going-concern for WAVE unless they retain their Critical Vendors' support during the transition into chapter 11.  After careful analysis undertaken by the Debtors' management team and their advisors, the Debtors determined that, failure to make the Critical Vendors Payments on the terms proposed in the Critical Vendor Motion will cause immediate and irreparable harm to the Company, which will directly undermine the Debtors' sale efforts and compromise the Debtors' ability to obtain maximum value for all interested parties.  In large part, the Debtors contemplate funding Critical Vendor Payments through cash received through operations and advances made under the proposed debtor in possession financing facility.

153.    If the Critical Vendors, none of whom are under contract, refuse to ship product, WAVE will be unable to manufacture product that is scheduled to be delivered and sold to customers.  The ongoing WAVE business is highly dependent on the Critical Vendors' products. The inability to source from the Critical Vendors would have a material adverse effect on WAVE's business and its ability to successfully consummate a value-maximizing transaction.  If WAVE is unable to deliver its wireless charging products to customers, WAVE will immediately lose market share – harming WAVE's reputation as the industry leader for EV wireless charging products.

154.    I understand that the Critical Vendors would immediately stop existing shipments

and services, refuse to provide future shipments and services, and/or would immediately tighten credit terms if the Debtors do not have authority to satisfy the Critical Vendors' prepetition claims.

155.    The Debtors and their advisors have carefully compiled a list of potential Critical Vendors, after which the Debtors' management team, together with the Debtors' advisors, determined the appropriate number of Critical Vendors, the scope of the Critical Vendor Payments, and the timing needs related thereto.  The Debtors are focused on ensuring a seamless operational transition into chapter 11 and marketing WAVE with an optimal platform.  Absent the relief sought in the Critical Vendor Motion, the Debtors believe that they would incur significant business disruption and attendant costs in securing alternative suppliers, even assuming that they could identify and implement such alternatives within the compressed timeframes necessary to ensure uninterrupted WAVE operations.

156.    In vetting the Critical Vendors, the Debtors reviewed its historical vendor usage and initially compiled a list of over 150 vendors that should be considered for critical vendor treatment.  The Debtors and their advisors considered, among other things, whether:

- the vendor is a sole-source or limited-source supplier or service provider;

- the vendor has the ability to exercise remedies against the Debtors;

- the vendor provides goods or services so vital to, or so commingled with, the Debtors' business that even a brief disruption would harm the Debtors' operations;

- the Debtors could cost-effectively obtain comparable products or services from alternative sources within a reasonable timeframe;

- the vendor could refuse providing essential supplies or services absent payment of prepetition balances;

- a contract exists between the Debtors and the vendor; and

- the vendor holds a valid claim under section 503(b)(9) of the Bankruptcy Code.

157.    As a result of this analysis, the Debtors identified the universe and type of vendors

whose support remains essential to the Debtors' ability to preserve and enhance value through the seamless transition of their operations into chapter 11.

158.   The Debtors seek authority, but not direction, to condition the Critical Vendor Payments on the Critical Vendor: (a) accepting payment in satisfaction of its prepetition claims; (b) applying Critical Vendor Payments, in the first instance, against its 503(b)(9) Claims, if any; and (c) continuing to provide supplies or services to the Debtors on (i) the most favorable trade terms, practices, and programs (including credit limits, rebates, discounts, pricing, timing of payments, availability, and other applicable terms and programs) in place during the 12 months before the Petition Date, and (ii) such other terms as the Debtors and the Critical Vendor may mutually agree ((i) and (ii) together, "Customary Trade Terms").

159.   To ensure that each Critical Vendor continues providing supplies or services on Customary Trade Terms for the duration of these Chapter 11 Cases, the Debtors seek authority, but not direction, to execute binding trade agreements (the "Trade Agreements") with the Critical Vendors.  A summary of the terms of a proposed Trade Agreement is set forth in the Critical Vendor Motion.  Irrespective of whether a Critical Vendor executes a Trade Agreement, the Debtors reserve the right to seek repayment of Critical Vendor Payments if any Critical Vendor refuses to provide goods or services on Customary Trade Terms or refuses to waive or release claims, liens, and other rights and remedies in connection with claims satisfied by the Critical Vendor Payments.  However, without authority to make the Critical Vendor Payments, the Debtors will have little ability to negotiate the Customary Trade Terms.

160.   I understand that the payment of an amount not to exceed $735,700, on an interim and final basis, is required to avoid immediate and irreparable harm to WAVE.  The Debtors carefully analyzed the list of Critical Vendors and the proposed Critical Vendors Payments to

determine which payments they had to make.

161.    In short, the Critical Vendor Payments are necessary to ensure continued operation of the Debtors' business and, in turn, preserve and enhance the value of the Debtors' estates.  The Debtors have carefully reviewed their accounts payable and undertaken a lengthy and thoughtful process to identify vendors, suppliers, and service providers essential to ongoing WAVE operations. Without the Critical Vendors' inventory and other goods and services, WAVE may be forced to halt most, if not all, ongoing business immediately while they search for substitute vendors, if any even exist, and the Debtors could be forced to forgo existing favorable trade terms. In this context, Tillou, in its capacity as lenders under DIP Loan (and Stalking Horse Bidder) has agreed to fund the Critical Vendor Payments.

162.    Accordingly, for the reasons set forth herein, I believe that the relief requested in the Critical Vendor Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate the Company without interruption, and to preserve value for the Debtors' estates.   The Debtors' management team, together with their financial and legal advisors, have extensively discussed and vetted the Critical Vendor program, and it reflects narrowly-tailored relief that I believe is critical to the success of these Chapter 11 Cases.

## CONCLUSION

163.    The Debtors' ultimate goal in these Chapter 11 Cases is to pursue a marketing and sale process and consummate a value-maximizing transaction.  In the immediate term, however, to minimize any loss of value of their business during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful restructuring of the Debtors' business

will be substantially enhanced.

164.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.


[Remainder of Page Intentionally Left Blank]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of December 2024.

**IDEANOMICS, INC.** *et al.*
Debtors and Debtors in Possession

*/s/ Alpesh A. Amin*
Alpesh A. Amin
Chief Restructuring Officer

## **Exhibit A**

**Organizational Chart**

# Domestic Operational Subsidiaries



# International & Inactive Subsidiaries

