UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                    .  Chapter 11
                                    .
IN RE:                              .
                                    .  Case No. 24-12728(CTG)
IDEANOMICS, INC., et al,            .
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
               Debtors.  .
. . . . . . . . . . . . . . . .  Thursday, December 5, 2024


          TRANSCRIPT OF HEARING RE: FIRST-DAY MOTIONS
            BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                 UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the U.S. Trustee:        Joseph Cudia, Esq.
                             OFFICE OF THE U.S. TRUSTEE
                             844 King Street, Suite 2207
                             Wilmington, Delaware 19801

APPEARANCES VIA ZOOM:   (On the Record)

For the Debtors:             Ricardo Palacio, Esq.
                             ASHBY & GEDDES, PA
                             500 Delaware Ave, Suite 8
                             Wilmington, Delaware 19801

                             John A. Simon, Esq.
                             FOLEY & LARDNER, LLP
                             500 Woodward Avenue, Suite 2700
                             Detroit, Michigan 48226

                             Timothy C. Mohan, Esq.
                             FOLEY & LARDNER, LLP
                             1400 16th Street, Suite 200
                             Denver, Colorado 80202
(Appearances Continued)

Audio Operator:              Electronically Recorded
                             by Alyce Doody, ECRO

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:  (On the Record - Continued)

For Tilou Management and
Consulting, Inc.:                Frank F. Velocci, Esq.
                                 FAEGRE, DRINKER, BIDDLE
                                  & REATH, LLP
                                 600 Campus Drive
                                 Florham Park, New Jersey 07932

Also Appearing:                  Ryan Jenkins
                                 IDEANOMICS, INC.

                                 Alpesh Amin
                                 Rick Malagodi
                                 Antonio Mittiga
                                 RIVERON CONSULTING, LLC

                                 J. Scott Victor
                                 Theresa Kohl
                                 Neil Gupta
                                 SSG CAPITAL ADVISORS

INDEX

|  | PAGE |
|---|---|
| JOINT ADMINISTRATION | 15 |
| CREDITOR MATRIX/PERSONAL IDENTIFICATION INFORMATION | 16 |
| RETENTION OF EPIQ AS CLAIMS AND NOTICING AGENT | 18 |
| EMPLOYEE WAGES AND BENEFITS | 19 |
| TAXES AND FEES | 20 |
| CRITICAL VENDORS | 21 |
| NOTICE AND HEARING PROCEDURES/NOLS | 22 |
| UTILITIES | 23 |
| INSURANCE | 23 |
| CASH MANAGEMENT | 24 |
| DIP FINANCING AND CASH COLLATERAL | 23 |
| SCHEDULING | 34 |

| EXHIBIT | EVID. |
|---|---|
| Amin Declaration at D.I. 13 Exhibit B | 13 |
| Amin Declaration at D.I. 14 | 13 |

1          (Proceedings commence at 12:45 p.m.)

2          THE COURT:  Good afternoon, all.  This is Judge

3    Goldblatt.  We are on the record in In Re Ideanomics, which

4    is Case Number 24-12728.

5          We are proceeding this afternoon by way of Zoom,

6    with one exception.  I just want to put on the record that

7    Mr. Cudia from the U.S. Trustee's Office is actually here in

8    the courtroom.  There were issues that closed our building

9    yesterday afternoon, and then the Boggs Building where the

10   U.S. Trustee is located today, so Mr. Cudia has asked to

11   appear in person, and our court is always open, so ...

12         So, with that, I'm happy to pass the virtual podium

13   to counsel for the debtor to take us through our agenda this

14   afternoon.

15         MR. PALACIO:  Thank you, Your Honor.  May it please

16   the Court, Ricardo Palacio of Ashby & Geddes here as proposed

17   Delaware counsel to Ideanomics, Inc. and its affiliated

18   debtors and debtors-in-possession.

19         At the outset, Your Honor, I'd like to thank Your

20   Honor, your staff, and the Court generally for accommodating

21   us on such short notice and making yourself available today.

22   As with any Chapter 11 case, the first-day hearing is of

23   critical importance, and this is no different.

24         Your Honor, with me today are my colleagues from

25   Foley & Lardner.  And in a moment, I will cede the podium to

1    Mr. Simon and Mr. Mohan from Foley.

2          What we want to do today, Your Honor, is -- and

3    you'll hear this from Mr. Simon -- is give you an overview of

4    the debtors very generally and then walk you through the

5    agenda.

6          I will say for the record -- and I think Mr. Cudia

7    from the U.S. Trustee's Office will note -- that we have been

8    working very closely with him and his office.  And I'm happy

9    to report that, I think save for one issue, I think we are

10   resolved on virtually all of the comments that the U.S.

11   Trustee has with respect to the first-day motions.

12         So, with that, Your Honor, and again, consistent

13   with the theme that I've laid out, I'm going to cede the

14   podium to Mr. Simon.

15         And I should note at the outset that Your Honor has

16   entered ordered with respect to the *pro hac vice* motions that

17   we filed on behalf of the Foley counsel, so thank you for

18   that.

19         And with that, I'll cede the podium to Mr. Simon.

20         THE COURT:  Okay.  Very well.  Thank you very much,

21   Mr. Palacio.

22         Mr. Simon.

23         MR. SIMON:  Good afternoon, Your Honor.  John Simon

24   of Foley & Lardner, proposed bankruptcy counsel to the

25   debtors and debtors-in-possession.

1          I want to reiterate my thanks and our thanks to the

2     Court for accommodating us here with a quick first-day

3     hearing.  We greatly appreciate Your Honor and your staff and

4     all of your efforts.

5          I'm here, as mentioned, with my colleagues from

6     Foley, Tim Mohan, in addition to our colleagues at Ashby &

7     Geddes, we are joined by the debtors' Chief Restructuring

8     Officer and first-day declarant, Amish [sic] -- I'm sorry --

9     Alpesh Amin, and the Riveron team of Rick Malagodi and

10    Anthony [sic] Mittiga, as well as, from the debtors, their

11    management representatives with Alfred Poor, the Chief

12    Executive Officer, who you can see on the screen here, as

13    well; Ryan Jenkins, the Chief Financial Officer; and Ben Wu.

14         And actually, now that I look the roster of people

15    up at the moment -- I just want to make sure they're actually

16    there.  Sorry.  Yes, they are.  Okay.  Very good.

17         And last, but not least, we have the debtors'

18    investment bankers from SSG, that's Scott Victor, Teresa

19    Kohl, and Neil Gupta.

20         THE COURT:  Great.  Well, let me welcome all of

21    you, virtually, to Wilmington.

22         MR. SIMON:  Thank you, Your Honor.

23         So we submitted, Your Honor, detailed first-day

24    motions with declarations of the Chief Restructuring Officer

25    Mr. Amin in support.

1          As mentioned by Mr. Palacio, we worked out, before

2    filing, many of the comments of the Office of the United

3    States Trustee, in collaboration and cooperation on those

4    first-day pleadings.  And I think we only have one issue left

5    on the DIP, and then the default notice period, to address in

6    that regard.  So we're happy to proceed with this hearing

7    however Your Honor would prefer.

8          THE COURT:  I'm happy to -- I mean, I'm happy to go

9    through the motions in order and address the issues as they

10   come up, but really, whatever is appropriate, whatever works

11   for the parties is fine with me.

12         MR. SIMON:  Okay, Your Honor.

13         So, if acceptable to you, as for the agenda then,

14   I'd like to provide you first a brief outline of the debtors'

15   history and businesses, then turn things over to Mr. Mohan to

16   handle a number of the first-day motions, and I'll be back

17   for the DIP financing motion.

18         THE COURT:  Very well.

19         MR. SIMON:  So (indiscernible) today is to provide

20   useful information on the company, how it got here, what the

21   company hopes to accomplish in these Chapter 11 cases.

22         Your Honor, moving to the debtors and their

23   background, Ideanomics, the parent of the other debtors, was

24   incorporated in the State of Nevada in 2004.  It was

25   originally known as a company called Alpha Nutraceuticals and

1      in the pharmaceutical space until 2010.

2              In 2010, from about 2010 to 2017, Ideanomics'

3      primary business activity was providing premium content

4      video-on-demand services, with operations chiefly in China

5      through its subsidiaries and variable interest entities

6      under the names of China Broadband and, later, You-On-Demand.

7              Starting in 2017, Ideanomics transitioned its

8      business model to pursue market opportunities in the FinTech,

9      financial technology, space, and these were mostly wound down

10     in 2022 and 2023.

11             In the second half of 2018, Ideanomics began to

12     identify opportunities in the Chinese electric vehicle

13     industry to facilitate the large-scale conversion fleet

14     vehicles from, as we saw projected at that time, internal

15     combustion engines to EV.

16             So, from 2021 to 2023, the debtors identified

17     opportunities outside of China; more specifically, in the

18     U.S. and Europe, and formulated an acquisition strategy to

19     acquire EV and related EV-related technology assets to

20     complete a foundation for the development of vehicles and

21     verticals in the off-highway, two-wheeler, and on-highway

22     vehicle space and the associated energy and electric charging

23     service space.

24             These were primarily split into four companies:

25             Solectrac, which is a seller and distributor and

1    manufacturer of electric farming machinery, presumably

2    tractors;

3         VIA Motors, which is a provider of skateboard

4    chasses for electric trucks in Classes 3 to 5.  Those are

5    medium (indiscernible) fleet vehicles like work trucks

6    (indiscernible) box delivery vehicles and the like.

7         And Energica, which is an Italian subsidiary of the

8    debtors that manufactured electric motorcycles.  And that

9    entity went into an Italian insolvency proceeding in October.

10        And WAVE, which is Wireless Advanced Vehicle

11   Electification, LLC.  That entity has fast, safe wireless

12   charging technology for electric vehicles in the Classes 2 to

13   8.  So it is for delivery vehicles of larger size, not just

14   passenger vehicles.

15        Currently, wireless charging is done for electric

16   vehicles primarily by cables that require maintenance, other

17   human and mechanical intervention, whereas WAVE sits and,

18   being wireless, enables a vehicle to park over a device

19   manufactured by WAVE and charge without all the holdups.  And

20   WAVE has actually been using this technology on customer

21   sites since approximately 2017.

22        As of the petition date, Your Honor, WAVE is the

23   only operating entity.  The debtors have either shuttered or

24   stopped funding operations for the other business lines.

25   That's some background on the debtors, Your Honor.

1      In terms of how we got here, obviously, the EV

2 industry is a growth industry, it has been for some time, and

3 it's faced well documented and well publicized challenges in

4 recent years, and they, frankly, have intensified.

5      The debtors' businesses are loss-making and they --

6 it required consistent investment.  So, although WAVE is a

7 leader in the technology of its business, the EV and EV-

8 adjacent market space is a cash-intensive and highly

9 competitive market.  The debtors' businesses are pre-

10 profitable growth businesses that require additional capital

11 to fund, among other things, R&D, operations, manufacturing,

12 and sales.

13      Now, as stated in the first-day pleadings, the

14 debtors were able to raise a significant amount of money to

15 advance their business operations, but that availability of

16 capital has significantly decreased in the last year.  And

17 indeed, this Court and other bankruptcy courts have seen a

18 number of cases involving other EV-related companies.

19      As a result of those cash flow issues, the debtors

20 undertook their previous financial and operational and

21 transactional efforts to try to right-size their operations

22 and address issues on the balance sheet, including selling a

23 variety of different assets that were owned by the debtors,

24 as discussed in the first-day dec.  And while these efforts

25 extended the runway for a determination of alternatives, they

1    just were not enough to keep the debtors out of this Chapter

2    11 or -- and bankruptcy.

3           So, in terms of the filing of this case, Your

4    Honor, the debtors' goals are very straightforward:  To

5    maximize value through a sale transaction that scours the

6    market for the highest and best value, highest and best bid

7    for all of the debtors' assets, and then to confirm a

8    liquidating Chapter 11 plan.

9           The debtors are entering this case with a stalking

10   horse asset purchase agreement, which we filed today, with

11   Tilou Management, the debtors' pre-petition first lien

12   secured lender and the proposed DIP lender.

13          The stalking horse bid provides for a credit bid by

14   Tilou of all of its pre-petition and post-petition secured

15   debt; payment of any secured -- any senior liens; and

16   assumption of assumed liabilities, including the payment of

17   cure costs for assigned contracts.  It's also subject to

18   higher and better bids in the sale process that may come from

19   the post-petition marketing process led by the debtors'

20   investment bankers SSG Advisors.

21          The debtors intend -- and there are a variety of

22   different deadlines in the documents and, chiefly, the DIP

23   and the APA itself for the filing of the bid procedures

24   motion, Your Honor.  And the debtors intend to file the bid

25   procedures motion by December 9th.  And that will provide the

1    proposed bidding, auction, and sale time line.

2           The debtors believe that the assets have

3    significant value and we are optimistic about the marketing

4    process and glad to have the support of Tilou in funding that

5    process and marketing the assets for sale and being there,

6    hopefully, to purchase the assets, should that be the result

7    of the marketing, if they have the best and highest bid.

8           And following consummation of that sale, Your

9    Honor, the debtors intend to present this Court with a

10   liquidating plan that will be funded that is in -- and one of

11   the benefits of the DIP provided by Tilou, the wind-down

12   budget, is to be funded pursuant to the interim order.

13          So, Your Honor, that's a summary of who the company

14   is, how it got here, and where we intend to go during this

15   case.

16          THE COURT:  Okay.  Thank you, Mr. Simon.  That's

17   helpful and I say the first-day papers were helpful, as well,

18   so I think I have an understanding of where we are, how we

19   got here, and what the vision is, and happy to give you the

20   opportunity to proceed through your motions, if that's where

21   we are next.

22          MR. SIMON:  Thank you very much, Your Honor, and

23   yes, we will proceed.

24          At this time, I'd like to offer the declarations of

25   Mr. Amin as Chief Restructuring Officer into evidence.  Mr.

1    Amin is present and available for cross-examination, if

2    necessary.  We have two declarations:

3              First, there's Docket Number 13, he submitted his

4    declaration in support of the DIP financing as Exhibit B to

5    Docket Number 13.

6              And we submitted a first-day declaration at Docket

7    14.

8              THE COURT:  Okay.

9              MR. SIMON:  So I'd move to have the Amin

10   declarations entered into evidence.

11             THE COURT:  Is there any party-in-interest that

12   objects to the admission into evidence of the two

13   declarations filed at D.I. 13 and 4, of Mr. Amin?

14        (No verbal response)

15             THE COURT:  Seeing none, the declarations will be

16   admited.

17        (Amin Declaration at D.I. 13 Exhibit B received in

18   evidence)

19        (Amin Declaration at D.I. 14 received in evidence)

20             THE COURT:  Is there any party-in-interest that

21   wishes to cross-examine Mr. Amin?

22        (No verbal response)

23             THE COURT:  Okay.  Seeing none, then, Mr. Simon,

24   you can proceed.

25             MR. SIMON:  Thank you, Your Honor.

1          I'd like to now pass the microphone to my colleague

2    Tim Mohan, who will present the debtors' first-day motions,

3    aside from the DIP.

4          THE COURT:  Okay.  Very well.  Thank you, Mr.

5    Simon.

6          Mr. Mohan, you can proceed.

7          MR. MOHAN:  Thank you, Your Honor.  Timothy Mohan,

8    Foley & Lardner, on behalf of the debtors.

9          Before I start, Your Honor, I want to give a shout-

10   out to the Foley & Lardner team Nora McGuffey, Jake Gordon,

11   and Mary Forfaeil, who did the yeomen's work on these first-

12   day motions; and the Riveron team Rick Malagodi and Anthony

13   Mittiga, as well, who also spent a good amount of time

14   putting together these motions.  So I wanted to start with

15   that.

16         Your Honor, unless you have a preference otherwise,

17   I plan on just going through the order -- the motions in the

18   order of the agenda filed at Docket Number 23.

19         And before I start on that, though, Your Honor, I

20   want -- two items:

21         First, as you saw at Docket Number 24, Epiq, the

22   proposed claims and noticing and agent, filed a certificate

23   of service that provides notice of today's hearing and the

24   agenda by overnight mail, email, or -- and/or fax, as

25   applicable, based on the information that we had.  Given the

1    short time line here, we believe that that notice was

2    sufficient to provide parties-in-interest that may be

3    affected by these motions notice of today's hearing.

4          The second one, the second point that has been

5    reiterated by multiple parties before, here is the consensual

6    nature of these first-day motions.  These motions were

7    negotiated with the debtors' pre-petition secured

8    lienholders, the debtors' DIP lender, and Mr. Cudia from the

9    U.S. Trustee's Office.  And the relief requested therein

10   reflects their comments to the relief.

11         One item that we want to note is that Your Honor

12   will see a proposed interim order for the insurance motion

13   that was filed last night at Docket Number 22.  That followed

14   -- after filing the motion, that followed a comment from Mr.

15   Cudia with respect to the relief requested therein and his

16   preference to have an interim order filed (indiscernible)

17   filed there, given the time line of the relief -- or the

18   requested relief and the nature of the request.  So we agreed

19   with that and filed the motions there, and so -- or filed

20   that proposed order, Your Honor.  Excuse me.

21         And so, with that, I'd like to go to the first-day

22   motions.  I'd like to do this efficiently and effectively,

23   given the consensual nature of this.

24         So, first, I'll just start with the joint admin

25   motion filed at Docket Number 3.

1          Your Honor, I think it's pretty basic, pretty

2    straightforward.  Ideanomics is a publicly held company that

3    is -- all the other debtors are consolidated into for public

4    reporting purposes.  I believe this is routine and

5    appropriate under the circumstances, and we request that Your

6    Honor enter the order.

7          THE COURT:  Okay.  Is there any party-in-interest

8    that would like to be heard with respect to the debtors'

9    motion for joint administration filed at D.I. Number 3?

10         (No verbal response)

11         THE COURT:  Okay.  Seeing none.

12         I've reviewed the motion and order.  I'm satisfied

13    that the relief sought is customary and appropriate and we

14    will enter that order.

15         MR. MOHAN:  Thank you, Your Honor.

16         Next up is Docket Number 4, the creditor matrix

17    motion.  Here, again, the standard relief here, filing

18    reflects the 30 largest general unsecured creditors,

19    modifying the requirements to file just registered holders of

20    the debtors' equity, providing notice to equity holders

21    through the transfer agent, publication on the Epiq website,

22    and filing a Form 8-K with the SEC, and then redacting

23    personally identifiable information for individual creditors

24    and shareholders.

25         I believe this is a routine request and, unless

1    Your Honor has any questions, request that the order be

2    entered.

3              THE COURT:  Okay.  Thank you, Mr. Mohan.

4              Is there any party-in-interest that would like to

5    be heard with respect to the creditor matrix motion filed at

6    D.I. Number 4?

7        (No verbal response)

8              THE COURT:  So, Mr. Jenkins, I see you just turned

9    on your -- or you -- I don't know if you just turned on your

10   camera or it's been on.  But are you -- would you like to be

11   heard?

12       (No verbal response)

13             THE COURT:  And you're muted.

14             MR. JENKINS:  No, Your Honor, not at this time.  I

15   apologize.

16             THE COURT:  Okay.  And it's just -- I just find it

17   helpful, for what it's worth, if folks would generally leave

18   their cameras off, unless you want to be heard.  It's not

19   that I'm not happy to see everyone, but I do find it helpful

20   to see cameras turn on as a way of signaling to me that

21   there's someone who wants the opportunity to be heard.

22             Okay.  So seeing no party that would like to be

23   heard.

24             I've reviewed the motion and proposed order.  I'm

25   satisfied that the relief sought is customary and appropriate

1    and we will enter that order.

2            So, Mr. Mohan --

3            MR. MOHAN:  Thank you, Your Honor.

4            THE COURT:  -- you can proceed.

5            MR. MOHAN:  Next up, Docket Number 5, Epiq's

6    retention application.

7            So Epiq is the debtors' proposed claims and

8    noticing agent.  In preparation for this case, in the cases,

9    the debtors received proposals from three different claims

10   and noticing agents, as required by the rules, and selected

11   Epiq to serve as this purpose.  The -- I understand -- we

12   believe the relief to be standard, straightforward relief, as

13   required by the rules, the Local Rules and the Bankruptcy

14   Rules, and request that it be entered.

15           One thing I would note is that Epiq would also be

16   retained as an administrative agent in this case.  We will

17   file a separate retention application for that relief, but I

18   just wanted to give the Court a heads-up about that.

19           THE COURT:  Okay.

20           MR. MOHAN:  Unless the Court has any questions, we

21   propose that the order approving the retention application be

22   entered.

23           THE COURT:  Okay.  Is there any party-in-interest

24   that would like to be heard with respect to the motion filed

25   at D.I. 5 to retain Epiq as the claims and noticing agent?

1        (No verbal response)

2                THE COURT:  Okay.  Seeing none.

3                I've reviewed the motion and proposed form of

4    order.  I'm satisfied the relief is appropriate and we will

5    enter that order.

6                MR. MOHAN:  Okay.  The next one, Your Honor, is

7    Docket Number 6, the wages motion here.

8                This motion is (indiscernible) relief with respect

9    to the debtors' current employees at Ideanomics and WAVE and

10   for the time periods immediately prior to the filing of the

11   petition or shortly just before then, as set forth in the

12   motion.

13               High level, Your Honor, to keep status quo, pay the

14   employees any pre-petition amounts owed and they can keep

15   status quo with respect any benefit plans or other benefits

16   that employees are entitled to.

17               Your Honor, I can delve into more detail, if

18   necessary, if you ask, if you prefer.  But unless otherwise,

19   we'd request that the order be entered to approve the motion.

20               THE COURT:  Okay.  Thank you, Mr. Mohan.

21               I've reviewed the motion and I think I understand

22   what you're asking for, and so I don't have further

23   questions.

24               Let's see if there's any party-in-interest who

25   would like to be heard with respect to the debtors' wages

1    motion filed at D.I. 6.

2         (No verbal response)

3              THE COURT:  Seeing no one.

4              I have -- as I said, I've reviewed the motion and

5    order.  I'm satisfied that this relief is customary and

6    appropriate, and we will go ahead and enter this order on an

7    interim basis.

8              MR. MOHAN:  Great.  Thank you, Your Honor.

9              Next is the taxes motion filed at Docket Number 7.

10             Again, standard order to pay any taxes on an

11   interim basis.  For today's hearing, a cap of $26,000

12   relating to current operations of the debtors' business.

13   Routine, standard, I do not believe there is anything unique

14   here.  And request that the order be entered to approve the

15   interim -- that the interim order be entered.

16             THE COURT:  Okay.  Is there any party-in-interest

17   that would like to be heard with respect to the debtors'

18   motion seeking interim authority to pay certain pre-petition

19   taxes filed at D.I. Number 7?

20        (No verbal response)

21             THE COURT:  Seeing none.

22             I've reviewed that motion and order.  I'm satisfied

23   that this relief is customary and appropriate, based on the

24   record before me, and we will enter that order on an interim

25   basis.

1           MR. MOHAN:  Great.  Thank you, Your Honor.

2           The next one, Docket Number 8, the critical vendors

3     order.

4           As set forth in the papers, WAVE is the debtors'

5     only operating business.  It's a technology company that has

6     some pretty cool assets that are advanced, and there's a

7     limited number of -- for certain parts of the equipment and

8     servicing, there's a limited number of vendors and service

9     providers that can provide the necessary goods and services

10    needed to keep that business op -- the WAVE business

11    operating.

12          We -- "we," being the debtors' professionals and

13    the debtors -- reviewed their -- the WAVE list of vendors,

14    narrowed them down according to applicable law and which

15    vendors are actually necessary and, without their services,

16    would have irreparable harm to the estate and the WAVE

17    business as a going concern, through that came up with this

18    narrow list.

19          Vendors, critical vendors that have $735,000, a

20    little bit over that, owed, that we propose to be able to pay

21    as critical vendors.  This amount was negotiated with Tilou,

22    the DIP lender, which agreed to fund the DIP amount to

23    include these critical vendors.

24          And based on that, based on the debtors' business

25    judgment, we request that the Court enter an order approving

1   the critical vendors motion on an interim basis.

2            THE COURT:  Okay.  Is there any party-in-interest

3   that would like to be heard with respect to the debtors'

4   motion seeking authority to pay certain pre-petition amounts

5   due to critical vendors that's filed at D.I. 8?

6       (No verbal response)

7            THE COURT:  Okay.  Seeing none.

8            I've reviewed the motion and order.  I'm satisfied

9   the relief sought is customary and we will enter that order

10   on an interim basis.

11           MR. MOHAN:  Great.

12           Next up, Your Honor, is Docket Number 9, called the

13   "NOL motion."  It establishes procedures to ensure that the

14   debtors NOL assets and tax attributes that account for nearly

15   $176 million be implemented, so just to ensure that there's

16   no potential limitation on the (indiscernible) use of tax

17   attributes.

18           Unless Your Honor has any questions, we propose

19   that Your Honor enter an interim -- the interim order filed

20   with the motion.  Excuse me.

21           THE COURT:  Okay.  Is there any party-in-interest

22   that would like to be heard with respect to the debtors' NOL

23   motion that's filed at D.I. Number 9?

24       (No verbal response)

25           THE COURT:  Seeing none, I've reviewed the motion

1    and order.  I'm satisfied that this relief is customary and

2    appropriate and we will enter that order on an interim basis.

3              MR. MOHAN:  Thank you, Your Honor.  Three more left

4    for me here.

5              So the utilities motion at Docket Number 10.  These

6    are all utilities related to the WAVE business located out in

7    Utah.

8              Consistent with practice, we are proposing a two-

9    week adequate assurance escrow, that accounts for about

10   $24,000.  That's going to be held at Citizens Bank here -- or

11   through a bank that helps us facilitate that.  And so we just

12   request that an interim order be approved to approve this

13   relief here.

14             THE COURT:  Okay.  Is there any party-in-interest

15   that would like to be heard with respect to the debtors'

16   utilities motion that's filed at D.I. 10?

17        (No verbal response)

18             THE COURT:  Seeing none.

19             I have reviewed the motion and order.  I'm

20   satisfied that the relief sought is appropriate and we will

21   go ahead and enter that order on an interim basis.

22             MR. MOHAN:  Thank you, Your Honor.

23             Next, the insurance motion filed at Docket Number

24   11.

25             As I mentioned before, we filed a proposed order

1    (indiscernible) at Docket Number 22.  The only difference is

2    that it provides for a ten-thousand-dollar cap on the payment

3    of pre-petition amounts owed with respect to the insurance

4    program.

5           We don't believe there's any -- because there are

6    insurance policies that are subject to expire at the end of

7    this year, we want to make sure that there's -- if there's

8    any issue, that we can have the ability to pay a certain

9    amount on those, to make sure the insurance is continued.

10          Unless Your Honor has any questions, we propose

11   that the interim order be entered.

12          THE COURT:  Okay.  Is there any party-in-interest

13   that would like to be heard with respect to the debtors'

14   insurance motion filed at D.I. 11, as revised to reflect the

15   interim nature of the relief sought?

16       (No verbal response)

17          THE COURT:  Okay.  Seeing none.

18          I've reviewed the motion.  I'm satisfied that the

19   relief sought is appropriate.  I agree with the conclusion

20   that this is best granted today on an interim basis.  But

21   with the revisions as provided, I'm very happy to enter that

22   order on an interim basis, and we will do so.

23          MR. MOHAN:  Great.  Thank you, Your Honor.

24          And then last is the cash management motion at

25   Docket Number 12.

1          I think the big picture here is to maintain the

2    status quo.  The debtors have bank accounts at Wells Fargo,

3    Vectra Bank, which is a division of Zions Bancorporation.

4    And the idea here, again, Your Honor, is to maintain the

5    status quo using the same bank accounts, using the same forms

6    and pay any pre-petition bank fees in the ordinary course of

7    business.

8          Unless Your Honor has any questions, we request

9    that entry of the interim order be done.

10          THE COURT:  Okay.  Is there any party-in-interest

11    that would like to be heard with respect to the debtors' cash

12    management motion that's filed at D.I. 12?

13       (No verbal response)

14          THE COURT:  Okay.  Seeing none.

15          I've reviewed the motion and proposed order.  I'm

16    satisfied that the relief sought is appropriate and we will

17    go ahead and enter that order on an interim basis.

18          MR. MOHAN:  Great.  Thank you, Your Honor.

19          That is the end of my presentation, so I'm going to

20    turn the mic back over to my colleague Mr. Simon to discuss

21    the DIP financing motion.

22          THE COURT:  Okay.  Very well.  Thank you, Mr.

23    Mohan.

24          Mr. Simon, you can proceed.

25          MR. SIMON:  Thank you, Tim.

1          Your Honor, with respect to the DIP financing

2    motion, that's D.I. 13.

3          This DIP, subject to its terms, is a senior secured

4    superpriority DIP with aggregate term loan commitments of

5    $30,491,350.64.  That includes a new money term lender in the

6    principal amount of about 11.6 million, pursuant to which

7    6.95 million will be made available to the borrowers to draw

8    under the DIP credit agreement under the interim order.

9          And 1.8 of that, approximately, Your Honor, will be

10   placed into a segregated account to fund the wind-down

11   budget.  We think that's a big benefit to the estate, given

12   the circumstances.

13         Separately from that, 4.6 of additional commitments

14   will be made available based on the final order.

15         The DIP also contemplates a roll-up that is a very

16   market roll-up, in our view, of up to 18.872, approximately,

17   million dollars of the two pre-petition obligations rolled up

18   on a dollar-for-dollar basis during the interim period, and

19   then fully rolled up upon entry of the final DIP order.

20         And the amounts under the DIP are subject to the 12

21   percent non-default interest rate.  If there's a default, it

22   goes up by 4 percent.

23         Importantly, Your Honor, we, as discussed, prior to

24   filing, exchanged drafts with Joe Cudia of the U.S. Trustee,

25   incorporating most of his suggestions and revisions to the

1   motion and the proposed interim order.

2          As stated in the dec and the motion, it's evident

3   that the debtors require the DIP financing.  We have

4   extremely limited cash on hand.  This financing, even prior

5   to the petition date, to -- had to finance the operations of

6   the company in order for a continuation of the business.  The

7   alternative here, if there ever was one, really is a Chapter

8   7 liquidation.  So this financing is required in order to

9   operate the business and support the Chapter 11 cases and

10  pursue the sale process and see the highest and best value

11  that can be achieved for the assets.

12         The DIP was also marketed.  Riveron reached out to

13  11 different parties and only 1 party executed an NDA and

14  agreed to provide -- and agreed to provide a DIP, and that

15  Tilou Management and Consulting, the DIP lender here.

16         Moreover, Your Honor, we view the DIP facility as

17  containing terms that are beneficial to the debtors beyond

18  just the practical reality of being able to borrow the money

19  and use them to fund the sale process.

20         First, the interest rate is 12 percent, which is 4

21  percent lower than the pre-petition Tilou obligations that

22  are being rolled up; and, therefore, that reduces the

23  interest rate following the roll-up as it happens.

24         Second, there are no DIP fees except for the

25  reasonable attorneys' fees.  So, generally, in circumstances

1    like this, it's not uncommon to see substantial fees, such as

2    facility fees, et cetera.  Here, the DIP doesn't contain any

3    and this helps maintain liquidity.

4            Third, there is the fully funded wind-down budget

5    that's already been approved by the DIP lender, and that is

6    supposed to be funded in week five in accordance with the

7    budget, and accessible after the consummation of the sale of

8    substantially all of the debtors' assets, whether those are

9    sold to the stalking horse bidder or not.

10           Among the other terms that are beneficial, Your

11   Honor, there's the five-day default notice period that will

12   permit the debtors or any other party-in-interest the

13   opportunity to object to a termination notice if given by the

14   DIP lender.  And in the event the Court cannot hear the

15   objecting party within five days, that period (indiscernible)

16   for up to three days.

17           This is the only area that I'm aware of that

18   there's an outstanding U.S. Trustee concern, which we can

19   address shortly and, of course, hear from Mr. Cudia, as well,

20   and the DIP lender.

21           So the debtors seek authorization to enter into a

22   DIP credit agreement, incur the DIP financing.  The debtors

23   believe the roll-up is appropriate here.  It's a key part of

24   the DIP facility.  This was heavily negotiated as part of

25   extensive negotiations with Tilou over a period of months

1    towards the Chapter 11.  And because of the creeping roll-up,

2    the roll-up is subject to the challenge rights of any

3    appointed committee or other party-in-interest.

4         Based on the first-day declaration and the DIP

5    declaration of Mr. Amin, I believe the debtors have satisfied

6    their burden.  The debtors believe this is the best and only

7    viable option for financing under the circumstances.  It will

8    allow the continuation of operations and fund the

9    administration of the Chapter 11 cases, including the sale

10   process that's projected.  And it represents significant

11   value to the estates under the circumstances.

12        So, if Your Honor doesn't have any additional

13   questions about the motion or the DIP, we would request entry

14   of the interim order, provided we get to resolution on Mr.

15   Cudia's issue.

16        THE COURT:  All right.  So, Mr. Simon --

17        MR. SIMON:  And --

18        THE COURT:  So, before we get to that issue, which

19   I do want to make sure I -- you know, everyone has a chance

20   to be heard on.  So I appreciate the disclosures in the

21   motion and the declaration.  I just want to make sure I've

22   got the facts here right.

23        So, as I understand it from my review of the motion

24   and the declarations, the -- Tilou, the DIP lender, is owned

25   by the father of the debtors' CEO, but there isn't,

1    otherwise, a formal corporate relationship between the

2    entities.  Do I have that mostly correct or in the ballpark

3    of correct?

4          MR. SIMON:  Your Honor, from the debtors'

5    perspective, yes, there is not a formal relationship between

6    Tilou, a business -- a contract, a business relationship, a

7    formal relationship.  He was not part of our management of

8    the company.  Shane McMahon, he's the Chairman of the Board

9    of Ideanomics.  He is not a manager, management member,

10   director, or officer of Tilou, upon what I've been told by

11   Tilou.

12         And we have Tilou's counsel here from the Faegre

13   law firm, who I'm sure can address Your Honor's question, as

14   well.  But yes, I am not aware of any formal process of Tilou

15   being involved in our company.

16         THE COURT:  Okay.  And --

17         MR. SIMON:  (Indiscernible) relationship.

18         THE COURT:  Just to -- I mean, I'm not sure that

19   the literal definition of "insider" makes a huge difference

20   here.  But do you dispute that the way -- if you work your

21   way through the way 101(31), that this is an insider

22   transaction?

23         MR. SIMON:  Your Honor, I would want to consider

24   that and further consider the definition and not

25   (indiscernible)

1          THE COURT:  Okay.  Fair enough.  This is not meant

2     to be a pop quiz.  That's fine.

3          Okay.  Let me hear from Mr. Cudia about the basis

4     for the objection, what the issue is that's before me.

5          MR. CUDIA:  Thank you, Your Honor.  Joseph Cudia

6     for the United States Trustee.

7          First, I want to take this opportunity to thank

8     debtors' counsel for working collaboratively with our office

9     to get the vast majority of our issues resolved.

10          We had actually, really, two issues with the DIP;

11     one I'm not contesting for purposes of the interim hearing,

12     which is the truncation of the challenge period.  I just want

13     to get it on the record that our office opposes the

14     truncation of the challenge period.  But since it's not

15     operative for purposes of the interim period, we're not

16     opposing what's currently in the order.

17          THE COURT:  Okay.

18          MR. CUDIA:  As far as the items that debtors'

19     counsel mentioned, in 21(c), it appears that the language

20     there regarding the emergency hearing conditions the ability

21     of parties to be heard at a default notice hearing on the

22     availability of the Court's schedule.  In other words, if the

23     Court is not able to schedule a hearing for whatever reason

24     within the time provided, that would open the possibility for

25     the DIP lender to begin taking their remedies without those

1   parties being able to be heard.  That's our only issues with

2   it and we wanted to bring that to your attention, Your Honor.

3            THE COURT:  Okay.

4            MR. CUDIA:  Thank you.

5            THE COURT:  Thank you, Mr. Cudia.

6            So, Mr. Simon, are you aware of cases in which

7   courts have granted relief like you're seeking here, to allow

8   essentially, the exercise of remedies without providing the

9   opportunity to get into court?

10            MR. SIMON:  No, Your Honor, I'm not.

11            THE COURT:  Okay.

12            MR. SIMON:  We're --

13            THE COURT:  So this case isn't going to be the

14   first.  So, look, let me say this.  If an issue were to arise

15   where there were an emergency, one of the things we work

16   really hard to do around here is to make ourselves available

17   to resolve concerns.  So I suspect this issue is highly

18   unlikely to arise where there's a situation, there's an

19   emergency, and neither I, nor anyone else, any of the judges

20   in this building, is available to jump in and hear the

21   parties and deal with the issue.  It's -- we're not perfect,

22   but we do work hard to make ourselves available to resolve

23   emergency disputes when they, in fact, arise.

24            That said, in the unlikely event that we weren't,

25   for any reason, available, I'm not comfortable with the

1    notion that the relief becomes available -- that, basically,

2    the lender can engage in self-help before giving anyone the

3    opportunity to be heard.  So I'd propose that we go to the

4    sort of standard language that conditions the right to -- the

5    remedy on the opportunity to have a hearing.  I understand I

6    can't make the lender lend under those terms, but I think

7    this is reasonably standard.

8              So is -- are the parties able to revise the form of

9    order to reflect that?

10             MR. SIMON:  That is acceptable from the debtors'

11   perspective, Your Honor.

12             THE COURT:  I'm happy to hear from counsel to the

13   lender.

14             MR. SIMON:  (Indiscernible)

15             THE COURT:  Mr. Velocci -- I'm sorry -- Velocci.

16             MR. VELOCCI:  Good afternoon, Your Honor.  Thank

17   you.  Frank Velocci, Faegre, Drinker, Biddle & Reath.

18             That's fine, Your Honor.  Thank you.

19             THE COURT:  Okay.  So can the parties -- I -- Mr.

20   Cudia, do you need this to be under certification or are you

21   happy to work with the debtors and allow them to upload an

22   order that reflects revisions that you're acceptable to?

23             MR. CUDIA:  Your Honor, as long as they let me know

24   what they're going to file, I'm fine with that.

25             THE COURT:  All right.  So I'm not going to require

1    a formal certification.  I'll accept the uploading of an

2    order as essentially a representation that Mr. Cudia is okay

3    with the form of order.

4              MR. CUDIA:  That's fine with the U.S. Trustee.

5              MR. SIMON:  Thank you, Your Honor.  We will

6    certainly follow up with Mr. Cudia as soon as possible --

7              THE COURT:  Okay.

8              MR. SIMON:  -- with that.

9              THE COURT:  Okay.  Is there anything further from

10   the debtors' perspective that I can do to be helpful.  Mr.

11   Palacio?

12             MR. PALACIO:  Yes, Your Honor.  This is a

13   housekeeping matter at this point.

14             Prior to the hearing, we had contacted chambers --

15   and again, we want to thank your staff for being so

16   accommodating, as well as Your Honor -- with respect to a

17   second-day hearing.  We have been given by Your Honor's

18   chambers January 7th, I believe at 2 p.m.

19             And what we wanted to discuss, or certainly I

20   wanted to raise with Your Honor, is an appropriate objection

21   and response deadline, understanding that a committee will

22   likely be formed in the next week or two.  So I'm sure Mr.

23   Cudia is going to want to be heard on this.  But that is

24   really what I wanted, to get Your Honor's attention before we

25   adjourned today.

1          With the January 7th hearing date, you would

2    typically go seven days, but it's right around the holidays.

3    We were going to seek, if Your Honor was amenable to it, an

4    objection deadline of the 27th.

5          THE COURT:  So, Mr. Palacio, candidly, I'd rather -

6    - subject to hearing from Mr. Cudia.  If Mr. Cudia doesn't

7    object to that, I'm not going to.  But I'd, frankly, rather

8    jam myself and, therefore, to some extent, the debtors than

9    put the committee in a position where, when it's just being

10   formed over the holidays, it has to immediately jump in and

11   meet an objection deadline.  So I would just as soon go to

12   January 2nd, which is five days, not seven days, before the

13   hearing.

14         But let me -- Mr. Cudia, does your office have a

15   preference in this regard?

16         MR. CUDIA:  Our office would prefer the 2nd, Your

17   Honor.  Getting a committee formed and up to speed during the

18   holidays is going to be a little more difficult than normal.

19         THE COURT:  Yeah, okay.  So I -- that's -- I mean,

20   Mr. Palacio, let me give a chance to be heard if that causes

21   enormous grief on your end.  I appreciate you'd prefer it be

22   earlier, but I just think, under the circumstances of -- you

23   know, the role of the committee, in connection with second

24   day relief, is important to a fair process.  And under the

25   circumstances here, I think I'd rather have one less day and

1   to make you all deal with having one less day, rather than

2   require a filing during the week when lots of folks are not

3   working.

4           MR. PALACIO:  Understood, Your Honor, and I

5   appreciate all of your comments, I don't disagree with any of

6   them.

7           The thing from our end -- and it's, again, just

8   we'll seek Your Honor's guidance on this -- we certainly

9   would like the opportunity to file a reply.  And then that

10   flies up against an agenda --

11           THE COURT:  Understood.  You know what?  How about

12   the following?  The second-day hearing is the 7th at 2 p.m.

13   If you -- anything you get me by the 6th at the -- like 5

14   p.m. on the 6th, I will read before I get on the bench on the

15   7th.  Again, I'd rather jam myself than others in these

16   circumstances.

17           MR. PALACIO:  Okay.

18           THE COURT:  And you know, when you file whatever

19   replies, if you'd just then amend the agenda --

20           MR. PALACIO:  Okay.

21           THE COURT:  -- so that I know what's in front of

22   me.  But I don't think you need a further motion seeking

23   leave.  You can take this transcript as authority to file a

24   reply at -- you know, any time before the close of business

25   on the 6th,.

1           MR. PALACIO:  That works perfectly, Your Honor,

2     because our agenda would be due on the 3rd, which we would

3     have any responses by the 2nd.  So we hear you loudly and

4     clearly, we'll work with that, Your Honor.

5           THE COURT:  Okay.

6           MR. PALACIO:  Thank you.

7           THE COURT:  Well, I appreciate everyone's

8     flexibility under the circumstances.

9           And is there any objection from any party-in-

10    interest to setting the second-day hearing at 2 p.m. on the

11    7th?

12        (No verbal response)

13          THE COURT:  All right.  So, if you can then, Mr.

14    Palacio, go in and you upload the orders, obviously reflect

15    the --

16          MR. PALACIO:  The dates.

17          THE COURT:  -- the dates there, the hearing date

18    and the objection deadline, that would be terrific.

19          MR. PALACIO:  Will do, Your Honor.

20          THE COURT:  Okay.  From the debtors' perspective,

21    is there anything else that I can do to be helpful while

22    we're here this afternoon?

23          MR. SIMON:  Nothing more, Your Honor.  Thank you

24    very much.

25          THE COURT:  Okay.  Is there any other party-in-

1   interest that would like the opportunity to be heard while

2   we're here today?

3       (No verbal response)

4           THE COURT:  Okay.  Let me just say I, you know,

5   very much appreciate that hearings like this are as simple

6   for me as they are because of the hard and good work done by

7   parties beforehand to work through issues and to solve

8   problems.  So I -- it's not unnoticed that you all worked

9   cooperatively to get this to be a consensual hearing, and I

10  want to express my thanks to all of the parties, to the

11  Office of the United States Trustee for all of their work.

12  It's extremely helpful to the Court, so you all have my

13  thanks.

14          And with that, if something were to arise where you

15  need us before the second day hearing, you all know how to

16  reach us.  And if I don't see you until then, I hope everyone

17  has happy holidays.  And with that, we're adjourned.  Thank

18  you.

19          COUNSEL:  Thank you, Your Honor.  Thank you, Your

20  Honor.

21      (Proceedings concluded at 1:28 p.m.)

22                          *****

23

24

25

1                         CERTIFICATION

2           I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____        December 13, 2024

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable

14

15

16

17

18

19

20

21

22

23

24

25