**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>IDEX WIND DOWN, INC. f/k/a IDEANOMICS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12728 (CTG)<br><br>(Jointly Administered) |

**AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF IDEX WIND DOWN, INC. f/k/a IDEANOMICS, INC. AND CERTAIN OF ITS DEBTOR AFFILIATES**


**ASHBY & GEDDES, P.A.**

Ricardo Palacio (DE Bar No. 3765)
Gregory A. Taylor (DE Bar No. 4008)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel: (302) 654-1888
Fax: (302) 654-2067
Email: rpalacio@ashbygeddes.com
gtaylor@ashbygeddes.com

*Co-Counsel to the Debtors and Debtors in Possession*

**FOLEY & LARDNER LLP**

John A. Simon (admitted *pro hac vice*)
Jake W. Gordon (admitted *pro hac vice*)
500 Woodward Ave., Suite 2700
Detroit, MI 48226-3489
Telephone: (313) 234-7100
Facsimile: (313) 234-2800
Email: jsimon@foley.com
jake.gordon@foley.com

- and -

Timothy C. Mohan (admitted *pro hac vice*)
1144 15th Street, Suite 2200
Denver, Colorado 80202
Telephone: (720) 437-2000
Facsimile: (720) 437-2200
Email: tmohan@foley.com

*Co-Counsel to the Debtors and Debtors in Possession*


Dated: October 29, 2025

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or state identification number are, are: IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. (8374); WAVE Wind Down, LLC f/k/a Wireless Advanced Vehicle Electrification, LLC (6793); Solectrac, Inc. (4653); Timios Holdings Corp. (0190); Justly Holdings Inc. (3657); Justly Markets Wind Down LLC f/k/a Justly Markets LLC f/k/a Delaware Board of Trade Holdings, Inc. (5107); VIA Motors International, Inc. (7063); and VIA Motors, Inc. (0185). The headquarters for the above-captioned Debtors is located at 217 W. 18th Street, PO Box 70, New York, NY 10113.

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS AND INTERPRETATION ............ 7
A. Defined Terms ............ 7
B. Interpretation ............ 19
C. Headings ............ 19
D. Application of Definitions and Rules of Construction Contained in the Bankruptcy Code. ............ 20
E. Other Terms ............ 20
F. Appendices to Plan Documents ............ 20
G. Controlling Document ............ 21
H. Computation of Time ............ 21
I. References to Monetary Figures ............ 21
J. Nonconsolidated Plan ............ 21
ARTICLE II THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ............ 21
A. The Debtors' Corporate History ............ 21
B. The Debtors' Business Operations ............ 23
C. The Debtors' Prepetition Capital and Equity Structure ............ 25
ARTICLE III EVENTS LEADING TO THE CHAPTER 11 FILING ............ 26
A. Financial and Operational Issues ............ 26
B. Prepetition Initiatives to Boost Liquidity ............ 27
ARTICLE IV EVENTS CONCURRENT WITH AND FOLLOWING COMMENCEMENT OF THE CHAPTER 11 CASES ............ 28
A. Operational and Other Relief ............ 28
B. The DIP Facility ............ 29
C. Retention of Professionals ............ 29
D. The Sale of Certain Assets ............ 30
E. Claims Bar Date ............ 30
F. Liquidating Trust ............ 31
G. Additional Tillou Funding and Debtors' Release of Claims Against Tillou ............ 31
ARTICLE V PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE Combined DS and Plan ............ 32
A. Treatment of Administrative Claims ............ 32
B. Professional Compensation ............ 33
C. Treatment of Tax Claims ............ 34
D. Statutory Fees ............ 35

ARTICLE VI CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 35
A. Summary of Classification ...... 35
B. Treatment of Claims and Interests ...... 37
C. Separate Classification of Claims Generally ...... 41
D. Class Acceptance Requirement ...... 41
E. Controversy Concerning Impairment ...... 41
F. Cramdown ...... 41
G. Subordinated Claims ...... 42
ARTICLE VII MEANS FOR IMPLEMENTATION OF THE Combined DS and Plan ...... 42
A. Sources of Consideration for Plan Distributions ...... 42
B. Preservation and Maintenance of Debtor Causes of Action ...... 42
C. Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust ...... 44
D. Corporate Action ...... 45
E. Board Compensation and Dissolution of the Debtors ...... 45
F. Cancellation of Instruments ...... 45
G. Amendment of the Debtors' Governance Documents ...... 46
ARTICLE VIII THE LIQUIDATING TRUST ...... 46
A. Liquidating Trust ...... 46
ARTICLE IX PLAN DISTRIBUTION PROVISIONS ...... 50
A. Plan Distributions ...... 50
B. Disputed Claims Reserves ...... 50
C. Address for Delivery of Plan Distributions ...... 51
D. Undeliverable and Unclaimed Distributions Held by Liquidating Trustee ...... 51
E. Time Bar to Cash Payments ...... 52
F. Manner of Payment under the Combined DS and Plan ...... 52
G. Fractional Plan Distributions ...... 52
H. De Minimis Distributions ...... 52
I. Foreign Currency Exchange Rate ...... 53
J. No Postpetition Interest on Claims ...... 53
K. Allocation Between Principal and Accrued Interest ...... 53
L. Single Satisfaction ...... 53
M. Claims Paid or Payable by Third Parties ...... 53
N. Distributions on Account of Subordinated Claims ...... 54
ARTICLE X PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS ... 54
A. Allowance of Claims ...... 54

B. Prosecution of Disputed Claims ..... 55
C. Entitlement to Plan Distributions upon Allowance ..... 55
D. Amendments to Claims ..... 55
E. Adjustment to Claims or Interests Without Objection ..... 55
F. Estimation of Claims ..... 56
ARTICLE XI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 56
A. Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 56
B. Claims Arising from Rejection, Expiration, or Termination ..... 57
C. Contracts and Leases Entered Into After the Petition Date ..... 57
D. Insurance Contracts ..... 58
E. Warranties ..... 58
F. Reservation of Rights ..... 58
ARTICLE XII EFFECTS OF CONFIRMATION ..... 58
A. Releases by the Debtors ..... 58
B. Third Party Releases ..... **Error! Bookmark not defined.**
C. Exculpation ..... 60
D. Injunctions ..... 61
E. Satisfaction of Claims ..... 62
F. Compromise and Settlement of Claims and Controversies ..... 62
G. Setoff Rights ..... 63
H. Third Party Agreements; Subordination ..... 63
I. Release of Liens ..... 63
ARTICLE XIII CONDITIONS PRECEDENT TO CONFIRMATION OF THE Combined DS and Plan AND THE OCCURRENCE OF THE EFFECTIVE DATE ..... 64
A. Conditions Precedent to Confirmation ..... 64
B. Conditions Precedent to the Occurrence of the Effective Date ..... 64
C. Waiver of Conditions ..... 65
D. Effect of Non-Occurrence of the Effective Date ..... 65
E. Option to Delay Occurrence of the Effective Date ..... 65
F. Modification of the Combined DS and Plan ..... 65
G. Revocation of Combined DS and Plan ..... 66
ARTICLE XIV RETENTION OF JURISDICTION ..... 66
ARTICLE XV MISCELLANEOUS PROVISIONS ..... 67
A. Additional Documents ..... 67
B. Substantial Consummation ..... 68

C. Reservation of Rights ........ 68
D. Successors and Assigns ........ 68
E. Notices ........ 68
F. Governing Law ........ 68
G. Exemption from Transfer Taxes ........ 68
H. Notice of Entry of Confirmation Order and Relevant Dates ........ 69
I. Compliance with Tax Requirements ........ 69
J. Rates ........ 70
K. Immediate Binding Effect ........ 70
L. Severability ........ 70
M. Closing of the Chapter 11 Cases ........ 70
N. No Admissions ........ 71
O. Solectrac ........ 71
ARTICLE XVI PLAN-RELATED RISK FACTORS ........ 71
A. The Combined DS and Plan Might Not Be Accepted ........ 71
B. The Combined DS and Plan Might Not Be Confirmed ........ 71
C. Parties in Interest Might Object to the Amount or Classification of Claims ........ 72
D. The Debtors Might Object to the Amount or Classification of a Claim ........ 72
E. Nonconsensual Confirmation ........ 73
F. The Chapter 11 Cases Might Be Converted to Cases under Chapter 7 of the Bankruptcy Code ........ 73
G. Combined DS and Plan Releases Might Not Be Approved ........ 73
H. Allowance of Claims Might Substantially Dilute the Recovery to Holders of Claims under the Combined DS and Plan ........ 73
I. Failure To Consummate the Combined DS and Plan ........ 74
J. Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero ........ 74
K. Costs of Administrating the Estates ........ 74
L. Certain Tax and Securities Implications of the Combined DS and Plan ........ 74
ARTICLE XVII VOTING PROCEDURES AND REQUIREMENTS ........ 74
A. Voting Instructions and Voting ........ 75
B. Parties Entitled to Vote ........ 76
C. Agreements Upon Furnishing Ballot ........ 77
D. Change of Vote ........ 77
E. Waivers of Defects, Irregularities, Etc. ........ 77
F. Miscellaneous ........ 78
G. Further Information; Additional Copies ........ 79

ARTICLE XVIII CONFIRMATION REQUIREMENTS .......... 79
A. The Combined Hearing .......... 79
B. Classification of Claims and Interests .......... 79
C. Impaired Claims or Interests .......... 81
D. Consensual Confirmation .......... 81
E. Feasibility and Best Interests of Creditors .......... 82
F. Confirmation Without Necessary Acceptances; Cramdown .......... 86
ARTICLE XIX CONCLUSION AND RECOMMENDATION .......... 87

**IMPORTANT INFORMATION REGARDING THIS COMBINED DISCLOSURE STATEMENT AND PLAN**

**IDEX Wind Down, Inc. f/k/a Ideanomics, Inc.; WAVE Wind Down, LLC f/k/a Wireless Advanced Vehicle Electrification, LLC; Timios Holdings Corp.; Justly Holdings Inc.; Justly Markets Wind Down LLC f/k/a Justly Markets LLC f/k/a Delaware Board of Trade Holdings, Inc.; VIA Motors International, Inc.; and VIA Motors, Inc. (collectively, the "Debtors") are soliciting votes on this *Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. and Certain of its Debtor Affiliates* from the Holders of Claims in Class 3 (GUC Convenience Claims) and Class 4 (General Unsecured Claims):**

**If you are in Class 3 or Class 4, you are receiving this document and the accompanying materials because you are entitled to vote on the Combined DS and Plan. Before submitting a ballot to vote on the Combined DS and Plan, you should review this *Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. and Certain of its Debtor Affiliates*. For the avoidance of doubt, this Combined DS and Plan does not include the estate of Solectrac, Inc. and does not resolve any Claims against Solectrac, Inc.**

**ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT NO LATER THAN DECEMBER 29, 2025 AT 12:00 P.M. (PREVAILING EASTERN TIME). BALLOTS MUST BE SUBMITTED TO THE CLAIMS AND NOTICING AGENT ELECTRONICALLY (ON THE CLAIMS AND NOTICING AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.**

**You can vote electronically by visiting the case information website maintained by the Claims and Noticing Agent, (HTTPS://DM.EPIQ11.COM/CASE/IDEANOMICS) clicking on the "E-Ballot" tab, and following the prompts and directions. You will need your unique E-Ballot ID# to submit your electronic ballot; your E-Ballot ID# can be found on your Ballot. Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Holders who vote electronically via the Claims and Noticing Agent's online portal should not also submit a paper Ballot. The electronic ballot portal is the only approved method to submit Ballots electronically, and Holders of Claims entitled to vote on the Plan are strongly encouraged to submit their Ballots via the electronic ballot portal. Ballots delivered by email, facsimile, or any other electronic means may not be counted.**

**If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:**

| If by First-Class Mail | If by Hand Delivery of Overnight Mail |
|---|---|
| IDEX Wind Down Ballot Processing Center<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4419<br>Beaverton, OR 97076-4419 | IDEX Wind Down Ballot Processing Center<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

***

## Preliminary Statement and Disclaimers[2]

The Bankruptcy Court has established **December 29, 2025 at 4:00 p.m. (prevailing Eastern Time)** as the deadline for filing and serving objections to the final approval and the confirmation of the Combined DS and Plan (the "Combined DS and Plan Objection Deadline"). Any objection to the final approval of the Combined DS and Plan must (a) be in writing, in English, and in text-searchable format, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules of Bankruptcy Practice and Procedure for the Bankruptcy Court for the District of Delaware, and the Solicitation Order, (c) state, with specificity, the legal and factual bases thereof, (d) be filed with the Bankruptcy Court no later than the Combined DS and Plan Objection Deadline, and served on the Objection Service Parties.

A hearing on the final approval of the Combined DS and Plan (as such hearing may be continued from time to time, the "Combined Hearing") will commence on **January 8, 2026 at 10:00 a.m. (prevailing Eastern Time**) in the Bankruptcy Court before the Honorable Craig T. Goldblatt, in courtroom 7 at 824 Market St., 3rd Floor Wilmington, DE 19801. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of the Chapter 11 Cases. In accordance with the Combined DS and Plan, the Plan may be modified, if necessary, before, during, or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined DS and Plan contains summaries of certain provisions and certain other documents and information. The financial information included herein is provided solely for the purpose of soliciting votes on the Combined DS and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined DS and Plan. While the summaries in the Combined DS and Plan shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Combined DS and Plan are fair and accurate. The summaries of the financial information in the Combined DS and Plan and the documents that are attached to, or incorporated by reference in, this Combined DS and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined DS and Plan. The Bankruptcy Court's approval or confirmation of the Combined DS and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined DS and Plan. The statements and information

---

[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the *Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. and Certain of its Debtor Affiliates* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof, including all appendices, exhibits, schedules, and supplements, including any Plan Supplements, thereto, the "Combined DS and Plan").

contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined DS and Plan should not assume at the time of such review that there have been no changes to the facts or information set forth herein since the date of the Combined DS and Plan. All Holders of Claims entitled to vote on the Combined DS and Plan are advised and encouraged to read the Combined DS and Plan in its entirety before voting on the Combined DS and Plan. No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined DS and Plan (including the documents attached hereto). The Combined DS and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to Holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information provided herein or incorporated herein by reference, such information contained herein has not been audited, except to the extent specifically indicated otherwise herein. The financial information provided herein has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which the financial information was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined DS and Plan, nor any action taken by a Debtor in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any Holder of a Claim.

The Combined DS and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined DS and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined DS and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. *See* Article XVI for a discussion of certain considerations and risk factors that Holders entitled to vote on the Plan should consider.

This Combined DS and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined DS and Plan has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of votes on the Plan, nor this Combined DS and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

***

# INTRODUCTION

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code,[3] the Debtors propose this *Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. and Certain of its Debtor Affiliates*, as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements)) thereto, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Combined Hearing to consider confirmation thereof. The Debtors are the proponents of the Combined DS and Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Combined DS and Plan; such items have been or may be filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article VIII, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Combined DS and Plan prior to its substantial consummation.

The purpose of the Combined DS and Plan is to describe the Combined DS and Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Combined DS and Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Combined DS and Plan will receive a Ballot together with this Combined DS and Plan to enable them to vote on the Combined DS and Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Combined DS and Plan.

The Combined DS and Plan includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases. In addition, this Combined DS and Plan includes the effects of confirmation of the Combined DS and Plan, certain risk factors associated with the Combined DS and Plan, the manner in which Plan Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered an order approving on an interim basis the Combined DS and Plan contained in this Combined DS and Plan, as containing "adequate information" in compliance with section 1125 of the Bankruptcy Code [D.I. •] (the "Solicitation Order"). Entry of the Solicitation Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Combined DS and Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's interim approval of the Combined DS and Plan contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Combined DS and Plan contains adequate information to permit a Holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Combined DS and Plan is still subject to final approval by the Bankruptcy Court at the Combined Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE COMBINED DS AND PLAN ARE ENCOURAGED TO READ THIS COMBINED DS AND PLAN IN ITS**

[3] Capitalized terms used herein shall have the meanings ascribed to them in Article I unless otherwise defined elsewhere herein.

**ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE COMBINED DS AND PLAN. The Debtors believe that confirmation and consummation of the Combined DS and Plan are in the best interests of the Debtors, their Estates, and their creditors. The Combined DS and Plan provides for an equitable distribution to Holders of Claims and the compromise and settlement of certain claims and controversies among the Debtors and their key stakeholders. The Debtors believe that any alternative to confirmation of the Combined DS and Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of significant value (and a corresponding reduction in the distributions to Holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs. Consequently, the Debtors urge all eligible Holders of Claims entitled to vote on the Combined DS and Plan to vote to ACCEPT the Combined DS and Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Noticing Agent on or before the Voting Deadline.**

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

A. *Defined Terms*

Unless the context otherwise requires, capitalized terms have the meanings set forth below.

1. *"Administrative Claim"* means a Claim incurred by the Debtors (or their Estates) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

2. "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date.

3. "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced entity was a debtor in a case under the Bankruptcy Code.

4. "*Allocation Percentage*" means the percentage of the aggregate Liquidating Trust Assets allocated to each Debtor, which percentage for each class (by Debtor) is as follows:[4]

| Debtor | Estimated Allocation Percentage |
|---|---|
| IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. | 76.05% |
| WAVE Wind Down, LLC f/k/a Wireless Advanced Vehicle Electrification, LLC | 1.49% |
| Timios Holdings Corp. | 0.16% |

[4] The Allocation Percentage of each Debtor is a fraction (expressed by a percentage), the numerator of which is the amount of all general unsecured claims filed against or scheduled by the respective Debtor and the denominator of which is all general unsecured claims filed against or scheduled by all Debtors. As such, the Allocation Percentage may change following the Debtors' or the Liquidating Trustee's, as applicable, completion of the Claims reconciliation process.

| Debtor | Estimated Allocation Percentage |
|---|---|
| Justly Holdings Inc. | 0.00% |
| Justly Markets Wind Down LLC f/k/a Justly Markets LLC f/k/a Delaware Board of Trade Holdings, Inc. | 0.00% |
| VIA Motors International, Inc. | 5.40% |
| VIA Motors, Inc. | 16.90% |

5. "*Allowed*" when used: (a) with respect to any Claim, except for a Claim that is an Administrative Claim, means such Claim to the extent it is (i) expressly allowed under the Combined DS and Plan, or (ii) not a Disputed Claim or a Disallowed Claim; (b) with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Article V.A of this Combined DS and Plan; and (c) with respect to Interests in any Debtor, means the Interests in such Debtor as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date. For the avoidance of doubt, a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim required to be filed under Article V.A filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allowed," "Allow," "Allowance" and "Allowing" shall have correlative meanings.

6. "*Ashby*" means Ashby & Geddes, P.A., the attorneys and professional staff retained in these Chapter 11 Cases by the Debtors pursuant to sections 327 and 330 of the Bankruptcy Code and approved by Final Order of the Court [D.I. 122].

7. "*Assets*" means all of the Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

8. "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the list of assumed Executory Contracts and Unexpired Leases (if any) filed as an exhibit to the Plan Supplement (if applicable), which may be supplemented or modified from time to time.

9. "*Avoidance Actions*" means all Causes of Action of the Estates that arise under sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

11. *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

13. "*Bar Date Order*" means the *Order (I) Establishing Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code), (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 197] entered in the Chapter 11 Cases.

14. "*Board*" means the board of directors or the board of managers of each Debtor, as applicable.

15. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16. "*Cash*" means the legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

17. "*Causes of Action*" means any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

18. "*Chapter 11 Cases*" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to the Debtors and Solectrac styled as *In re IDEX Wind Down, Inc. f/k/a Ideanomics, Inc.*, *et al.*, Chapter 11 Case No. 24-12728 (CTG).

19. "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims Bar Date*" means the applicable deadline for filing Proofs of Claim as set forth in the Bar Date Order or another order of the Bankruptcy Court.

21. "*Claims and Noticing Agent*" means Epiq.

22. "*Claim Objection Deadline*" means the date that is one hundred eighty (180) days after the Effective Date.

23. "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

24. "*Combined DS and Plan*" means this combined disclosure statement and chapter 11 plan, either in its present form or as it may be amended, supplemented or otherwise

modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

25. "*Combined Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Combined DS and Plan pursuant to section 1129 of the Bankruptcy Code and final approval of the Combined DS and Plan.

26. "*Company*" means the Debtors and their non-U.S. Affiliates.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

28. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Combined DS and Plan.

29. "*CRO*" means Alpesh Amin, the Chief Restructuring Officer of the Debtors.

30. "*D&Os*" means all current and former directors, managers, members, officers, and employees of (a) the Debtors, (b) the Debtors' current and former direct and indirect subsidiaries, and (c) the Debtors' current and former Affiliates.

31. "*D&O Actions*" means any and all Causes of Action of each Debtor and Estate against any of the D&Os, including claims for breach of fiduciary duty, knowing participation in breach of fiduciary duty or aiding and abetting breach of fiduciary duty, fraud, gross negligence and/or reckless mismanagement.

32. "*D&O Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of, or providing coverage to, any D&Os.

33. *"Debtor in Possession"* means any Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

34. "*Debtors*" means, collectively, IDEX Wind Down, Inc. f/k/a Ideanomics, Inc.; WAVE Wind Down, LLC f/k/a Wireless Advanced Vehicle Electrification, LLC; Timios Holdings Corp.; Justly Holdings Inc.; Justly Markets Wind Down LLC f/k/a Justly Markets LLC f/k/a Delaware Board of Trade Holdings, Inc.; VIA Motors International, Inc.; and VIA Motors, Inc. For the avoidance of doubt, the definition of Debtors does not include Solectrac.

35. "*DIP Motion*" means the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Use Cash Collateral, (B) Obtain Senior Secured Superpriority Postpetition Financing, and Granting Liens and Superpriority Administrative Claims, and (C) Provide Adequate Protection, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [D.I. 13] filed in these Chapter 11 Cases.

36. "*Disallowed*" means, with respect to any Claim that is not otherwise expressly Allowed hereunder, a Claim or any portion thereof that (a) has been Disallowed by a Final Order,

(b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Combined DS and Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Combined DS and Plan, or (d) has been waived or withdrawn by agreement of the applicable Debtor and the holder thereof, or has been waived or withdrawn by the holder thereof.

37. "*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest that is not yet Allowed or Disallowed, including (a) any Proof of Claim that, on its face, is contingent or unliquidated; (b) any Proof of Claim or request for payment of an Administrative Claim filed after the Effective Date or the deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Bankruptcy Court.

38. "*Disputed Claims Reserve*" means one or more reserves for Disputed Claims established and maintained by the Liquidating Trustee for the benefit of Holders of Disputed Claims.

39. "*Effective Date*" means, with respect to each Debtor, the date that the Combined DS and Plan becomes effective, which shall be a Business Day after all of the conditions specified in Article XIII.B have been satisfied or waived (to the extent waivable).

40. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

41. "*Epiq*" means Epiq Corporate Restructuring, LLC.

42. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

43. "*Estate Cash*" means Cash reflected on the Debtors' balance sheet as of the Effective Date and all Cash in their bank accounts, but excluding any Cash held or required to be held in the Professional Fee Escrow.

44. "*Estate Assets*" means, collectively, the following assets: (a) Estate Cash, (b) the Preserved Estate Claims, (c) the GUC Minimum Funding, (d) the Returned Tillou Causes of Action, and (e) amounts of cash remaining as of the Effective Date, which shall be transferred to the Liquidating Trust upon the Effective Date subject and pursuant to the terms of this Combined DS and Plan. For the avoidance of doubt, the Estate Assets do not include any Assets held by the Solectrac Estate.

45. "*Exculpated Parties*" means each of the following, to the extent permitted by applicable law, in their capacity as such: (a) each Debtor; (b) each D&O that served as a director and/or officer of any of the Debtors; (c) Ashby, as counsel to the Debtors; (d) Foley, as counsel to

the Debtors; (e) Riveron, as provider of CRO and supporting services to the Debtors; (f) Phoenix, as financial advisor to the Debtors; (g) Epiq, as Claims and Noticing Agent and administrative advisor to the Debtors; and (h) SSG, as investment banker for the Debtors.

46. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

47. "*Fee Application*" means an application for allowance and payment of a Professional Fee Claim.

48. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases.

49. "*Final DIP Order*" means the *Final Order Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Use Cash Collateral, (B) Obtain Senior Secured Superpriority Postpetition Financing, and Granting Liens and Superpriority Administrative Claims, and (C) Provide Adequate Protection, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [D.I. 118].

50. "*Final Order*" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided*, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

51. "*First Day Declaration*" means the *Declaration of Alpesh A. Amin in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 14].

52. "*Foley*" means Foley & Lardner LLP, the attorneys and professional staff retained in these Chapter 11 Cases by the Debtors pursuant to sections 327 and 330 of the Bankruptcy Code and approved by Final Order of the Court [D.I. 126].

53. "*General Unsecured Claim*" means any Claim against any of the Debtors other than an Administrative Claim, an Other Priority Claim, a Tax Claim, a Professional Fee Claim, an Other Secured Claim, and an Intercompany Claim. For the avoidance of doubt, the JVIS Deficiency Claim is included as a General Unsecured Claim.

54. "*Governance Documents*" means any charter, certificate of incorporation, certificate of formation, bylaws, limited liability company agreements (or any other formation and organizational documents) of the Debtors in effect as of the Petition Date, as such documents may

be amended from time to time, and any such documents put into effect subsequent to the Petition Date.

55. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

56. "*GUC Convenience Claim*" means a General Unsecured Claim in the amount of $20,000 or less, or a General Unsecured Claim that is reduced to $20,000 at the election of the Holder of the General Unsecured Claim.

57. "*GUC Convenience Claim Election*" shall have the meaning specified in Article VI.A of the Plan. A Holder of an Allowed Class 4 – General Unsecured Claim may opt out of Class 4 and opt into Class 3 – GUC Convenience Claim by making a GUC Convenience Claim Election.

58. "*GUC Minimum Funding"* means the amount of $250,000 less the amount distributed on account of Allowed GUC Convenience Claims that will be paid from the Tillou Cash Payment to the Liquidating Trust on the Effective Date, which shall be solely for the benefit of the Liquidating Trust Beneficiaries.

59. "*Holder*" means an Entity holding a Claim or an Interest, as applicable.

60. "*IDEX Wind Down*" means IDEX Wind Down, Inc. f/k/a Ideanomics, Inc.

61. "*Impaired*" means a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

62. "*Insurance Contracts*" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time or provide coverage, benefits, or proceeds to any of the Debtors and all agreements, documents, or instruments relating thereto, including, D&O Policies, insurance policies providing workers' compensation coverage and claims handling agreements.

63. "*Insurer*" means any company or other entity that issued an Insurance Contract, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

64. "*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor based on any fact, action, omission, occurrence or transaction that occurred or came into existence prior to or after the Petition Date, including any Administrative Expenses or other account receivable, account payable, contribution claim, or Cause of Action asserted by one Debtor against another Debtor.

65. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

66. "*Interest*" means (a) any outstanding ownership interest in any of the Debtors, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or

compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (b) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court

67. "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and (II) Granting Related Relief* [D.I. 107].

68. "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

69. "*IRS*" means the United States Internal Revenue Service.

70. "*JVIS*" means JVIS-USA, LLC.

71. "*JVIS Deficiency Claim*" means JVIS' Allowed General Unsecured Claim in the amount of $938,273.63 against VIA Motors, Inc.

72. "*JVIS Sale Order*" means the *Order (I) Approving the Sale of Certain Assets of Debtor VIA Motors, Inc. Free and Clear of Liens, Encumbrances, Claims and Interests, and (II) Granting Related Relief* [D.I. 252].

73. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

74. "*Liquidating Trust*" means the trust created as provided in the Combined DS and Plan pursuant to the Liquidating Trust Agreement for the benefit of the Liquidating Trust Beneficiaries.

75. "*Liquidating Trust Administrative Claims Reserve*" means an amount reserved as provided in the Combined DS and Plan to pay any expenses of the Liquidating Trust and any Allowed Administrative Claims, Tax Claims, or Other Priority Claims in accordance with the Combined DS and Plan.

76. "*Liquidating Trust Agreement*" means the agreement governing the Liquidating Trust, dated as of the Effective Date, which shall be substantially in the form filed with the Bankruptcy Court as part of the Plan Supplement.

77. "*Liquidating Trust Assets*" means all property of the Estates including, without limitation, (a) all Causes of Action not otherwise sold, released or settled in the Chapter 11 Cases or under the Combined DS and Plan herein and (b) the Estate Assets. Except as otherwise prescribed by this Combined DS and Plan or the Liquidating Trust Agreement, the Liquidating Trust Assets shall be transferred to the Liquidating Trust by the Debtors, Holders of Claims, and Holders of Interests, or by any other Person then in possession of Liquidating Trust Assets, as applicable, on the Effective Date. For the avoidance of doubt, no Assets or Causes of Action owned by Solectrac are considered a Liquidating Trust Asset.

78. "*Liquidating Trust Beneficiaries*" means Holders of Liquidating Trust Units.

79. "*Liquidating Trust Expenses*" the reasonable and documented fees and expenses incurred by the Liquidating Trust and reimbursable pursuant to the Combined DS and Plan and the Liquidating Trust Agreement.

80. "*Liquidating Trust Units*" means beneficial interests in the Liquidating Trust entitling Holders thereof to their pro rata share of distributions from the Liquidating Trust in accordance with the Combined DS and Plan and the Liquidating Trust Agreement.

81. "*Liquidating Trustee*" means Phoenix, as trustee of the Liquidating Trust.

82. "*Net Proceeds of Estate Claims*" means the Proceeds of Estate Claims net of reasonable and documented Liquidating Trust Expenses incurred in connection with administering the Preserved Estate Claims.

83. "*Non-Voting Combined Notice*" means the non-voting combined hearing notice to be distributed to Holders of Claims and Interest not entitled to vote on the Combined DS and Plan, which contains a form for such Holders to opt into the third-party releases set forth in **Article XI.B** of this Combined DS and Plan.

84. "*Other Priority Claims*" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Administrative Claims, Other Secured Claims, and Tax Claims.

85. "*Other Secured Claims*" means a Secured Claim that has not been Allowed pursuant to the Sale Orders.

86. "*Petition Date*" means December 4, 2024.

87. "*Phoenix*" means Phoenix Management, a Part of J.S. Held LLC, the financial advisor retained in these Chapter 11 Cases by the Debtors pursuant to sections 327 and 330 of the Bankruptcy Code and approved by Final Order of the Court [D.I. 351].

88. "*Plan Distribution*" means the payment or distribution under the Combined DS and Plan of Liquidating Trust Assets, securities, or instruments evidencing an obligation under the Combined DS and Plan to the Holder of an Allowed Claim, a Liquidating Trust Beneficiary.

89. "*Plan Distribution Date*" means with respect to any Claim (a) if such Claim is Allowed on the Effective Date, a date that is as soon as reasonably practicable on or after the Effective Date, or (b) if such Claim is not Allowed on the Effective Date, the date or dates determined by the Liquidating Trustee, upon which the Liquidating Trustee shall make Plan Distributions.

90. "*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Combined DS and Plan that aid in effectuating the Combined DS and Plan as specifically identified as such herein and filed with the Bankruptcy Court, including this Combined DS and Plan, the Plan Supplement, and the Confirmation Order.

91. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Combined DS and Plan, to be Filed at least seven (7) calendar days before the Combined Hearing, and any additional documents or schedules Filed before the Effective Date as supplements or amendments to the Plan Supplement, including the Liquidating Trust Agreement. Any reference to the Plan Supplement in this Combined DS and Plan, including, without limitation, the Liquidating Trust Agreement, shall include each of the documents identified above. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

92. "*Preserved Estate Claims*" means those Causes of Action of the Debtors and the Estates, including the Debtors' rights under assumed Executory Contracts, assumed Unexpired Leases and the Returned Tillou Causes of Action, and Avoidance Actions, to the extent not sold pursuant to the Sale Orders (unless assigned back to the Debtors or the Liquidating Trust), and were not waived, relinquished, released, compromised, or settled in the Combined DS and Plan or any Final Order. For the avoidance of doubt, the Preserved Estate Claims do not include any Causes of Action owned by the Solectrac Estate.

93. "*Pro Rata Share*" means, for an Allowed Claim in a particular Class, a share proportional to the ratio of the amount of such Allowed Claim to the amount of all Allowed Claims in the same Class.

94. "*Proceeds of Estate Claims*" means proceeds of Preserved Estate Claims received by the Liquidating Trust.

95. "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code.

96. "*Professional Fee Bar Date*" means the first business day that is forty-five (45) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

97. "*Professional Fee Claims*" means all Claims for accrued, contingent and/or unpaid fees and expenses (including hourly, transaction, and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not Disallowed by a Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction Disallows or reduces by a Final Order any amount of a Professional's fees or expenses, then those Disallowed amounts or the amount of any such reduction shall no longer constitute Professional Fee Claims.

98. "*Professional Fee Escrow*" means an interest-bearing escrow account held by the Liquidating Trust to pay Professional Fee Claims upon approval by the Bankruptcy Court.

99. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

100. "*Related Party*" means, each solely in its capacity as such, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, assignors, participants, successors, assigns, majority-owned subsidiaries, direct or indirect partners, limited partners, general partners, members, principals, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

101. "*Released Party*" means each of the following, each solely in their capacity as such: (a) each Debtor; (b) SSG, as investment banker for the Debtors; (c) the Liquidating Trustee; (d) Foley, as counsel to the Debtors, (e) Riveron, as provider of CRO and supporting services to the Debtors; (f) Epiq, as Claims and Noticing Agent and administrative advisor to the Debtors; (g) the CRO; (h) Tillou; and (i) each Related Party of each Entity in clauses (a) through (h) above.

102. "*Releasing Party*" means, collectively, and in each case solely in their respective capacities, as such: (a) all Holders of Claims who are sent a Ballot, vote to accept or reject the Combined DS and Plan and do not timely elect to opt-out of the releases provided by the Combined DS and Plan in accordance with the Solicitation Procedures; (b) all Holders of Claims who are sent a Non-Voting Combined Notice and timely elect to opt-in to the release provided by the Combined DS and Plan in accordance with the Solicitation Procedures; (c) each Released Party; (d) Tillou; and (e) each current and former Affiliate of each Entity in clauses (a) through (d) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Combined DS and Plan under applicable non-bankruptcy law; and (f) each Related Party of each Entity in clause (a) through (e) above.

103. "*Returned Tillou Causes of Action*" means those Causes of Action acquired by Tillou pursuant to the Sale Order and contributed by Tillou to the Liquidating Trust on the Effective Date. A schedule of the Returned Tillou Causes of Action will be included in the Plan Supplement.

104. "*Riveron*" means Riveron Management Services, LLC, and its professional staff retained in these Chapter 11 Cases by the Debtors pursuant to sections 327 and 328 of the Bankruptcy Code and approved by Final Order of the Court [D.I. 124].

105. "*Sale Orders*" means, together, the JVIS Sale Order and the Tillou Sale Order.

106. "*Schedules*" means, unless otherwise stated, the schedules of assets and liabilities and list of Interests and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

107. "*Secured Claim*" means, when referring to a Claim: (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant

to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Combined DS and Plan as a Secured Claim.

108. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

109. "*Solicitation Order*" means the *Order (I) Approving (A) the Combined DS and Plan on an Interim Basis, (B) the Solicitation and Tabulation Procedures, And (C)* the Forms of *Ballots, Solicitation Package, and Notices, (II) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Combined DS and Plan, (III) Scheduling a Combined Hearing for Final Approval and Confirmation of the Combined DS and Plan, and (VI) Granting Related Relief*.

110. "*Solectrac*" means Solectrac, Inc.

111. "*SSG*" means SSG Advisors, LLC, and its professional staff retained in these Chapter 11 Cases by the Debtors pursuant to sections 327 and 328 of the Bankruptcy Code and approved by Final Order of the Court [D.I. 123].

112. "*Tax Claim*" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

113. "*Therese Note*" means that certain Secured Negotiable Promissory, dated April 6, 2023, made payable to Therese Lee Carabillo by IDEX Wind Down.

114. "*Tillou*" means Tillou Management and Consulting LLC and its successors and assigns, subsidiaries, and Affiliates, and any of their current and former officers, directors, members, partners, employees, agents.

115. "*Tillou Cash Payment*" means, the payment made by Tillou to the Debtors or the Liquidating Trust, as applicable, upon confirmation of the Combined DS and Plan, in the amount of $517,000 in Cash in exchange for the releases provided in Articles XII.A and XII.B of this Combined DS and Plan.

116. "*Tillou Promissory Notes*" means, together, with all other amendments, amendments and restatements, supplements, and all other documents in connection therewith, that certain Promissory Note, dated December 13, 2022, by and between IDEX Wind Down and the Prepetition Lender in the original principal amount of $2,000,000; that certain Promissory Note, dated March 19, 2023, by and between IDEX Wind Down and the Prepetition Lender, in the original principal amount of $2,000,000; that certain Amended and Restated Promissory Note, dated April 25, 2024, by and between IDEX Wind Down and the Prepetition Lender, in the original principal amount of $4,137,095; that certain Amended and Restated Promissory Note, dated May 29, 2024, by and between IDEX Wind Down and the Prepetition Lender, in the original principal amount of $7,217,095; that certain Amended and Restated Promissory Note, dated June 18, 2024, by and between IDEX Wind Down and the Prepetition Lender, in the original principal amount of $7,862,095; that certain Amended and Restated Promissory Note, dated July 19, 2024,

by and between IDEX Wind Down, and the Prepetition Lender, in the original principal amount of $8,638,095; that certain Amended and Restated Promissory Note, dated August 9, 2024, by and between IDEX Wind Down and the Prepetition Lender, in the original principal amount of $10,382,095; that certain Amended and Restated Promissory Note, dated November 5, 2024, by and between IDEX Wind Down and Tillou, in the original principal amount of $13,835,911.64; and that certain Amended No. 1 to Amended and Restated Promissory Note, dated November 25, 2024, by and between IDEX Wind Down and the Prepetition Lender, which increased the original principal amount to $14,347,850.64.

117. "*Tillou Sale Order*" means the *Order (I) Approving the Sale of Substantially All Assets of the Debtors Free and Clear of Liens, Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [D.I. 254].

118. "*Unexpired Lease*" means a lease to which any of the Debtors are a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

119. *"Unimpaired"* means a claim that is not "impaired" pursuant to section 1124 of the Bankruptcy Code.

120. "*U.S. Trustee*" means the office of the United States Trustee for the District of Delaware.

121. "*Voting Deadline*" means December 29, 2025 at 12:00 p.m. (prevailing Eastern Time), or such other date and time as may be set in accordance with the Solicitation Procedures.

122. "*Wind-Down Budget*" means an amount of $1,815,700 funded by Tillou pursuant to the DIP Motion and Final DIP Order, as amended.

B. *Interpretation*

Unless otherwise specified, all section, article and exhibit references in the Combined DS and Plan are to the respective section in, article of or exhibit to the Combined DS and Plan, as the same may be amended, waived or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender. The Combined DS and Plan may be referred to for purposes of interpretation to the extent any term or provision of the Combined DS and Plan is determined by the Bankruptcy Court to be ambiguous.

C. *Headings*

The headings used in the Combined DS and Plan are inserted for convenience only, and neither constitute a portion of the Combined DS and Plan nor in any manner affect the construction of the provisions of the Combined DS and Plan.

D. *Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.*

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Combined DS and Plan, unless a different definition is given in Article I.A or elsewhere in the Combined DS and Plan. Unless otherwise specified, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined DS and Plan. Captions and headings to Articles, Sections, schedules, and exhibits are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof. Any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. References to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system. References to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable. References to "shareholders," "directors," and "officers" shall also include "members" and "managers," as applicable, as such terms are defined under the applicable state limited liability company laws or applicable foreign law. The words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation" and "but not limited to." Unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time. Any reference herein to an Entity as a holder of a Claim or interest includes that Entity's successors and assigns. Capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form.

Any immaterial effectuating provisions may be interpreted by the Debtors or the Liquidating Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of the Combined DS and Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Entity.

E. *Other Terms*

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Combined DS and Plan as a whole and not to any particular section, subsection or clause contained in the Combined DS and Plan.

F. *Appendices to Plan Documents*

All appendices to the Plan Documents are incorporated into the Combined DS and Plan by this reference and are a part of the Combined DS and Plan as if set forth in full herein. Except as otherwise provided herein, the Plan Supplement shall be filed with the Bankruptcy Court not less than seven (7) days prior to the Voting Deadline. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, at the Debtors' case information website located at https://dm.epiq11.com/case/ideanomics/ or at www.deb.uscourts.gov, or contact the Claims and Solicitation Agent via telephone at (888) 884-3413 (toll-free in the U.S. and Canada) or (503) 242-1684 (international). Unless otherwise expressly provided in the Combined DS and Plan, the

Debtors may alter, modify, or amend any Plan Supplement document in accordance with Article XV.

G. *Controlling Document*

In the event of an inconsistency between this Combined DS and Plan or any solicitation document, the terms of the Combined DS and Plan shall control in all respects. In the event of an inconsistency between the Combined DS and Plan and the Plan Supplement, the terms of the Combined DS and Plan shall control. In the event of an inconsistency between the Confirmation Order and the Combined DS and Plan, the Confirmation Order shall control.

H. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. Unless otherwise specified, all references herein to times of day shall be references to prevailing Eastern Time. In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

I. *References to Monetary Figures*

All monetary figures referenced herein are denominated in U.S. dollars, unless otherwise expressly provided.

J. *Nonconsolidated Plan*

For purposes of administrative convenience and efficiency, the Combined DS and Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors. The Combined DS and Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

A. *The Debtors' Corporate History*

Debtor IDEX Wind Down, the parent of the other Debtors, was incorporated in the State of Nevada on October 19, 2004.[5] IDEX Wind Down has been headquartered in New York state since 2018.

Prior to entry of the Sale Orders, IDEX Wind Down maintained seven (7) subsidiaries, of which only Debtor Wireless Advanced Vehicle Electrification, LLC ("WAVE") was operating.

[5] During prior iterations of its business, IDEX Wind Down was formerly known as "Wecast Network, Inc.," and "Seven Star Cloud Group, Inc.," before changing its name to IDEX Wind Down in August 2018.

The remaining subsidiaries were (i) holding companies or dormant subsidiaries that ceased operations, (ii) remain unliquidated solely for the purpose of compliance with administrative formalities, or (iii) in the wind down process and are expected to be liquidated.

From 2010 through 2017, IDEX Wind Down's primary business activity was providing premium content video on demand services, with operations chiefly in China through subsidiaries and variable interest entities under the brand names of China Broadband and, later, You-on-Demand. It was during this time that Mr. Shane McMahon, the Debtor's Chairman, became involved in the Debtors and their earlier business iterations as he was the CEO, Chairman, Vice Chairman during various times between 2010 and 2025. IDEX Wind Down closed the You-on-Demand business in 2019.

Starting in 2017, IDEX Wind Down transitioned its business model to pursue market opportunities in the financial technology ("Fintech") space. IDEX Wind Down built a network of businesses, operating principally in the trading of petroleum products and electronic components, which the company believed had significant potential to recognize benefits from blockchain and artificial intelligence technologies. The Fintech operations also included providing title and escrow services throughout the United States, through the acquisition of Debtor Timios Holdings Corp. and its affiliates ("Timios") in January 2021. Further, Debtors Justly Holdings Inc. ("Justly Holdings") and Justly Markets LLC ("Justly Markets") were the Debtors' FINRA-registered broker dealer destinations for Environmental, Social, and Governance (ESG) and thematic investments.

In the second half of 2018, IDEX Wind Down began identifying opportunities in the Global Electric Vehicle ("EV") industry to facilitate the large-scale conversion of fleet vehicles from internal combustion engines to EV. Recognizing substantial potential growth opportunities in the nascent EV space, the Debtors pivoted to focus on EV and EV-adjacent markets. To concentrate on its EV business, the Debtors divested and/or wound down the Fintech businesses in 2022 and 2023.

From 2021 through 2023, the Debtors focused on opportunities within the United States and Europe to align with available governmental incentives, and formulated an acquisition strategy to acquire EV and technology assets to complete the foundation for the development of four product-focused EV verticals comprised of off-highway, two-wheeler, and on-highway vehicles, and associated energy and electric charging services. These transactions included the acquisitions of Debtors WAVE, Solectrac, and Via Motors International, Inc. and its affiliates ("VIA Motors"), and non-Debtors US Hybrid Corporation ("US Hybrid"), and the majority ownership of Energica Motor Company, S.P.A. ("Energica").[6] The Debtors financed these acquisitions through cash on hand and the issuance of common stock, warrants, equity lines of credit, At the Money ("ATM") transactions, and convertible notes. Collectively, the Debtors spent approximately $320 million

[6] In March 2022, IDEX Wind Down acquired over 70% ownership in Energica, an electric motorcycle company based in Modena, Italy, that has been recognized with multiple awards as one of the world's leading electric motorcycle manufacturers. However, Energica faced similar challenges in the EV market in Italy as well as other supply chain challenges. Despite the Debtors best efforts to find a buyer, Engerica entered into an Italian bankruptcy judicial liquidation on October 14, 2024.

to fund these acquisitions.[7]

The majority of these investments were early to market growth companies and remained a substantial liquidity drain on the Debtors as the Debtors seek profitability in the relatively new and growing EV industry which has faced well-publicized challenges and crises in recent years. Therefore, to consolidate around their most promising business, that of WAVE, the Debtors engaged in various divestitures and business winddowns. In 2023, the Debtors decided to wind down Tree Technologies Sdn. Bhd. ("Tree Technologies"), culminating in a sale of leasehold land acquired by that business (sale closed in January 2024), and the company's remaining China-based operations, at that time focused on the financing of commercial EVs to fleet operators, due to the excessively competitive Asian EV market. The Debtors also sold the Timios business (in July 2023) and US Hybrid (in January 2024) for no material gain or loss. Prior to the Petition Date, the Debtors also attempted to sell the Energica, VIA Motors, and Solectrac businesses, but were unable to come to economic terms or transactions that were viable.

B. *The Debtors' Business Operations*

Following the divestitures and winding down of certain of the Debtors' businesses, as of the Petition Date, the Debtors had one operating entity, WAVE. The Debtors' other remaining business lines—VIA Motors, Solectrac, and Energica—were shuttered or are left without supporting funding due to liquidity constraints typical of the Company's industry peers.

1. WAVE

WAVE was founded in 2011 and is headquartered in Salt Lake City, Utah. WAVE is a leading provider of high-power wireless inductive charging solutions for medium and heavy-duty EVs. Embedded in-route on public roads and at depot facilities, the WAVE system automatically charges vehicles during scheduled stops without the inconvenience of cable-based systems. The hands-free WAVE system improves operational efficiency of electric vehicles and enables fleets to achieve extended duty cycles comparable to those of traditional internal combustion engine commercial vehicles. This is believed to be a key step in enabling perpetual operations for fleets, and an enabling technology for autonomous freight and autonomous warehouse operations.

Deployed since 2012, WAVE has demonstrated the capability to develop and integrate high-power charging systems into heavy-duty EVs from leading commercial EV manufacturers, such as, among others, BYD, Kenworth, and Cummins. WAVE provides custom fleet solutions for mass transit, logistics, airport and campus shuttles, drayage fleets, and off-road vehicles at ports and industrial sites. Currently, WAVE's wireless charging system is being utilized by, among others, the Antelope Valley Transit Authority ("AVTA"), the only fully electric transit authority in the United States, which serves the cities of Palmdale, California, Lancaster, California, and Northern Los Angeles County. At this time, the AVTA is the largest system of high-powered

[7] To further support this initiative, the Debtors entered into a lease agreement for a facility in New Jersey to serve a center of excellence to promote education and advocacy of electric and hydrogen powered vehicles to commercial fleet operators. The Debtors stopped using this facility in 2023 and recorded an impairment loss of $3 million.

wireless vehicle charging deployed globally anywhere in the world, covering 200 square miles—and serves as a showcase of WAVE's market leading technology.

Since acquiring WAVE in January 2021, the Debtors continued investing in engineering, facilities and production resources, including continuous development programs improving technology, reducing cost and scaling manufacturing. These investments and programs were necessary to meet current and anticipated demand for WAVE's high power inductive wireless charging products. WAVE continued to develop its high-powered induction capabilities beyond their initial power and speed levels, successfully delivering systems at 125kW and 500kW. Further, WAVE has over 40 patents issued, 21 patents published, and 25 patents pending for its hardware and software patents in North America, Europe, and China. Specifically, WAVE allows for EV to charge at depot facilities without the inconvenience of cable-based charging systems. Among other things, this technology presents opportunities for the autonomous EVs of the future to charge on their routes, at all hours, without human assistance.

To support widespread adoption, WAVE has developed relationships with additional OEM partners to facilitate the integration of its vehicle-side hardware. Additionally, WAVE pursued interoperability between its systems so WAVE-enabled vehicles may access wireless charging regardless of the power level of a given WAVE system. Indeed, the Debtors also negotiated business relationships for several large companies in the United States and the Middle East to utilize the WAVE wireless charging system.

2. VIA Motors

Ideanomics acquired VIA Motors in January 2023, following its initial investment in the business in 2021. VIA Motors is a commercial EV company in the Class 2 to Class 5 commercial EV segment. The VIA Motors EV is built on a modular proprietary "skateboard" tailored to the rigors and needs of commercial customers. This skateboard platform allows for the upfitting of the vehicle as a box truck, walk-in van, service truck, skate truck, bus, shuttle, step van, or other form. The VIA Motors platform was developed with commercial drivers in mind—utilizing durable steel frames, cost-effective materials, and ergonomic features.

Although VIA Motors has industry-leading technology, the business required significant capital to develop the products, maintain operations, and achieve meaningful cash inflows. Unfortunately, VIA Motors did not have the necessary cash to continue in 2024 and ceased operating the business. Therefore, the Debtors recorded approximately $198 million in impairment losses related to VIA Motors. Furthermore, in 2024, VIA Motors ceased to use its lease in Michigan, resulting in an impairment loss of $4.4 million.

3. Solectrac

In June 2021, IDEX Wind Down acquired Solectrac, a California-based assembler and distributor of electric powered tractors. Solectrac is a certified B Corp. Founded in 2012, Solectrac was the first North American company to offer fully battery-powered, all-electric tractors for agriculture and utility applications. As a first mover, Solectrac built a leadership position in the North American electric tractor market. Solectrac's products include 25, 50 and 75 horsepower electric tractors, and an innovative electric 2-wheel tractor / tiller under development.

Due to shifting EV market conditions, Solectrac began building a national dealer/distributor network to a direct-to-customer strategy supported by a small number of dealers in geographic regions where adoption of the technology is greater. Solectrac's direct customer sales have been further supported by government programs designed to incentivize electrification.

Like VIA Motors, Solectrac lacked the necessary cash flows to continue operations. In October 2023, the Debtors shuttered Solectrac and held it for sale to third parties. Again, similar to industry trends in commercial on-road EV, Solectrac's peers have also been subjected to a lack of capital availability and have publicly announced rounds of workforce reduction, suspension of contracting manufacturing, and a focus on licensing their technologies as a means to survive.

Solectrac is not a Debtor to the Combined DS and Plan and no Claims or Interests of Solectrac are being resolved through the Combined DS and Plan. The Debtors are determining whether they will convert Solectrac's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or will dismiss Solectrac's Chapter 11 Case and allow for Solectrac to be dissolved through state-regulated procedures.

A more detailed summary of the Debtors' business operations can be found in the First Day Declaration.

C. *The Debtors' Prepetition Capital and Equity Structure*

As of the Petition Date, IDEX Wind Down had approximately $30,519,894.64 million in the aggregate of outstanding principal funded debt obligations, as reflected in the chart below and as more fully described in the DIP Motion:[8]

| **Funded Debt** | **Maturity** | **Total Amount Outstanding**[9] |
|---|---|---|
| Tillou Promissory Notes | May 2024 | $14,347,850.64 |
| Secured Debenture Purchase Agreement | Variable | $4,524,500 |
| Mitsubishi Financing Arrangements | Variable | $9,174,213 |
| NFS Leasing Financing Arrangements | Variable | $1,475,069 |
| Small Business Association Paycheck Protection Program | April 2025 | $133,256 |
| Therese Note | June 2023 | $865,006 |
| **TOTAL FUNDED DEBT** | **$30,519,894.64** | |

IDEX Wind Down is a public company, and its common stock was listed on the Nasdaq Stock Market LLC's ("Nasdaq") until July 11, 2024 and then subsequently traded on OTC Markets under the symbols "IDEX" and "IDEXQ" respectively. As of the Petition Date, IDEX Wind Down had approximately (a) 21,850,000 of issued and outstanding shares of common stock; and (b) 7,000,000 shares of Series A redeemable and convertible preferred stock were issued and

[8] The table is for illustrative and summary purposes only. The Debtors do not admit to the validity, priority, or allowance of any claim, lien, or interest in property and reserve their rights in relation to such issues.

[9] Amounts include the accrued interest and approximate fees and expenses due and owing under the applicable debt instruments.

outstanding (Series A Preferred Stock); and (c) 2,000,000 shares of Series C redeemable and convertible preferred stock were issued and outstanding (Series C Preferred Stock).

## ARTICLE III
## EVENTS LEADING TO THE CHAPTER 11 FILING

A. *Financial and Operational Issues*

The Debtors were unable to maintain and generate sufficient liquidity to fund operations. In 2020 and 2021, the Debtors raised over $717 million in cash through the issuance of common stock and convertible notes. The vast majority of these proceeds went towards $320 million in EV industry or EV industry-adjacent acquisitions that began in 2021. As these businesses are considered pre-profitable, growth businesses, they required additional capital to fund, among other things, research and development, operations, manufacturing, and sales. The Debtors' businesses did not become cash flow positive.

1. Negative Financial Performance

As outlined in the chart below, the Debtors experienced significant operating losses that significantly outpaced revenues, generating cumulative operating losses of over $800 million in five years.

| Year | Revenue | Operating Expenses | Loss from Operations | Ending Cash Balance |
|---|---|---|---|---|
| 2019 | $44,566,000 | $111,682,000 | $(68,574,000) | $2,633,000 |
| 2020 | $26,759,000 | $97,701,000 | $(95,644,000) | $165,764,000 |
| 2021 | $114,080,000[10] | $282,785,000 | $(259,557,000) | $269,863,000 |
| 2022 | $19,015,000 | $209,276,000 | $(212,634,000) | $2,914,000 |
| 2023 | $15,459,000 | $214,740,000 | $(217,454,000) | $1,249,000 |
| **Cumulative Loss from Operations** | | | **$(853,883,000)** | |

Further, the Debtors cash balance decreased from a high of $269 million as of December 31, 2021, to $1.2 million as of December 31, 2023. As of the Petition Date, the Debtors had approximately $189,000 in cash. Simply put, the Debtors' businesses were not financially sustainable without receiving substantial influxes of new financing.

Given negative trends and headwinds in the growth-oriented EV space in recent years, and the fact that the Debtors' operations consumed significantly more cash than they generated, the Debtors undertook a number of restructuring initiatives to try to boost liquidity and right-size the

[10] The 2021 revenue was incorrectly listed in the 10-K and resulted in a restatement for 2021 and 2022.

business. Ultimately, these initiatives did not yield sufficient financial results to avoid the Chapter 11 Cases.

2. Qualified Audit Opinions

As a result of the Debtors' financial performance and negative cash flows, the Debtors' independent auditors began issuing qualified opinions regarding the Debtors' long-term financial viability. Beginning in 2021, the Debtors publicly disclosed that there was substantial doubt about the Debtors' ability to continue as a going concern. These disclosures were the result of the Debtors' recurring losses from operations and the lack of liquidity to sufficiently fund operations and the acquisitions that the Debtors executed.

3. Nasdaq De-Listing

Further, prior to the Petition Date, IDEX Wind Down's stock price and market capitalization was out of compliance with Nasdaq listing rules. On July 9, 2024, Ideanomics was notified by Nasdaq that Ideanomics would be delisted from The Nasdaq Capital Market, effective as of July 11, 2024, due to Ideanomics' noncompliance with Nasdaq Listing Rules 5550(a)(2) and 5550(b)(2).[11] Ideanomics common stock is still quoted on the OTC Markets' under the trading symbol "IDEXQ".

The Nasdaq delisting had a significant detrimental impact on the Debtors' ability to raise capital to fund operations.

B. *Prepetition Initiatives to Boost Liquidity*

Based on their financial performance, operational issues, and public reporting concerns (stock price and market capitalization concerns), the Debtors' ability to secure additional funding to support their operations became increasingly difficult. With limited sources of capital and continuing operating losses, the Debtors continued to implement initiatives to further costs and improve liquidity. In late 2023, the Debtors engaged Foley, as legal counsel, and Riveron, as financial advisor, to assist the Debtors in reviewing their financial situation and restructuring alternatives. In October 2024, the Debtors retained SSG, as investment banker, to further assist in these efforts.

At an operational level, the Debtors ceased operations of their business lines except for WAVE. The Debtors continuously reviewed staffing levels and as of the Petition Date, the Debtors only had a skeleton crew of 17 full-time employees and 1 part-time employee. These decisions were made to focus remaining capital and assets on WAVE—the business most mature and able to achieve success in the EV market.

Since Fall 2023 and through the Petition Date, the Debtors considered and pursued a range of possible options, including (i) seeking to raise financing from new financing sources and existing stakeholders; (ii) soliciting interest in strategic transactions; (iii) attempting to market and

[11] IDEX Wind Down first started receiving notices from the Nasdaq in May 2022 regarding IDEX Wind Down's' failure to satisfy Nasdaq's continued listing requirements and rules.

sell all or a portion of their assets and/or operations to third parties; and (iv) negotiating with stakeholders around potential in- and out-of-court restructuring options that would enable the Company to continue as an operating business. The Debtors went to great lengths to pursue all such options. Unfortunately, notwithstanding these comprehensive efforts, IDEX Wind Down was delisted from NASDAQ on July 11, 2024, and subsequently lost access to funding that it had relied upon. The Debtors concluded that, based on its deteriorating financial condition, the value maximizing pathway was to identify a purchaser for its valuable assets and establish a market-tested auction sale process.

In parallel with its various prepetition initiatives, the Debtors, with the assistance of their advisors, engaged in extensive good faith, arm's-length negotiations over the terms of debtor-in-possession financing with Tillou. As approved by the Final DIP Order, the Debtors and Tillou negotiated debtor-in-possession financing that preserved the Debtors' liquidity during the pendency of the Chapter 11 Cases and funded the Wind-Down Budget.

## ARTICLE IV
## EVENTS CONCURRENT WITH AND FOLLOWING COMMENCEMENT OF THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property that was not sold pursuant to the Sale Orders and continue to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 and the *Order (I) Authorizing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 and (II) Granting Related Relief* [D.I. 38] entered by the Bankruptcy Court on December 5, 2024, in each of the Chapter 11 Cases. No request has been made for the appointment of a trustee or examiner and no official committee of unsecured creditors was formed in the Chapter 11 Cases.

### A. *Operational and Other Relief*

On or shortly after the Petition Date, the Debtors filed a number of "first day" motions designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. The relief requested in the motions has been granted in various orders entered by the Bankruptcy Court.

The orders entered by the Bankruptcy Court either on an interim or final basis enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including by, among other things, (1) authorizing the Debtors to maintain existing cash management system, bank accounts, and business forms, and continue to perform intercompany transactions [D.I. 104]; (2) authorizing the Debtors to pay certain prepetition taxes and fees [D.I. 100]; (3) authorizing the Debtors to pay their obligations under prepetition insurance policies, continue paying brokerage fees, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business [D.I. 105]; (4) granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and maintain certain employee benefit programs [D.I. 99]; (5) approving procedures for, among other things, determining adequate assurance for utility

providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance [D.I. 103]; (6) authorizing the Debtors to pay certain prepetition amounts owed to certain vendors, suppliers, service providers, and similar entities that provide goods and services to the ongoing operations of the Debtor [D.I. 101]; and (7) approving procedures regarding certain transfers of, or certain claims of worthlessness for federal or state tax purposes with respect to, equity securities in IDEX Wind Down or any beneficial interest therein [D.I. 102].

B. *The DIP Facility*

On January 8, 2025, the Court entered the Final DIP Order [D.I. 118], approving the debtor-in-possession financing for these Chapter 11 Cases (the "DIP Facility") provided by Tillou. In particular, the DIP Facility consisted of (a) a term loan in the aggregate principal amount of $11,619,000 of "new money" loans that were made available to the Debtors pursuant to the terms of the Final DIP Order and (b) a "creeping roll up" of the Prepetition Tillou Obligations (as defined in the Final DIP Order) during the interim period and up to the full amount of the Prepetition Tillou Obligations upon entry of the Final DIP Order.

The DIP Credit Agreement (as defined in the Final DIP Order) and the Final DIP Order contemplated that the Prepetition Tillou Obligations would be "rolled up" on a dollar-for-dollar basis concurrently with the making of Term Loan Advances (as defined in the DIP Credit Agreement). Upon entry of the Final DIP Order, the remaining Prepetition Tillou Obligations were "rolled up" and the DIP Obligations increased on a dollar-for-dollar basis by such amount in accordance with the DIP Credit Agreement. In exchange for consenting to the roll up, Tillou permitted the Debtors to place $1,815,700 into a segregated account to facilitate the wind-down of the Debtors as contemplated in the Wind-Down Budget. The Tillou Sale Order further provided the Wind-Down Budget could be used by the Debtors without regard to line items otherwise described in such budget.

C. *Retention of Professionals*

On the Petition Date, the Debtors filed an application to retain and employ Epiq as Claims and Noticing Agent. An order approving the Claims and Noticing Agent was entered at D.I. 42. In addition, to assist the Debtors in carrying out their duties as debtors in possession, and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ the following professionals: (1) Foley, as counsel to the Debtors [D.I. 126]; (2) Ashby, as Delaware counsel to the Debtors [D.I. 122]; (3) Riveron, as provider of CRO and supporting services, and Alpesh A. Amin as CRO to the Debtors [D.I. 124]; (4) SSG, as the investment banker [D.I. 123]; (5) Epiq, as the Administrative Advisor [D.I. 125].

On March 7, 2025, following the close of the sale of assets approved pursuant to the Tillou Sale Order, the Debtors terminated their engagements with Riveron and the CRO. As a result, the Debtors retained Phoenix as replacement financial advisor to succeed Riveron. The Bankruptcy Court entered an order authorizing the Debtors' retention of Phoenix as financial advisor at D.I. 351. The Debtors also retained tax professionals to assist with the finalization of certain tax returns. *See* D.I. 352.

D. *The Sale of Certain Assets*

To further maximize the value of the Debtors' estates, on December 9, 2024, the Debtors sought entry of an order approving procedures for the sale of substantially all of their assets; approving Tillou as the stalking horse bidder; scheduling an auction and a hearing to approve the sale; and approving the procedures related thereto [D.I. 51].

On January 8, 2025, the Bankruptcy Court entered the Bidding Procedures Order [D.I. 119], approving the bidding procedures in connection with the sale of the Debtors' assets as well as the designation of Tillou as stalking horse bidder.

On February 20, 2025, the Debtors filed their *Notice of (I) Cancellation of Auction and (II) Designation of Successful Bidders* [D.I. 233], stating that Tillou, as the stalking horse bidder, was the successful bidder for the assets of IDEX Wind Down, WAVE, Timios, Justly Holdings, and Justly Markets.

On February 24, 2025, the Debtors filed their *Notice of Designation of Successful Bidder* [D.I. 237], stating that JVIS was the successful bidder of certain assets of VIA Motors, Inc.

On February 26, 2025, the Bankruptcy Court held a sale hearing, at which the Bankruptcy Court approved the sale of assets to Tillou and JVIS. The Bankruptcy Court entered the JVIS Sale Order on February 26, 2025 [D.I. 252] and entered the Tillou Sale Order on March 3, 2025 [D.I. 254].

Pursuant to the terms of the Tillou Sale Order, as consideration for Tillou's acquisition of certain assets, Tillou provided consideration of the total aggregate amount outstanding of the Prepetition Obligations (as defined in the Final DIP Order), if any, and the DIP Obligations (as defined in the Final DIP Order), in each case including, without limitation, any accrued interest and fees, which was deemed to be discharged and satisfied in full and applied to the Purchase Price pursuant to the terms of the Asset Purchase Agreement (each as defined in the Final DIP Order). Pursuant to the terms of the JVIS Sale Order, JVIS credit bid the sum of $224,999.00 of its total prepetition claim.

The sale of assets to Tillou closed on March 7, 2025, and the sale to JVIS closed on April 2, 2025. Following the closure of these sales approved in the Sale Orders all Assets remaining at VIA Motors International, Inc., and certain assets of VIA Motors, Inc. remain available to be monetized by the Debtors or the Liquidating Trustee, as applicable. Further, none of Solectrac's assets were sold during these Chapter 11 Cases and remain available to Solectrac's Estate. As of the date hereof, SSG has continued marketing these Assets for the benefit of the Debtors' and Solectrac's respective Estates.

E. *Claims Bar Date*

On February 4, 2025, the Bankruptcy Court entered the Bar Date Order, establishing, among other things, (1) 5:00 p.m. (prevailing Eastern Time) on **March 2, 2025** as the deadline for all non-Governmental Units to file Proofs of Claim, including Claims available under Section 503(b)(9) of the Bankruptcy Code, in the Chapter 11 Cases; (2) 5:00 p.m. (prevailing Eastern Time) on **June 2, 2025** as the deadline for all Governmental Units to file Proofs of Claim in the

Chapter 11 Cases; (3) the procedures for filing Proofs of Claim; and (4) the form and manner of notice of the various Bar Dates, each subject to the terms and exceptions set forth therein.

Based on the Debtors' initial analysis, which is subject to change resulting from the Debtors' or the Liquidating Trustee's claims reconciliation process, approximately 212 General Unsecured Claims were filed against the Debtors in an aggregate amount of approximately $56 million. The GUC Convenience Claims constitute approximately 63 Claims in an aggregate amount of approximately $371,000. Given the number of Holders of GUC Convenience Claims and the approximate aggregate amount of such Claims, the Debtors believe that the separate classification and treatment of the GUC Convenience Claims from General Unsecured Claims is reasonable and necessary for the administrative convenience of General Unsecured Claims by the Debtors and Liquidating Trustee.

F. *Liquidating Trust*

This Combined DS and Plan contemplates the establishment of the Liquidating Trust to administer post-Effective Date responsibilities of the Debtors and conclusion of the Debtors' business under the Combined DS and Plan, including: (1) the Estate Cash and the Estate Assets being vested with the Liquidating Trust Assets; (2) making distributions to Holders of Allowed Claims in accordance with the terms of this Combined DS and Plan and the Liquidating Trust Agreement; (3) resolving all Disputed Claims and effectuating the Claims reconciliation process pursuant to the procedures prescribed in this Combined DS and Plan; (4) prosecuting, settling, and resolving Preserved Estate Claims; (5) recovering, through enforcement, resolution, settlement, collection, or otherwise, assets on behalf of the Liquidating Trust (which assets shall become part of the Liquidating Trust Assets); (6) concluding the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, or take other similar action with respect to each Debtors, including by terminating the corporate or organizational existence of each such Debtor; and (7) performing all actions and executing all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidating Trust.

G. *Additional Tillou Funding and Debtors' Release of Claims Against Tillou*

On September 30, 2025, the Debtors and Tillou executed a term sheet whereby Tillou agreed to fund the Tillou Cash Payment to the Debtors and/or Liquidating Trust, as applicable, pursuant to the terms of the Combined DS and Plan. The Debtors intend to use the Tillou Cash Payment for, among other things, to: (i) pay all Allowed GUC Convenience Claims, (ii) provide the GUC Minimum Funding, (iii) fund the Professional Fee Escrow, and (iv) fund the Liquidating Trust to allow for the Liquidating Trustee to effectuate the terms of this Combined DS and Plan. Tillou agreed to provide the Tillou Cash Payment and the Returned Tillou Causes of Action on the condition that the Combined DS and Plan contain the releases set forth in Article XII.A and XII.B of the Combined DS and Plan.

The Debtors and their Professionals analyzed the proposal provided by Tillou and believe that Tillou's provision of the Tillou Cash Payment and Returned Tillou Causes of Action under the Combined DS and Plan is sufficient and adequate consideration for the releases set forth in Article XII.A and XII.B of the Combined DS and Plan.

# ARTICLE V
## PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE COMBINED DS AND PLAN

Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of this Combined DS and Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

A. *Treatment of Administrative Claims*

1. Time for Filing Administrative Claims

The holder of an Administrative Claim, other than (a) a Professional Fee Claim, (b) an Administrative Claim that has been Allowed or paid on or before the Administrative Claims Bar Date, or (c) any Administrative Claim that is based on a Claim under Section 503(b)(9) of the Bankruptcy Code, must file with the Bankruptcy Court and serve on the Debtors or the Liquidating Trust, as the case may be, and the Office of the United States Trustee, notice of such Administrative Claim by no later than the Administrative Claims Bar Date. Such notice must include, at a minimum, (x) the name of the Holder of the Claim, (y) the amount of the Claim, and (z) the basis of the Claim. Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred. **For the avoidance of doubt, Holders of Administrative Claims pursuant to Section 503(b)(9) of the Bankruptcy Code must have filed a Proof of Claim or an application for such expenses by the Claims Bar Date.**

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SET FORTH HEREIN OR THE CLAIMS BAR DATE, AS APPLICABLE, SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST, OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE**.

2. Allowance of Administrative Claims

An Administrative Claim (other than a Professional Fee Claim) (i) with respect to which, in the case of Administrative Claims that must be filed and noticed pursuant to Article V.A.1, notice has been timely and properly filed and served pursuant to Article V.A.1 or (ii) with respect to which, in the case of Claims under Section 503(b)(9) of the Bankruptcy Code, a valid Proof of Claim has been filed prior to the applicable Claims Bar Date, shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, (ii) the date of service of the applicable notice of Administrative Claim, or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

3. Payment of Allowed Administrative Claims

On the later of (a) the Effective Date or (b) the date such Allowed Administrative Claim becomes due in the ordinary course, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) shall receive (i) the amount of such Holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be to by such Holder of an Allowed Administrative Claim and the Debtors (prior to the Effective Date) or the Liquidating Trust (on or after the Effective Date); *provided*, that such treatment shall not provide a return to such Holder having a present value as of the Effective Date in excess of such Holder's Allowed Administrative Claim; *provided*, *further*, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business at any time prior to the occurrence of the Effective Date. Any Allowed Administrative Claim (other than a Professional Fee Claim) that becomes due after the Effective Date shall be paid by the Liquidating Trust from the Liquidating Trust Administrative Claims Reserve.

B. *Professional Compensation*

1. Professional Fee Payment.

Each Professional that holds or asserts an Administrative Claim that is a Professional Fee Claim shall be required to file with the Bankruptcy Court, and to serve on all parties required to receive notice, a final Fee Application on or before the Professional Fee Bar Date. The failure to timely file the Fee Application shall result in the Professional Fee Claim being forever barred and discharged. A Professional Fee Claim with respect to which a Fee Application has been properly and timely filed pursuant to this Article V.B shall be treated and paid only to the extent approved by order of the Bankruptcy Court. No Professional Fee Claims shall be allowed on account of any services rendered by a Professional whose retention with respect to the Chapter 11 Cases has not been approved by the Bankruptcy Court.

The Allowed Professional Fee Claims of Professionals retained by the Debtors are intended to be paid and are subject to the aggregate limits set forth for each of the Debtors' Professionals in the Final DIP Order, and otherwise from the Wind-Down Budget. Such Professional fees will not be paid from the Estate Cash; *provided*, *however*, the out-of-pocket expenses of such Debtors' Professionals may be paid from the Estate Cash to the extent that amounts allocable to the Debtors' Professionals from above are insufficient to pay such expenses in full. Notwithstanding the foregoing, the fees of each Professional retained by the Debtors may be Allowed in amounts greater than the budgeted amounts noted above and may be paid from the Estate Cash, in the sole discretion of the Liquidating Trustee, as applicable. If there are any remaining funds from such amounts allocated to the Debtors' Professionals after the payment of the Allowed fees and expenses of such Professionals, such surplus shall be treated as Estate Cash.

To the extent of any inconsistency between the Confirmation Order, on the one hand, and any order approving a Fee Application (whether entered before or after the Confirmation Order), on the other, the Confirmation Order shall control.

2. Professional Fee Escrow

As soon as reasonably practicable on or after the Confirmation Date (and in no event later than the Effective Date without the consent of the applicable Professional(s)), the Debtors or the Liquidating Trustee, as applicable, shall establish the Professional Fee Escrow and fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates, or the Liquidating Trust; *provided*, after all Allowed Professional Fee Claims have been paid in full (subject to the limitations set forth herein), Fee Applications in connection with all Professional Fee Claims have been Filed, there are no Fee Applications pending before the Bankruptcy Court, and there are no Disputed Professional Fee Claims, any remaining Cash in such reserve shall be distributed to the Liquidating Trust. No Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way.

After the Effective Date, amounts owing to the applicable holder of a Professional Fee Claim shall be paid in Cash to such Holder (subject to the limitations set forth herein) from funds held in the Professional Fee Escrow when such Professional Fee Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid pursuant to the Interim Compensation Order or other order of the Bankruptcy Court.

3. Time for Filing Professional Fee Claims

Each Professional who holds or asserts a Professional Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, by the Professional Fee Bar Date, for final Allowances of compensation for services rendered and reimbursement of expenses incurred. The failure to timely file and serve such Fee Application shall result in the Professional Fee Claim being forever barred. Objections to the Allowance of Professional Fee Claims must be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the filing of the applicable Fee Application. Any provision in the Interim Compensation Order requiring Professionals to file an Interim Fee Application shall be waived.

4. Post-Effective Date Fees and Expenses.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, the Liquidating Trust, may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Combined DS and Plan and the Liquidating Trust Agreement.

C. *Treatment of Tax Claims*

On the Plan Distribution Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Tax Claim, at the election of the Debtors (prior to the Effective Date) or the Liquidating Trust (on or after the Effective Date), will receive: (i) payment in Cash of the Allowed amount of such Claim over

five (5) years, pursuant to section 1129(a)(9)(c)(ii) of the Bankruptcy Code; (ii) a one-time payment in Cash of the Allowed amount of such Claim; or (iii) such other treatment as may be agreed to by such Holder of an Allowed Tax Claim and the Debtors (prior to the Effective Date) or the Liquidating Trust (on or after the Effective Date); *provided*, that such agreed upon treatment may not provide such Holder with a return having a present value as of the Effective Date that is greater than the amount of such Holder's Allowed Tax Claim. After the Effective Date, Allowed Tax Claims shall be satisfied by the Liquidating Trust from the Liquidating Trust Administrative Claims Reserve.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. Any Statutory Fees due and payable after the Effective Date for the calendar quarter that includes the Effective Date (the "Effective Date Statutory Fees") shall be paid by the Liquidating Trust from the Liquidating Trust Administrative Claims Reserve. All Statutory Fees (other than Effective Date Statutory Fees) that become due and payable after the Effective Date for distributions by the Liquidating Trust, shall be paid by the Liquidating Trust from the Liquidating Trust Assets. Notwithstanding anything to the contrary herein, after the Effective Date, the Liquidating Trust shall be solely liable to pay any and all Statutory Fees when due and payable. After the Effective Date, the Debtors, and any entity making disbursements on behalf of any Debtor or making disbursements on account of an obligation of any Debtor (each a "Disbursing Entity"), shall be jointly and severally liable to pay Quarterly Fees when due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidating Trust, and any entity making disbursements on behalf of any Debtor or making disbursements on account of an obligation of any Debtor, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Liquidating Trustee shall provide a written report to Tillou on any and all uses of the Tillou Cash Payment on the 15th day and the last day of each month after the Effective Date. Each and every one of the Debtors and the Liquidating Trust shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

## ARTICLE VI
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

For the purposes of organization, voting and all confirmation matters, except as otherwise provided herein, all Claims against and all Interests in the Debtors shall be classified as set forth in this Article VI.

A. *Summary of Classification*

The Combined DS and Plan constitutes a separate Combined DS and Plan proposed by each Debtor and the classification set forth in Classes 1 through 7 shall be deemed to apply to each

Debtor. Each Class shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors. Except for the Claims addressed in Article V of the Combined DS and Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.

A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Combined DS and Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart includes a summary of anticipated recovery to Holders of Claims and Interests under the Combined DS and Plan. Any estimates of Claims or Interests in this Combined DS and Plan may vary from the final amounts Allowed by the Bankruptcy Court. The following summary is based solely on the Schedules of Assets and Liabilities filed by each of the Debtors, as may have been amended from time to time [D.I. 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 188, 189, 190, 191] and claims filed in the Chapter 11 Cases. The actual recoveries under the Combined DS and Plan may vary based on final amounts Allowed by the Bankruptcy Court. Distributions under the Combined DS and Plan are subject to the Combined DS and Plan being confirmed and satisfaction of all conditions to the Effective Date.

The Classes of Claims against and the Interests in the Debtors shall be classified under the Combined DS and Plan as follows:

| Class | Claim | Status | Voting Rights | Projected Amount of Claims (in millions) | Projected Recovery Under the Combined DS and Plan |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0.01 | 100% |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0.087 – $2.087 | 100% |
| 3 | GUC Convenience Claims | Impaired | Entitled to Vote | $0.371 – $2.171 | 10% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | $50.7 – $55.6 | 0.4-.05% |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 6 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |

A Holder of an Allowed General Unsecured Claim may, on or before the Voting Deadline, provide an authenticated written notice to the Debtors voluntarily electing (a "GUC Convenience Claim Election") if the General Unsecured Claim is, or may be, greater than $20,000, to reduce the amount of such General Unsecured Claim to $20,000. Such a GUC Convenience Claim Election constitutes an irrevocable waiver and release of all amounts in excess of $20,000, any rights in Collateral and any priority. Any Holder that makes a GUC Convenience Claim Election shall be deemed to release the Debtors from any and all liability for amounts in excess of $20,000. In the event a Holder timely makes such a GUC Convenience Claim Election, its General Unsecured Claim shall be treated as a GUC Convenience Claim in the lesser amount of (a) $20,000, or (b) the Allowed Amount of the Claim. Holders of Allowed GUC Convenience Claims shall receive distributions as set forth in the Plan. For the avoidance of doubt, GUC Convenience Claims shall not be considered Liquidating Trust Beneficiaries.

B. *Treatment of Claims and Interests*

The classes of Claims against the Debtors and Interests in the Debtors shall be treated under the Combined DS and Plan as follows:

1. <u>Class 1 – Other Priority Claims</u>

   a. *Classification*: Class 1 shall consist of all Other Priority Claims against the Debtors.

   b. *Treatment*: On the Plan Distribution Date, except to the extent that less favorable treatment is agreed to by a Holder of an Allowed Priority Claim and the Debtors (prior to the Effective Date) or the Liquidating Trust (on or after the Effective Date), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Other Priority Claim shall be paid in full and in Cash or provided such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. After the Effective Date, Allowed Other Priority Claims shall be satisfied from the Liquidating Trust Administrative Claims Reserve.

   c. *Voting*: Claims in Class 1 are Unimpaired. Holders of Other Priority Claims are conclusively presumed to have accepted the Combined DS and Plan under Section 1126(f) of the Bankruptcy Code. Holders of Other Priority Claims are not entitled to vote to accept or reject the Combined DS and Plan.

2. <u>Class 2 – Other Secured Claims</u>

   a. *Classification*: Class 2 shall consist of all Other Secured Claims against the Debtors.

   b. *Treatment*: On the Plan Distribution Date, except to the extent that less favorable treatment is agreed to by Holder of an Allowed Other Secured Claim and the Debtors (prior to the Effective Date) or the Liquidating Trust (on or after the Effective Date), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Liquidating Trust, (i) be paid in full and in Cash, (ii) receive its collateral in full satisfaction of its Claim, or (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   c. *Voting*: Claims in Class 2 are Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Combined DS and Plan under section 1126(f) of the Bankruptcy Code. Holders of Other Secured

Claims are not entitled to vote to accept or reject the Combined DS and Plan.

3. Class 3 – GUC Convenience Claims

a. *Classification*: Class 3 shall consist of all GUC Convenience Claims.

b. *Treatment:* On the Plan Distribution Date, except to the extent that a Holder of an Allowed GUC Convenience Claim and the Debtors (prior to the Effective Date) or the Liquidating Trust (after the Effective Date) agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed GUC Convenience Claim shall receive a payment in Cash in the amount of ten percent (10%) of the Allowed amount of such GUC Convenience Claim. In the event the Court does not approve this treatment for GUC Convenience Claims, then all GUC Convenience Claims shall be considered General Unsecured Claims and will receive the treatment for such Claims under Class 4 – General Unsecured Claims set forth in this Combined DS and Plan.

c. *Voting:* Claims in Class 3 are Impaired. Holders of Allowed GUC Convenience Claims are entitled to vote to accept or reject the Combined DS and Plan.

4. Class 4 – General Unsecured Claims

a. *Classification*: Class 4 shall consist of all General Unsecured Claims that did not make a GUC Convenience Claims Election.

b. *Treatment:* On the Plan Distribution Date, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors (prior to the Effective Date) or the Liquidating Trust (after the Effective Date) agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Liquidating Trust Units applicable to such Debtor according to the Allocation Percentage after Holders of Allowed Other Priority Claims and Allowed Other Secured Claims are paid in full.

c. *Voting:* Claims in Class 4 are Impaired. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Combined DS and Plan.

d. *GUC Convenience Claim Election:* If a Holder of an Allowed General Unsecured Claim timely makes a GUC Convenience Claim Election, then such Claim (i) shall be an Allowed GUC Convenience Claim and receive

the treatment of an Allowed GUC Convenience Claim and (ii) shall not receive treatment as a Class 4 – General Unsecured Claim.

5. Class 5 – Intercompany Claims

a. *Classification*: Class 5 shall consist of all Intercompany Claims among Debtors.

b. *Treatment*: On the Effective Date, all Intercompany Claims shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect. No Holder of an Intercompany Claim will receive any Plan Distribution on account thereof. For the avoidance of doubt, any Claims held by the Debtors against their non-Debtor subsidiaries or Affiliates shall not be affected or otherwise modified by the Combined DS and Plan.

c. *Voting:* Claims in Class 5 are Impaired. Holders of Intercompany Claims are conclusively deemed to have rejected the Combined DS and Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Combined DS and Plan.

6. Class 6 – Interests

a. *Classification*: Class 6 shall consist of all Interests in the Debtors other than Intercompany Interests.

b. *Treatment*: On the Effective Date, all Interests in the Debtors, other than Intercompany Interests which shall be included in Class 7, shall be deemed automatically canceled, released, and extinguished and shall be of no further force or effect; *provided*, that, one or more of the Debtors may continue to exist after the Effective Date as and to the extent provided in Article VII.F. No Holder of an Interest will receive any Plan Distribution on account thereof.

c. *Voting*: Interests in Class 6 are Impaired. Holders of Interests included in Class 6 are conclusively deemed to have rejected the Combined DS and Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Interests included in Class 6 are not entitled to vote to accept or reject the Combined DS and Plan.

7. Class 7 – Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, all Intercompany Interests shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect; *provided*, one or more of the Debtors may

continue to exist after the Effective Date as and to the extent provided in Article VII.F. No Holder of an Intercompany Interest will receive any Plan Distribution on account thereof.

c. Voting: Intercompany Interests in Class 7 are Impaired. Holders of Intercompany Interests are conclusively deemed to have rejected the Combined DS and Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Combined DS and Plan.

C. *Separate Classification of Claims Generally*

The Combined DS and Plan constitutes a separate Combined DS and Plan for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interests shall be deemed eliminated from the Combined DS and Plan solely for purposes of (i) voting to accept or reject the Combined DS and Plan and (ii) determining acceptance or rejection of the Combined DS and Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. Tabulation of votes accepting or rejecting the Combined DS and Plan shall be conducted on a Debtor-by-Debtor basis.

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate Class to a certain Debtor for purposes of receiving distributions under this Combined DS and Plan.

D. *Class Acceptance Requirement*

A Class of Claims shall have accepted the Combined DS and Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Combined DS and Plan. A Class of Interests shall have accepted the Combined DS and Plan if it is accepted by Holders of at least two-thirds (2/3) of the Interests in such class that actually vote on the Combined DS and Plan.

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject this Combined DS and Plan, this Combined DS and Plan shall be presumed accepted by the Holders of such Claims in such Class.

E. *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F. *Cramdown*

If all applicable requirements for confirmation of the Combined DS and Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, except subsection (8) thereof, then the Combined DS and Plan shall be treated as a request that the Bankruptcy Court confirm

the Combined DS and Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Combined DS and Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Interests that is impaired under, and has not accepted, the Combined DS and Plan.

G. *Subordinated Claims*

The classification and manner of satisfying all Claims and Interests under the Combined DS and Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, any of the prepetition intercreditor agreements with respect to the prepetition debt documents or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Combined DS and Plan. Nothing in the Combined DS and Plan shall release or impair any creditor's rights to enforce any subordination agreement against any other creditor pursuant to Bankruptcy Code Section 510 or any subordination agreement and the rights and defenses of any creditor related to such enforcement. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE COMBINED DS AND PLAN

A. *Sources of Consideration for Plan Distributions*

On or as soon as practicable after the Effective Date, the Debtors or the Liquidating Trustee shall make Plan Distributions in accordance with the Combined DS and Plan to Holders of Allowed Administrative Claims, Allowed Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims, as applicable, that are due and payable as of the Effective Date using the Estate Cash. Tillou shall fund to the Debtors the Tillou Cash Payment upon confirmation of the Combined DS and Plan. On the Effective Date, the Debtors shall transfer all Liquidating Trust Assets to the Liquidating Trust. After the Effective Date, the Liquidating Trustee shall make Plan Distributions from the Liquidating Trust Assets on account of Allowed Claims in accordance with the Combined DS and Plan and, as applicable, the Liquidating Trust Agreement.

B. *Preservation and Maintenance of Debtor Causes of Action*

1. Maintenance of Causes of Action.

Except as otherwise provided in this Combined DS and Plan or the Confirmation Order, after the Effective Date, the Liquidating Trust shall automatically be deemed to have been vested with any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Preserved Estate Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Bankruptcy Court in connection with the Chapter 11 Cases. The Liquidating Trust, as the successor in interest to the Debtors and the Estates, may, in its sole and absolute discretion, and will have the exclusive right to, investigate, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any Preserved Estate Claims that have not been released pursuant to the terms of this Combined DS and Plan without notice to or approval from the Bankruptcy Court or the Debtors. The Liquidating Trust or

its successor(s) may pursue such Preserved Estate Claims as appropriate in accordance with the best interests of the Liquidating Trust, or its successor(s) who hold such rights. Tillou shall assign to the Liquidating Trust the Returned Tillou Causes of Action as of the Effective Date.

2. Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a Holder of a Claim or an Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Combined DS and Plan or any Final Order (including the Confirmation Order or by virtue of the allowance of such Claim hereunder), such Cause of Action is expressly preserved for later adjudication by the Liquidating Trust (including Causes of Action not specifically identified or of which the Debtors or their creditors who shall receive beneficial interests in the Liquidating Trust may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Preserved Estate Claims, to the extent such claims are not released by this Combined DS and Plan). Therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Preserved Estate Claims upon or after the entry of the Confirmation Order or the Effective Date of the Combined DS and Plan based on the Combined DS and Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Combined DS and Plan (including, and for the avoidance of doubt, the releases contained in the Confirmation Order).

Any Preserved Estate Claims shall be automatically deemed to have vested in and been transferred to the Liquidating Trust on the Effective Date for investigation and potential prosecution and adjudication by the Liquidating Trust. In addition, the Liquidating Trust shall have the exclusive right to pursue or adopt any Preserved Estate Claims in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. The Debtors and the Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Preserved Estate Claims.

3. D&O Actions.

Notwithstanding anything to the contrary in this Combined DS and Plan (including in this Article VII and/or in Article XII of this Combined DS and Plan) or otherwise, to the extent any D&O Actions are not released pursuant to Article XII, and are brought against the D&Os and such D&O Actions result in a recovery (including by way of settlement, judgment or award) against any D&O, such D&O reserves the right to seek coverage for such recovery from the applicable D&O Policy, and any such recovery shall be satisfied solely by and limited to the extent of the proceeds of any applicable D&O Policy after payment from such D&O Policy of any and all covered costs and expenses incurred in connection with the defense of the D&O Action.

Nothing in this Combined DS and Plan shall, or shall be construed to, limit, diminish, or otherwise impair, waive, or release any objections, defenses, or counterclaims of the Debtors, the Liquidating Trust to any Proof of Claim or Administrative Claim filed by a D&O. Except as otherwise provided in this Combined DS and Plan, nothing herein shall limit, diminish, or

otherwise impair, waive, or release any claims, defenses, counterclaims, or rights of any of the D&Os arising from, related to, or in connection with the D&O Actions and any D&O Policy.

C. *Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust*

1. Creation of Liquidating Trust

On the Effective Date, in furtherance of the liquidation of the Debtors, the Liquidating Trust shall be established for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Combined DS and Plan. The form of the Liquidating Trust Agreement shall be included in the Plan Supplement and approved pursuant to the Combined DS and Plan. The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth in and shall be governed by the Combined DS and Plan and the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust Administrative Claims Reserve shall be transferred by the Debtors to the Liquidating Trust.

2. Vesting of Liquidating Trust Assets

Except as otherwise provided in the Combined DS and Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Combined DS and Plan (including Article VIII.A.3) or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Liquidating Trust Assets (including all interests, and rights related thereto) of each of the Debtors, shall immediately vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests. All Claims, Liens, encumbrances, charges, and other interests in or on the Liquidating Trust Assets shall be deemed fully released as of the Effective Date, except as otherwise provided in the Combined DS and Plan (including Article VIII.A.3) or the Confirmation Order.

3. Transfer of Liquidating Trust Assets

On the Effective Date, other than as set forth in this Combined DS and Plan (including Article VIII.A.3) or the Confirmation Order, the Debtors are authorized and directed to and shall be deemed to have irrevocably transferred, granted, assigned, conveyed, and delivered to the Liquidating Trust, for the benefit of the Liquidating Trust Beneficiaries, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to all of the Liquidating Trust Assets free and clear of any and all Liens, Claims, encumbrances and interests (legal, beneficial or otherwise) of all other Entities. The Debtors, the Liquidating Trustee, the Liquidating Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors, and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in, or with respect to, the Liquidating Trust Assets or the

Liquidating Trust in accordance with this Article VII.C of the Combined DS and Plan (including Article VIII.A.3). Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

D. *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Liquidating Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, (i) the incurrence of all obligations contemplated by the Combined DS and Plan and the making of Plan Distributions; (ii) the implementation of all settlements and compromises as set forth in or contemplated by the Combined DS and Plan; and (iii) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents). On the Effective Date, the officers of the Debtors and the Liquidating Trustee, as applicable, are authorized to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Combined DS and Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor and the Liquidating Trust, as applicable.

E. *Board Compensation and Dissolution of the Debtors*

All rights of the Debtors' Board to compensation from the Petition Date to the Effective Date are hereby waived. On the Effective Date, the respective Board of each of the Debtors shall be terminated and the members of each of the Boards of the Debtors shall be deemed to have resigned.

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, the board of directors or similar governing body of the Debtors or the Liquidating Trustee or order of the Bankruptcy Court. The Liquidating Trustee is authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Debtor was formed or in any other jurisdiction. The Liquidating Trustee may appoint director(s) to the Board or equivalent governing body of any Debtor that continues to exist after the Effective Date.

F. *Cancellation of Instruments*

On the Effective Date and except as otherwise provided herein, all instruments evidencing or creating any indebtedness or obligation of any Debtor, except such instruments that are authorized or issued under this Combined DS and Plan, shall be canceled and extinguished. Additionally, as of the Effective Date, all Interests in any Debtor, and any and all warrants, options,

rights, or interests with respect to such Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued, shall be deemed cancelled and extinguished without any further action of any party. The Liquidating Trustee shall have all power and authority that may be or could have been exercised, with respect to the Liquidating Trust Assets, by any officer, director, shareholder or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised and taken by action of such officers, directors, shareholders or other party. The Holders of, or parties to, the debt instruments, membership interests, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Combined DS and Plan.

G. *Amendment of the Debtors' Governance Documents*

The Debtors' articles of incorporation and bylaws (or analogous governance documents) shall, to the extent required under section 1123(a)(6) of the Bankruptcy Code, be amended consistent with the Combined DS and Plan and all necessary action shall be taken by the Debtors or Liquidating Trustee, as applicable, to provide for such provisions, terms, and conditions necessary to comply, conform with, and implement the terms, conditions, and requirements of the Combined DS and Plan, without the need for further action by the members, shareholders or directors of the Debtors.

## ARTICLE VIII
## THE LIQUIDATING TRUST

A. *Liquidating Trust*

1. Purpose of the Liquidating Trust

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code (excluding any Disputed Claims Reserve), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust, and without effect to its status as a "liquidating trust" for U. S. federal income tax purposes. The Liquidating Trust shall be governed by the Combined DS and Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for U.S. federal income tax purposes. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the primary purpose of receiving all Liquidating Trust Assets and distributing any such assets pursuant to the Combined DS and Plan.

2. Liquidating Trust Assets

On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Combined DS and Plan and for the benefit of the Liquidating Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors' Estates' rights, title, and interest in and to all of the Liquidating Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, or interests, subject to the terms of this Combined DS and Plan (including Article VIII.A.3) and the Liquidating Trust Agreement. The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors.

3. Role of the Liquidating Trustee

In furtherance of and consistent with the purpose of the Liquidating Trust and the Combined DS and Plan, the Liquidating Trustee shall: (i) hold the assets of the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash assets of the Liquidating Trust obtained through the exercise of its power and authority in accordance with the Combined DS and Plan; (iii) have the power and authority to investigate, prosecute and resolve, in the name of the Debtors and/or the name of the Liquidating Trustee, any Preserved Estate Claims and to enter into arrangements to fund such litigation with third parties and/or certain Holders of beneficial interests in such Liquidating Trust on such terms as are determined to be reasonable and in the interest of the Liquidating Trust (*provided*, that any such funding with respect to the Preserved Estate Claims shall have recourse solely to the proceeds of the Preserved Estate Claims); (iv) have the power and authority to perform such other functions as are provided in the Combined DS and Plan; and (v) have the power and authority to administer the closure of the Chapter 11 Cases. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with this Combined DS and Plan and comply with any other applicable tax reporting obligations imposed on the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction, or credit will be allocated to each of the Liquidating Trust Beneficiaries in accordance with their relative beneficial interest in the Liquidating Trust.

The Liquidating Trust shall be given access by the Debtors and their professionals (at the expense of the Liquidating Trust with respect to any expenditure of resources that is more than de minimis) to all information the Liquidating Trustee determines is necessary to prosecute, investigate, sell, transfer, or convey any of the Preserved Estate Claims and to benefit from any

relevant privileges. As set forth in the Liquidating Trust Agreement, all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "LT Privileges") held by any one or more of the Debtors (including any prepetition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors) (collectively, the "LT Privilege Transfer Parties") related in any way to the Liquidating Trust Assets and the purpose of the Liquidating Trust (the "LT Transferred Privileged Information") are hereby transferred and assigned to the Liquidating Trust. The LT Transferred Privileged Information shall include documents and information of all manner, whether oral, written, or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the LT Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the LT Privilege Transfer Parties related in any way to the Liquidating Trust Assets and the purpose of the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trustee shall make (or cause to be made) a good faith valuation of the assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for U.S. federal income tax purposes.

Except as otherwise set forth in this Combined DS and Plan and to the extent permitted by applicable law, the Liquidating Trustee, in the performance of their duties hereunder, shall be defended, held harmless and indemnified from time to time by the Liquidating Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the Liquidating Trustee may be subject by reason of their execution of duties pursuant to the discretion, power and authority conferred on the Liquidating Trustee by the Combined DS and Plan or the Confirmation Order; *provided*, *however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the Liquidating Trustee for any actions taken which constitutes fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Combined DS and Plan or the Confirmation Order. Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the Liquidating Trust Assets, including, if available, any insurance maintained by the Liquidating Trust. The indemnification provisions contained in this Section shall remain available to and be binding upon any future Liquidating Trustee or the estate of any decedent.

After the Effective Date, the Liquidating Trustee shall provide Tillou with a report of all expenditures by the Liquidating Trust on the 15th day and last day of each month. The Liquidating Trustee is not required to file such reports with the Bankruptcy Court.

4. Compensation of the Liquidating Trustee

The Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings and as disclosed in the Plan Supplement.

5. Retention of Professionals by the Liquidating Trustee

The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee

deems appropriate without Bankruptcy Court approval. The Liquidating Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

6. Tax Treatment; No Successor in Interest

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d). Pursuant to the Liquidating Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets (which, for the avoidance of doubt, includes the Net Proceeds of the Liquidating Trust, and the Liquidating Trust's rights thereto, pursuant to Article VIII.A.2) by the Debtors to the Liquidating Trust (a) in part as the transfer of Assets, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such Assets, by the Debtors to the Holders of Allowed General Unsecured Claims, followed by the transfer of such Assets (subject to such liabilities) by such Holders to the Liquidating Trust in exchange for the Liquidating Trust Units, and (b) in part as the transfer of such Assets by the Debtors to one or more Disputed Claims Reserves, and to the extent permitted by applicable law, all relevant parties shall report consistently for state and local income tax purposes. Notwithstanding the foregoing, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the Liquidating Trust does not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust (excluding any Disputed Claims Reserve) be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust (excluding any Disputed Claims Reserve) to be treated as such a partnership.

7. Disputed Claims Reserves

Notwithstanding anything herein otherwise, the Liquidating Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Liquidating Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by the Disputed Claims Reserves. Pursuant to Treasury Regulation section 1.468B-9, no Holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) (and grantor trust pursuant to Treasury Regulation section 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all taxes imposed on the Liquidating Trust (including any taxes imposed on any Disputed Claims Reserve) from Liquidating Trust Assets (although any taxes imposed on any Disputed Claims Reserve will be paid out of such Disputed Claims Reserve and not out of general assets held by the Liquidating Trust).

8. Dissolution of the Liquidating Trust

The Liquidating Trustee and the Liquidating Trust, as applicable, shall be discharged or dissolved, as the case may be, at such time as (a) all Liquidating Trust Assets have been liquidated

and (b) all distributions required to be made by the Liquidating Trustee under the Combined DS and Plan have been made, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary of the Effective Date (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, absent a favorable letter ruling from the IRS providing that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust.

9. Securities Exempt

The issuance of any beneficial interests of the Liquidating Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act, as amended, and any state or local law requiring registration.

## ARTICLE IX
## PLAN DISTRIBUTION PROVISIONS

A. *Plan Distributions*

The Debtors or the Liquidating Trustee shall make all Plan Distributions to the Liquidating Trust Beneficiaries and Holders of Allowed Administrative Claims, Allowed Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed GUC Convenience Claims, as applicable, in accordance with the Combined DS and Plan and the Liquidating Trust Agreement. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day but shall be deemed to have been made on the date otherwise due. Except as otherwise provided herein, Plan Distributions shall be made to the Holders of Allowed Claims as reflected in the registry of Claims maintained by the Claims and Noticing Agent, on the Effective Date. On the Effective Date, the Liquidating Trustee shall also distribute Liquidating Trust Units to the Holders of any General Unsecured Claims that constitute Allowed Claims as of such date and shall make further distributions of such beneficial interests to Holders of any other General Unsecured Claims that have not become Allowed Claims as of the Effective Date, promptly after any of such General Unsecured Claims have been Allowed.

B. *Disputed Claims Reserves*

On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee may establish and administer Disputed Claims Reserves for each Class or category, in the case of unclassified Claims, of Disputed Claims in accordance with the Liquidating Trust Agreement. The Liquidating Trustee may reserve, in Cash or Liquidating Trust Units the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim. For the avoidance of doubt, the Liquidating Trustee may administer the Disputed Claims Reserves by book entry.

The Cash and/or Liquidating Trust Units in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class or category, in the case of unclassified Claims. Each Disputed Claims Reserve shall be closed by the Liquidating Trustee, as applicable, when all Plan Distributions required to be made under this Combined DS and Plan to the Holders of Disputed Claims that subsequently become Allowed have been made in accordance with the terms of this Combined DS and Plan and no Disputed Claims relating to such Disputed Claims Reserve remain. Upon closure of a Disputed Claims Reserve, all Cash and other property held in that Disputed Claims Reserve shall be transferred to the Liquidating Trust in accordance with the Combined DS and Plan and the Liquidating Trust Agreement.

Notwithstanding any provision otherwise in the Combined DS and Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. When a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall thereupon become entitled to receive the Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

With respect to the calculation of distributions to Holders of Allowed General Unsecured Claims and the Disputed Claims Reserve, the Debtors or the Liquidating Trustee, as applicable, shall take into account the applicable Allocation Percentages.

C. *Address for Delivery of Plan Distributions*

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a Holder of an Allowed Claim shall be made at the last known address of such Holder as set forth (i) in the Schedules, (ii) on the Proof of Claim filed by such Holder, (iii) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (iv) in any notice served by such Holder giving details of a change of address; *provided*, *however*, with respect to syndicated bank debt or other similarly situated creditor groups, if requested by the agent bank, Plan Distributions may be made to the agent bank to forward to the participating banks in accordance with the applicable credit documents.

D. *Undeliverable and Unclaimed Distributions Held by Liquidating Trustee*

1. Holding of Undeliverable Distributions

If any Plan Distribution to a Holder of an Allowed Claim is returned to the Liquidating Trust as undeliverable, no further distributions will be made to such Holder unless and until the Liquidating Trust is notified by written certification of such Holder's then-current address. Nothing contained in the Combined DS and Plan shall require the Liquidating Trust to attempt to locate any Holder of an Allowed Claim.

2. After Distributions Become Deliverable

On each Plan Distribution Date, the Liquidating Trustee will make all Plan Distributions that became deliverable to Holders of Allowed Claims after the most recent Plan Distribution Date;

*provided*, *however,* that the Liquidating Trustee may each establish a record date prior to each Plan Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Plan Distribution. Notwithstanding the foregoing, the Liquidating Trustee reserves the right to postpone a Plan Distribution Date, if it determines a Plan Distribution on any Plan Distribution Date is uneconomical or unfeasible or is otherwise unadvisable.

3. Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Plan Distribution prior to the date that is six months after the applicable Plan Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Liquidating Trust, as applicable, and their respective property. In such cases, (i) the undeliverable Plan Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and vest in the Liquidating Trust the Allowed Claims with respect to such Plan Distributions shall be automatically cancelled, the right of the Holders entitled to those Plan Distributions shall be discharged and forever barred; and (ii) the undeliverable Plan Distributions shall be reserved or distributed in accordance with the Combined DS and Plan and the Liquidating Trust Agreement.

E. *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not presented within ninety (90) days after the date of issuance thereof. After such date, all Claims in respect of void checks shall be expunged and forever barred and any Cash held for payment on account of such voided checks shall be deemed to be unclaimed property and shall vest in the Liquidating Trust and be deemed to be Liquidating Trust Assets.

F. *Manner of Payment under the Combined DS and Plan*

Unless the Entity receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Combined DS and Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

G. *Fractional Plan Distributions*

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars will be made. Fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

H. *De Minimis Distributions*

Notwithstanding anything contrary contained herein, no Plan Distribution of less than one hundred dollars ($100.00) shall be made to the Holder of any Claim unless a request therefor is made in writing to the Liquidating Trustee. If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall be added to and constitute a portion of the Liquidating Trust Assets, as applicable.

I. *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition,* on the Petition Date.

J. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Combined DS and Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, including any Disputed Claims, against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Plan Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto.

K. *Allocation Between Principal and Accrued Interest*

To the extent that any Allowed Claim entitled to a Plan Distribution from the Liquidating Trust consists of indebtedness for U.S. federal income tax purposes and other amounts (such as accrued but unpaid interest thereon), such Plan Distribution shall be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts, if any.

L. *Single Satisfaction*

In no case shall the aggregate value of all property received or retained under the Combined DS and Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

M. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

The Debtors or the Liquidating Trust, as applicable, shall reduce in full a Claim, and such Claim shall be hereby Disallowed without a Claim objection having to be filed and without any further notice to action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Liquidating Trust; *provided*, the Debtors or the Liquidating Trustee, as applicable, shall provide twenty-one (21) days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidating Trust on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the extent the Holder's total recovery on account of such Claim from the third party and under the Combined DS and Plan exceeds the total amount of such Claim. The failure of such

Holder to timely repay or return such Plan Distribution shall result in the Holder owing the Liquidating Trust, as applicable, annualized interest at the federal judgment rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2. Applicability of Insurance Contracts

No Plan Distributions under the Combined DS and Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim may be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, the Liquidating Trustee shall provide twenty-one (21) days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

Except as otherwise provided in the Combined DS and Plan, Plan Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract. Nothing contained in the Combined DS and Plan shall constitute or be deemed a waiver of any Cause of Action under any Insurance Contract that the Debtors or any entity may hold against any other entity, including Insurers, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

N. *Distributions on Account of Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions on account thereof take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding the foregoing, the Combined DS and Plan shall be without prejudice to the contractual, legal, or equitable subordination rights (if any) in favor of any Holder of any Allowed Claim, and any Holder of any Allowed Claim (if any) subject to any such contractual, legal, or equitable subordination shall remit any distribution on account of such Claim to which such Holder's Claim is subordinated in accordance with and to the extent required under any applicable contractual, legal, or equitable subordination obligation.

## ARTICLE X
## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, the Liquidating Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with

respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Combined DS and Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim has been timely filed by the applicable Claims Bar Date, is not considered Allowed and shall be disallowed without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

B. *Prosecution of Disputed Claims*

Except as otherwise specifically provided in this Combined DS and Plan, the Debtors, before the Effective Date, and the Liquidating Trustee, after the Effective Date, subject to the Liquidating Trust Agreement, shall have the sole authority to: (i) file, withdraw or litigate to judgment, objections to Claims; (ii) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court (other than a Professional Fee Claim); and (iii) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order, or approval by the Bankruptcy Court.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline (subject to such being extended by an order of the Bankruptcy Court). For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

C. *Entitlement to Plan Distributions upon Allowance*

Notwithstanding any other provision of the Combined DS and Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim, subject to the setoff rights as provided in Article XII.G. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the Holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

D. *Amendments to Claims*

Except as provided herein, on or after the Effective Date, without the prior authorization of the Bankruptcy Court or the Liquidating Trustee, a Claim may not be Filed or amended and any such new or amended Claim Filed shall be hereby deemed Disallowed in full and disallowed without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Adjustment to Claims or Interests Without Objection*

Any Claim that has been paid, satisfied, or assumed, or any Claim that has been amended or superseded, may be adjusted or disallowed on the claims register by the Debtors or the Liquidating Trustee (as applicable) without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F. *Estimation of Claims*

The Debtors or the Liquidating Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any respective Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Combined DS and Plan. All of the objection, estimation, settlement and resolution procedures set forth in the Combined DS and Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE XI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1. Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, except: (a) any Executory Contracts and Unexpired Leases that are the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order; (b) contracts and leases (if any) listed in the Assumed Executory Contracts and Unexpired Leases Schedule, filed as an exhibit to the Plan Supplement (if applicable), and any supplements thereto; (c) all Executory Contracts and Unexpired Leases (if any) assumed or assumed and assigned by order of the Bankruptcy Court, including the Sale Orders, entered before the Effective Date and not subsequently rejected pursuant to an order of the Bankruptcy Court; (d) any Executory Contract or Unexpired Lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (e) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to the Debtors or to indemnify the Debtors; (f) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors; and (g) the Insurance Contracts, including the D&O Policies. Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an Executory Contract or Unexpired Lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered pre-confirmation. The Debtors reserve the right to amend the Plan Supplement prior to the entry of the Confirmation Order.

For the avoidance of doubt, any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that such assumption has been previously approved by a Final Order of the

Bankruptcy Court shall be deemed disallowed without further notice to or action, order, or approval of the Bankruptcy Court.

2. Effect of Rejection

Exclusion of a contract, lease, or other agreement from the exceptions in Article XI.A.1 shall constitute adequate and sufficient notice of (a) any Claims arising thereunder or related thereto shall be treated as GUC Convenience Claims or General Unsecured Claims, as applicable, under the Combined DS and Plan and (b) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder. The Combined DS and Plan shall constitute a motion to reject such Executory Contracts and Unexpired Leases rejected pursuant to this section, and the Debtors shall have no liability thereunder except as is specifically provided in the Combined DS and Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, Executory Contract or Unexpired Lease is burdensome, and that the rejection thereof is in the best interests of the Debtors and their Estates.

B. *Claims Arising from Rejection, Expiration, or Termination*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court by the later of thirty (30) days from the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Liquidating Trust or property of the foregoing parties, without the need for any objection by the Debtors or the Liquidating Trustee, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as GUC Convenience Claims or General Unsecured Claims, as applicable, and shall be treated in accordance with Article VI.B, and such claims may be objected to in accordance with this Combined DS and Plan.

C. *Contracts and Leases Entered Into After the Petition Date*

For Executory Contracts and Unexpired Leases entered into or assumed by the Debtors after the Petition Date that are not assigned to a non-Debtor third-party, the Liquidating Trust (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a Proof of Claim within thirty (30) days of the Effective Date in accordance with this Combined DS and Plan or have their rights forever satisfied, settled, released, and discharged.

D. *Insurance Contracts*

All Insurance Contracts to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtor and assigned to the Liquidating Trust effective as of the Effective Date pursuant to sections 365(a) and 1123 of the Bankruptcy Code, and such Insurance Contracts shall continue in full force and effect after the Effective Date in accordance with their respective terms. Nothing in the Combined DS and Plan (including the assignment of any Insurance Contract to the Liquidating Trust pursuant to the Combined DS and Plan) shall impair, diminish, or otherwise adversely modify the enforceability of, or any coverage under, any Insurance Contracts or the Debtors' or Liquidating Trust's, as applicable, rights in any Insurance Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption and assignment to the Liquidating Trust of each of the Insurance Contracts pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

E. *Warranties*

Notwithstanding the rejection of any of the Debtors' Executory Contracts under this Combined DS and Plan or by separate motion, the Debtors and the Liquidating Trust, as applicable, shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; *provided*, for the avoidance of doubt, the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that has been assumed and assigned (other than to the Liquidating Trust) by order entered by the Bankruptcy Court on or before the Effective Date. For the avoidance of doubt, the Debtors are not assuming any warranty obligations of the Debtors or otherwise provided by the Debtors under any Executory Contract that is rejected pursuant to this Combined DS and Plan or otherwise rejected in the Chapter 11 Cases.

F. *Reservation of Rights*

Nothing contained in the Combined DS and Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Liquidating Trust has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Liquidating Trustee shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII
## EFFECTS OF CONFIRMATION

A. *Releases by the Debtors*

**Except as otherwise provided herein, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under this Combined DS and Plan and the contributions of the Released Parties to facilitate and implement this Combined DS and Plan, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably,**

**and forever released and discharged by the Debtors and their Estates, including any of their successors and assigns, and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates from any and all Causes of Action whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- and out-of-court restructuring efforts, the Chapter 11 Cases, the Plan Documents, or any other instrument, contract, or document related to the foregoing, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Combined DS and Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, administration, implementation, or consummation of the Chapter 11 Cases (including any payments, distributions or transfers in connection therewith), the Plan Documents, or any other instrument, contract, or document related to the foregoing, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.**

**For the avoidance of doubt and notwithstanding anything to the contrary in this Combined DS and Plan, the Confirmation Order, or any prior order of the Bankruptcy Court, the releases set forth in this Article XII.A and Article XII.B do NOT release: (a) Claims or Causes of Action of the Debtors against (i) all professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in (d) through (g) of the definition of "Released Party" in Article I.A.101 of this Combined DS and Plan, (ii) any entity that directly or indirectly owned, held, or controlled any equity in the Debtors prior to the Petition Date (unless otherwise provided herein), (iii) the Debtors' current or former direct or indirect non-Debtor subsidiaries, (iv) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct, and (v) Solectrac, and; and (b) (i) any obligations of any party or Entity under the Combined DS and Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Combined DS and Plan; (ii) any rights or obligations under the Sale Orders; (iii) any Causes of Action against any Entity that is not a Released Party; or (iv) any Causes of Action against any Entity solely to the extent (1) such Causes of Action are asserted as defenses to affirmative prepetition Claims asserted by such Entity against the Debtors' Estates, and (2) such Claims have not been Allowed pursuant to a Final Order or expressly Allowed pursuant to this Combined DS and Plan.**

B. *Third Party Releases*

**Except as otherwise provided in the Combined DS and Plan, as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration,**

**including the obligations of the Debtors under this Combined DS and Plan and the contributions of the Released Parties to facilitate and implement this Combined DS and Plan, each Releasing Party, conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, and forever releases and discharges the Released Parties from any and all Causes of Action whatsoever (including any derivative claims purportedly asserted or assertable by any Releasing Party against any Released Party), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- and out-of-court restructuring efforts, the Chapter 11 Cases, the Plan Documents or any other instrument, contract, or document related to the foregoing, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Combined DS and Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, administration, implementation, or consummation of the Chapter 11 Cases (including any payments, distributions or transfers in connection therewith), the Plan Documents, or any other instrument, contract, or document related to the foregoing.**

**For the avoidance of doubt and notwithstanding anything to the contrary in this Combined DS and Plan, the Confirmation Order, or any prior order of the Bankruptcy Court, the releases set forth in this Article XII.B do NOT release: (i) any obligations of any party or Entity under the Combined DS and Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Combined DS and Plan, (ii) any rights or obligations under the Sale Orders, (iii) any Causes of Action against any Entity that is not a Released Party, and (iv) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.**

C. *Exculpation*

**No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action or liability for any Claim related to any act or omission occurring from the Petition Date through the Effective Date in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Final DIP Order and the Sale Orders, the entry into the Liquidating Trust Agreement, the negotiation and pursuit of this Combined DS and Plan, or the solicitation of votes for, or confirmation of, this Combined DS and Plan, the funding of this Combined DS and Plan, the consummation of this Combined DS and Plan, or the administration of this Combined DS and Plan or the property to be distributed under this Combined DS and Plan, and the issuance of securities or beneficial interests under or in connection with this Combined DS and Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as finally determined by a Final Order,**

**but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to this Combined DS and Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Combined DS and Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Combined DS and Plan or such distributions made pursuant to this Combined DS and Plan. Notwithstanding anything to the contrary in the foregoing or any other provision of the Combined DS and Plan, the foregoing provisions of this exculpation provision shall not operate to waive or release the rights of the Debtors or other parties in interest to enforce the Combined DS and Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Combined DS and Plan and Plan Supplement or assumed pursuant to the Combined DS and Plan or assumed pursuant to Final Order of the Bankruptcy Court.**

D. *Injunctions*

**Except as otherwise provided in the Combined DS and Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Entities who have held, hold or may hold Causes of Action, Claims or Interests in the Debtors or the Estates that have been released or are subject to exculpation are, with respect to any such Causes of Action, Claims or Interests, permanently enjoined, from and after the Effective Date, from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates or any of their Assets, the Liquidating Trust, the Released Parties, the Exculpated Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Estates or any of their Assets, the Liquidating Trust, the Released Parties, the Exculpated Parties or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estates or any of their Assets, the Liquidating Trust, the Released Parties, the Exculpated Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Combined DS and Plan or the Confirmation Order, including the releases and exculpations provided under Article XII.A, Article XII.B and Article XII.C of the Combined DS and Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Combined DS and Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the**

**provisions of this Combined DS and Plan; *provided*, that the Debtors shall receive the benefit of this paragraph through and until the date upon which all Liquidating Trust Assets vest in the Liquidating Trust; *provided*, further, *however*, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Combined DS and Plan. Each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth herein. For the avoidance of doubt, the foregoing provisions of this Section shall not operate to waive or release the rights of the Debtors, the Liquidating Trustee, or other parties in interest to enforce the Combined DS and Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Combined DS and Plan and Plan Supplement or assumed pursuant to the Combined DS and Plan or assumed pursuant to Final Order of the Bankruptcy Court.**

E. *Satisfaction of Claims*

(1) Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Combined DS and Plan, the Plan Distributions and rights afforded under the Combined DS and Plan and the treatment of Claims and Interests under the Combined DS and Plan shall be in exchange for and in complete satisfaction of all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in the Debtors. Except as otherwise specifically provided in the Combined DS and Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled. Accordingly, except as otherwise provided in the Combined DS and Plan or the Confirmation Order, confirmation of the Combined DS and Plan shall, as of the Effective Date, satisfy, terminate and cancel all Claims against the Debtors and Interests and other rights of equity security Holders in the Debtors.

(2) Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Combined DS and Plan, all Entities shall be precluded from asserting against the Debtors, the Liquidating Trust, or their respective successors or property, any other or further Claims, debts, rights, Causes of Action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date.

(3) No Entity holding a Claim may receive on account of such Claim any payment from, or seek recourse or recovery against, any Assets that are to be distributed under the Combined DS and Plan, other than Assets required to be distributed to that Entity under the Combined DS and Plan.

F. *Compromise and Settlement of Claims and Controversies*

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Combined DS and Plan, upon the Effective Date, the provisions of the Combined DS and Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Combined DS and Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best

interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and within the range of reasonableness. Subject to Article IX of the Combined DS and Plan, all Plan Distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final. Notwithstanding any other provision of this Combined DS and Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

G. *Setoff Rights*

Except with respect to Claims released under the Combined DS and Plan, the Debtor, and the Liquidating Trust, as applicable, may set off any Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) against all Claims that the applicable Debtor may have held against the Holder of such Claim or exercise recoupment with respect thereto. Neither the failure to setoff nor the allowance of any Claim under the Combined DS and Plan shall constitute a waiver or release of any Claims that any Debtor or the Liquidating Trustee, as applicable, may have against the Holder of any Claim.

H. *Third Party Agreements; Subordination*

The Plan Distributions to the various classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach or employ another legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All such rights and any agreements relating thereto shall remain in full force and effect, except as otherwise compromised and settled pursuant to the Combined DS and Plan.

Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Combined DS and Plan. The right of the Debtors or the Liquidating Trust to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or subordinated Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim or subordinated Interest.

I. *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Combined DS and Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, or the Liquidating Trustee, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trust and its successors and assigns.

# ARTICLE XIII
# CONDITIONS PRECEDENT TO CONFIRMATION OF THE COMBINED DS AND PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE

A. *Conditions Precedent to Confirmation*

The following are conditions precedent to confirmation of the Combined DS and Plan:

(1) the Bankruptcy Court shall have entered an order or orders, in form and substance acceptable to the Debtors and Tillou: (a) approving the Combined DS and Plan as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (b) authorizing the solicitation of votes with respect to the Combined DS and Plan; (c) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Combined DS and Plan; (d) confirming and giving effect to the terms and provisions of the Combined DS and Plan; (e) determining that all applicable tests, standards and burdens in connection with the Combined DS and Plan have been duly satisfied and met by the Debtors and the Combined DS and Plan; (f) approving the Plan Documents; and (g) authorizing the Debtors to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Combined DS and Plan and the Plan Documents; and

(2) the Plan Documents shall be in form and substance reasonably satisfactory to the Debtors and Tillou.

B. *Conditions Precedent to the Occurrence of the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date with respect to each of the Debtors' Estates:

(1) the Confirmation Order shall be a Final Order and be in form and substance reasonably satisfactory to the Debtors and Tillou;

(2) the Liquidating Trust shall have been formed and the Liquidating Trustee shall have been appointed, and the Debtors shall have taken such actions and provided such information as reasonably requested by counsel to the Committee and the prospective Liquidating Trustee that are reasonably necessary to allow the Liquidating Trustee to perform its duties under and in accordance with the Combined DS and Plan and the Liquidating Trust Agreement;

(3) no orders, decisions, or injunctions shall have been issued by a Governmental Unit prohibiting, modifying, or conditioning any transaction contemplated herein;

(4) all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan Documents, including satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan Documents in accordance with Article XIII.A of the Combined DS and Plan;

(5) all Professional Fee Claims shall have been paid in accordance with Article V.B.1 of this Combined DS and Plan, the Professional Fee Escrow shall have been funded with the

Professional Fee Escrow Amount in accordance with Article V.B.2 of this Combined DS and Plan (subject to the Professional Fee Cap), and the Liquidating Trust Administrative Claims Reserve shall have been funded in accordance with Article I.A.75 of this Combined DS and Plan;

(6) Tillou shall have assigned to the Liquidating Trust the Returned Tillou Causes of Action; and

(7) Tillou shall have funded the Tillou Cash Payment.

C. *Waiver of Conditions*

The Debtors may waive any one or more of the conditions set forth in Article XIII.A or Article XIII.B without notice or order of the Bankruptcy Court and without notice to any other parties in interest.

D. *Effect of Non-Occurrence of the Effective Date*

If the Effective Date shall not occur (except as provided in Article XIII.E hereof), the Combined DS and Plan shall be null and void and nothing contained in the Combined DS and Plan shall: (i) constitute a waiver or release of any Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, including any right to seek an extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (iii) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

E. *Option to Delay Occurrence of the Effective Date*

Notwithstanding anything in the Combined DS and Plan to the contrary, the Debtors reserve the right to delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; *provided*, *however*, any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates.

F. *Modification of the Combined DS and Plan*

As provided in section 1127 of the Bankruptcy Code, modification of the Combined DS and Plan may be proposed in writing by the Debtors, at any time before confirmation, *provided*, that the Combined DS and Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Combined DS and Plan at any time after confirmation and before substantial consummation, *provided*, that the Combined DS and Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Combined DS and Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Combined DS and Plan shall be deemed to have accepted such Combined DS and Plan as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

G. *Revocation of Combined DS and Plan*

The Debtors reserve the right to revoke and withdraw the Combined DS and Plan and/or to adjourn the Combined Hearing prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Combined DS and Plan, or if the Effective Date does not occur, then the Combined DS and Plan and all settlements and compromises set forth in the Combined DS and Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Combined DS and Plan shall be deemed to constitute a waiver or release of any Claims against or Interests in the Debtors or to prejudice in any manner the rights of the Debtors or any other Entity in any other further proceedings involving the Debtors.

## ARTICLE XIV
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

1. to hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XI hereof for the assumption, assumption and assignment or rejection of Executory Contracts or Unexpired Leases to which any Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine any and all Claims and any related disputes (including the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any Executory Contract or Unexpired Lease);

2. to hear and determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Combined DS and Plan, may be instituted by the Liquidating Trustee after the Effective Date, including any adversary proceedings which the Liquidating Trustee may choose to bring in the Bankruptcy Court in respect to any of the Preserved Estate Claims;

3. to hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Disputed Claim in whole or in part;

4. to issue such orders in aid of execution of the Combined DS and Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

5. to consider any modifications of the Combined DS and Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

6. to hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Combined DS and Plan or the Bankruptcy Code;

7. to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation;

8. to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of or against the Estates, any of the Preserved Estate Claims, or Causes of Action constituting Liquidating Trust Assets;

9. to determine such other matters that may be set forth in the Combined DS and Plan or the Confirmation Order, or that may arise in connection with the Combined DS and Plan or the Confirmation Order;

10. to hear and determine matters concerning state, local and federal taxes, fines, penalties or additions to taxes for which the Debtors may be liable in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

11. to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with any setoff and/or recoupment rights of the Debtors or any Entity under the Combined DS and Plan;

12. to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with Causes of Action of the Debtors or the Estates (including the Preserved Estate Claims and Causes of Action) commenced by the Liquidating Trustee, the Debtors or any third parties, as applicable, before or after the Effective Date;

13. to enter an order or final decree closing the Chapter 11 Cases;

14. to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Combined DS and Plan or the Confirmation Order;

15. to extend the initial stated terms of the Liquidating Trust in accordance with the provisions concerning such a potential extension in the Liquidating Trust Agreement; and

16. to hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

A. *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further

evidence the terms and conditions of the Combined DS and Plan. The Debtors or the Liquidating Trustee (as applicable) and all Holders of Claims or Interests receiving distributions pursuant to the Combined DS and Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Combined DS and Plan or the Confirmation Order.

B. *Substantial Consummation*

On the Effective Date, this Combined DS and Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

C. *Reservation of Rights*

The Combined DS and Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Combined DS and Plan, any statement or provision contained in the Combined DS and Plan, or the taking of any action by the Debtors with respect to the Combined DS and Plan or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

D. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Combined DS and Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

E. *Notices*

After the Effective Date, any pleading, notice, or other document required by the Combined DS and Plan to be served on or delivered to the Liquidating Trust shall be served on the Liquidating Trust and its counsel at the notice address set forth in the Liquidating Trust Agreement.

F. *Governing Law*

Unless a rule of law or procedure is supplied by federal law (*including* the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Combined DS and Plan and any agreements, documents and instruments executed in connection with the Combined DS and Plan, *except* as otherwise expressly provided in such instruments, agreements or documents.

G. *Exemption from Transfer Taxes*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers (including any transfer from a Debtor to the Liquidating Trust) of property pursuant to, in contemplation of, or in connection with the Combined DS and Plan, including any transfer pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security,

property, or other interest in the Debtors or the Liquidating Trust; (2) any transfer, sale or exchange of the assets that is the subject of a motion or notice pursuant to section 363 of the Bankruptcy Code filed by the Debtors before the Effective Date regardless of the date the transaction is approved by the Bankruptcy Court or the date such transfer, sale or exchange closes; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Combined DS and Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Combined DS and Plan, shall not be subject to any stamp, real estate transfer, personal property transfer tax, mortgage recording, sales, use or other similar tax, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax. To effectuate the terms of this Section, the Bankruptcy Court may enter any order necessary or appropriate to implement this provision of the Combined DS and Plan.

H. *Notice of Entry of Confirmation Order and Relevant Dates*

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and Holders of Claims and Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Combined DS and Plan, including the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

I. *Compliance with Tax Requirements*

In connection with the Combined DS and Plan, the Debtors and the Liquidating Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the foregoing, the Debtors and the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Combined DS and Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Combined DS and Plan, any withheld amount (or property) paid to the applicable Tax Authority shall be treated as if paid to the applicable claimant. The Debtors and the Liquidating Trust reserve the right to allocate all distributions made under the Combined DS and Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. The Liquidating Trustee has the right, but not the obligation, to not make a Plan Distribution until such Holder has made arrangements satisfactory to the Liquidating Trustee for

payment of any such tax obligations and, if any party issuing any instrument or making any distribution under the Combined DS and Plan fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse such party. The Debtor or the Liquidating Trustee may require, as a condition to the receipt of a distribution, that the Holder complete the appropriate IRS Form W-8 or IRS Form W9, as applicable to each Holder.

J. *Rates*

The Combined DS and Plan does not provide for the change of any rate that is within the jurisdiction of any Governmental Unit, including, for the avoidance of doubt, any governmental regulatory commission after the occurrence of the Effective Date.

K. *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Combined DS and Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Liquidating Trustee, the Holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

L. *Severability*

In the event the Bankruptcy Court determines that any provision of the Combined DS and Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Debtors may modify the Combined DS and Plan in accordance with Article XIII.F so that such provision shall be not applicable to the Holder of any such Claim or Interest or transaction. Any such determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provision of the Combined DS and Plan or (ii) require the re-solicitation of any acceptance or rejection of the Combined DS and Plan.

M. *Closing of the Chapter 11 Cases*

On or after the Effective Date, the Liquidating Trustee shall be authorized to file a motion requesting entry of one or more orders of this Court closing any of the Chapter 11 Cases other than the Chapter 11 Case of IDEX Wind Down, Inc., f/k/a Ideanomics, Inc. Such motion may be heard by the Court on fourteen (14) days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b). Each Debtor estate shall be entitled to appoint the Liquidating Trustee to prosecute claims and defenses and make distributions, and attend to other liquidation and cessation of business affairs on behalf of each of the other prior Debtors as if such Debtor estates continued to exist solely for that purpose. The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court, and file a motion under Local Rule 3022-1(a) to close the Chapter 11 Case of IDEX Wind Down, Inc., f/k/a Ideanomics, Inc. and of any other Debtor whose case remains open at that time. Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

N. *No Admissions*

As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Action, this Combined DS and Plan shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

O. *Solectrac*

Other than with respect to any Intercompany Claims or Intercompany Interests that Solectrac may have against or in the Debtors, which such Intercompany Claims or Intercompany Interests shall receive the treatment set forth in Class 5 and Class 7 of the Combined DS and Plan, respectively, Solectrac, its Estate and Assets, Claims against Solectrac, and Interests in Solectrac shall not be affected or modified by the Combined DS and Plan.

## ARTICLE XVI
## PLAN-RELATED RISK FACTORS

**THE COMBINED DS AND PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED DS AND PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH HEREIN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED DS AND PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED DS AND PLAN AND ITS IMPLEMENTATION.**

A. *The Combined DS and Plan Might Not Be Accepted*

The Debtors can make no assurances that the requisite acceptances to the Combined DS and Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the Holders or may liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to Holders as those proposed in the Combined DS and Plan.

B. *The Combined DS and Plan Might Not Be Confirmed*

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Combined DS and Plan. Even if the Bankruptcy Court determines that the Combined DS and Plan, the balloting procedures, and the results were appropriate, the Bankruptcy Court could still decline to confirm the Combined DS and Plan if it found that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined DS and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the

Combined DS and Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent liquidation.

C. *Parties in Interest Might Object to the Amount or Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Combined DS and Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Combined DS and Plan may place a Claim or Interest in a particular Class only if such Claim or interest is substantially similar to the other Claims or interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Combined DS and Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Combined DS and Plan to be confirmed, the Debtors may seek (i) to modify the Combined DS and Plan to provide for whatever classification might be required for Confirmation or (ii) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Combined DS and Plan, by changing the composition of such Class and the vote required for approval of the Combined DS and Plan. There can be no assurance that the Bankruptcy Court, if it were to find that a classification was inappropriate and required a reclassification, would approve the Combined DS and Plan based upon such reclassification. Except to the extent that modification of classification in the Combined DS and Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Combined DS and Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Combined DS and Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Combined DS and Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that the Combined DS and Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Combined DS and Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Combined DS and Plan.

Issues or disputes relating to classification or treatment could result in a delay in the confirmation and consummation of the Combined DS and Plan and could increase the risk that the Combined DS and Plan will not be consummated.

D. *The Debtors Might Object to the Amount or Classification of a Claim*

Except as otherwise provided herein, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Combined DS and Plan. The estimates set forth herein cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described herein.

E. *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims or interests does not vote to accept the Combined DS and Plan, the Bankruptcy Court may nevertheless confirm the Combined DS and Plan if at least one Impaired Class has accepted the Combined DS and Plan, and, as to each Impaired Class that has not accepted the Combined DS and Plan, the Bankruptcy Court determines that the Combined DS and Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es). The Debtors believe that the Combined DS and Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

F. *The Chapter 11 Cases Might Be Converted to Cases under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors or any Debtor, the Bankruptcy Court may convert such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate such Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Combined DS and Plan because of (i) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling the Assets at a later time in a controlled manner; (ii) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (iii) additional expenses and Claims, some of which would be entitled to priority, that would be generated during a liquidation.

G. *Combined DS and Plan Releases Might Not Be Approved*

There can be no assurance that the releases, third-party agreements, exculpation, and injunction provisions, as provided in Article XII, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a Combined DS and Plan of liquidation that differs from the Combined DS and Plan or the Combined DS and Plan not being confirmed.

H. *Allowance of Claims Might Substantially Dilute the Recovery to Holders of Claims under the Combined DS and Plan*

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual Allowed amounts of Claims may differ from these estimates. These estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein. Because certain Plan Distributions are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain Holders of Allowed Claims under the Combined DS and Plan.

I. *Failure To Consummate the Combined DS and Plan*

The Combined DS and Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date hereof, there can be no assurance that any or all of the conditions in the Combined DS and Plan will be satisfied (or waived). Accordingly, even if the Combined DS and Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

J. *Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero*

The Debtors have not obtained or requested an opinion from any bank or other firm as to the value of the Liquidating Trust Assets. As such, any valuation of any of the Plan Distributions (*i.e.*, the Liquidating Trust Assets) is necessarily speculative, and the value of certain of such assets could potentially be zero. Accordingly, the ultimate value, if any, of the Plan Distributions (*i.e.*, the Liquidating Trust Assets) could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Allowed Claims in Class 3.

K. *Costs of Administrating the Estates*

Liquidation of the Estates' remaining assets and the disbursement of the proceeds of such liquidation will require certain administrative costs that may vary based on a variety of factors. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Combined DS and Plan.

L. *Certain Tax and Securities Implications of the Combined DS and Plan*

There are a number of material securities and income tax considerations, risks, and uncertainties associated with the Combined DS and Plan. Each Holder should consult its own advisors regarding these matters, based upon the particular circumstances pertaining to such Holder.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DS AND PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND APPLICABLE FOREIGN TAX CONSEQUENCES OF THE COMBINED DS AND PLAN.**

## ARTICLE XVII
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Combined DS and Plan, each Holder of Allowed GUC Convenience Claims or Allowed General Unsecured Claims should carefully review this Combined DS and Plan. This section is qualified in its entirety by the Solicitation Order.

A. *Voting Instructions and Voting*

**Holders of Claims in Class 3 (GUC Convenience Claims) and Class 4 (General Unsecured Claims) are entitled to vote to accept or reject the Combined DS and Plan**. All Holders within such Classes have been sent a Ballot together with this Combined DS and Plan. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Combined DS and Plan to cast your vote. Each Ballot contains detailed voting instructions. Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Combined DS and Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots. The Voting Record Date for determining which Holders are entitled to vote on the Combined DS and Plan is November 1, 2025. **The Voting Deadline is December 29, 2025, at 12:00 p.m. (prevailing Eastern Time).**

**The Ballots have been specifically designed for the purpose of soliciting votes on the Combined DS and Plan from Holders of Claims within Class 3 and Class 4 who are entitled to a vote with respect thereto. Accordingly, in voting on the Combined DS and Plan, please use only the Ballot sent to you with this Combined DS and Plan. In order for your Ballot to be counted, please complete and sign your Ballot, and submit it so as to be received by 12:00 p.m. (Prevailing Eastern Time), on December 29, 2025 using one of the following methods:**

**For Holders of Claims in Class 3 (GUC Convenience Claims) and Class 4 (General Unsecured Claims), if by Mail:**

**IDEX Wind Down Ballot Processing Center**
**c/o Epiq Corporate Restructuring, LLC**
**P.O. Box 4419**
**Beaverton, OR 97076-4419**

**If by Hand Delivery of Overnight Mail:**

**IDEX Wind Down Ballot Processing Center**
**c/o Epiq Corporate Restructuring, LLC**
**10300 SW Allen Blvd.**
**Beaverton, OR 97005**

**If by Electronic, Online Submission:**

**Visit the Debtors' restructuring website at:**
**https://dm.epiq11.com/case/ideanomics click on the "E-Ballot" tab, and follow the prompts and directions.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY, FACSIMILE, OR EMAIL BE ACCEPTED.** Following the Voting Deadline, the Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Combined DS and Plan. Ballots submitted to the Debtors or any of its agents and advisors (other than the Claims and Noticing Agent) will not be counted.

If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Combined DS and Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Claims and Noticing Agent at https://dm.epiq11.com/case/ideanomics/info or via telephone at (888) 884-3413 (toll-free in the U.S. and Canada) or (503) 242-1684 (international).

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE COMBINED DS AND PLAN, (B) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE COMBINED DS AND PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE COMBINED DS AND PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE COMBINED DS AND PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT HTTPS://DM.EPIQ11.COM/CASE/IDEANOMICS/INFO OR VIA TELEPHONE AT (888) 926-3479 (TOLL-FREE IN THE U.S. AND CANADA) OR (310) 751-1825 (INTERNATIONAL).

B. *Parties Entitled to Vote*

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes are entitled to vote on the Combined DS and Plan. Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Combined DS and Plan unless (1) the Combined DS and Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or interest entitles the Holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or interest, the Combined DS and Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the Holder of an Impaired Claim or Interest will not receive or retain any distribution under the Combined DS and Plan on account of such Claim or interest, the Bankruptcy Code deems such Holder to have rejected the Combined DS and Plan, and, accordingly, Holders of such Claims and Interests do not vote on the Combined DS and Plan and will not receive a Ballot. If a Claim or interest is not impaired by the Combined DS and Plan, the Bankruptcy Code presumes the Holder of such Claim or interest to have accepted the Combined DS and Plan and, accordingly, Holders of such Claims and interests are not entitled to vote on the Combined DS and Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

As set forth above, the Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection

of the plan; and (ii) interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

**Claims in Class 3 (GUC Convenience Claims) and Class 4 (General Unsecured Claims) are impaired under the Combined DS and Plan and entitled to vote to accept or reject the Combined DS and Plan.** Claims in all other Classes are either unimpaired and presumed to accept or will not receive a Distribution under the Combined DS and Plan and deemed to reject the Combined DS and Plan, and therefore are not entitled to vote. For a detailed description of the treatment of Claims and Interests under the Combined DS and Plan, *see* Article VI.B herein.

The Debtors will request confirmation of the Combined DS and Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Combined DS and Plan by all Holders of Claims or Interests in Class 5 (Intercompany Claims), Class 6 (Equity Interests) and Class 7 (Intercompany Interests). Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article XVIII.E herein.

C. *Agreements Upon Furnishing Ballot*

The delivery of a properly completed Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this solicitation; and (ii) to the extent such accepting Ballot and returns a Ballot that votes in favor of the Combined DS and Plan ***or*** votes to reject, but in either case does not opt out of the voluntary releases contained in Article XII.B of the Combined DS and Plan by checking the "opt out" box on the Ballot, the terms of the Combined DS and Plan including the releases set forth in Article XII.B therein. All parties in interest retain their right to object to confirmation of the Combined DS and Plan.

D. *Change of Vote*

Any party who has previously submitted to the Claims and Noticing Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Claims and Noticing Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Combined DS and Plan.

E. *Waivers of Defects, Irregularities, Etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Claims and Noticing Agent and/or the Debtors, as applicable, in their sole reasonable discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors; *provided*, *however*, the Debtors may not waive the requirement that a Ballot must be signed to be counted. The

interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors or the Bankruptcy Court may determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

F. *Miscellaneous*

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Combined DS and Plan has not been indicated, will not be counted. The Claims and Noticing Agent is authorized, but not required, to contact parties that submit incomplete or otherwise deficient votes to make a reasonable effort to cure such deficiencies. If you simultaneously return duplicative Ballots that are voted inconsistently, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Combined DS and Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders of the Claims or Interests, as applicable, who actually vote will be counted. The failure of a Holder to deliver a duly executed Ballot to the Claims and Noticing Agent will be deemed to constitute an abstention by such Holder with respect to voting on the Combined DS and Plan and such abstentions will not be counted as votes for or against the Combined DS and Plan.

Except as provided below, unless the Ballot is timely submitted to the Claims and Noticing Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to include it in the tabulation of votes for or against the Combined DS and Plan.

As a cost saving measure, the Debtors are authorized to cause the Claims and Noticing Agent to distribute this Combined DS and Plan and the Solicitation Order (without exhibits) to claimholders in paper format or electronic format (i.e., a USB drive) via first class U.S. mail to the extent a valid physical mailing address is known. Additionally, for purposes of serving the solicitation packages, combined hearing notice, and notice of non-voting status, the Debtors are authorized to rely on the address information for voting and non-voting Classes as compiled, updated, and maintained by the Claims and Noticing Agent as of the Voting Record Date. The Debtors and the Claims and Noticing Agent are not required to conduct any additional research for updated addresses based on undeliverable solicitation packages, combined hearing notices, and notices of non-voting status. In the event the Debtors do not have a mail address for a claimholder in a voting Class, the Claims and Noticing Agent will serve this Combined DS and Plan and the Solicitation Order on such voting claimholder by email to the extent possible.

G. *Further Information; Additional Copies*

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of this Combined DS and Plan, the Solicitation Order, or any exhibits thereto, please contact the Claims and Noticing Agent.

## ARTICLE XVIII
## CONFIRMATION REQUIREMENTS

The following is a brief summary of the Plan Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code consult their own legal, financial, and other advisors.

A. *The Combined Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing. The Solicitation Order set the date and time for the Combined Hearing to consider (i) final approval of the Combined DS and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) Confirmation of the Combined DS and Plan pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by filing a notice with the Bankruptcy Court.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. **Objections to Confirmation of the Combined DS and Plan must be made in writing and must be filed with the Bankruptcy Court and served in accordance with the Solicitation Order** (as described in the Preliminary Statement hereto).

B. *Classification of Claims and Interests*

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and Interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined DS and Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Combined DS and Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined DS and Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Combined

DS and Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined DS and Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created hereunder. Accordingly, the classification of Claims and Interests in the Combined DS and Plan complies with section 1122 of the Bankruptcy Code. Notwithstanding, it is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Combined DS and Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Combined DS and Plan, to make such modifications to the Combined DS and Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined DS and Plan.

**EXCEPT AS SET FORTH IN THIS COMBINED DS AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY AND ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THIS COMBINED DS AND PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO TREATMENT UNDER THIS COMBINED DS AND PLAN OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim, and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under this Combined DS and Plan to Holders of Allowed Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.

The Bankruptcy Court must find that a number of statutory tests are met before it may confirm this Combined DS and Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on this Combined DS and Plan, or do

not vote to accept this Combined DS and Plan, but who will be bound by the provisions of this Combined DS and Plan if it is confirmed by the Bankruptcy Court.

C. *Impaired Claims or Interests*

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject such plan. Under section 1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

**Under the Combined DS and Plan, Holders of Claims in Class 3 (GUC Convenience Claims) and Class 4 (General Unsecured Claims) are Impaired and are entitled to vote on the Combined DS and Plan.** Holders of Claims or Interests in Classes 5, 6, and 7 are Impaired and will not receive or retain any property under the Combined DS and Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Combined DS and Plan and deemed to reject the Combined DS and Plan under section 1126(g) of the Bankruptcy Code. Under the Combined DS and Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Combined DS and Plan and are deemed to accept the Combined DS and Plan under section 1126(f) of the Bankruptcy Code.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THIS COMBINED DS AND PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4.**

D. *Consensual Confirmation*

In general, the Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan. As further set forth in section 1124 of the Bankruptcy Code, a class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the Holder of such claim or interest or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the Holder of such claim or interest. In addition, Classes that receive no Plan Distributions are not entitled to vote on the Combined DS and Plan and are deemed to have rejected the Combined DS and Plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two thirds in dollar amount and more than one half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For the avoidance of doubt, votes will be solicited and tabulated in accordance with the procedures approved in the Solicitation Order.

The Bankruptcy Court can confirm the Combined DS and Plan only if it determines that the Combined DS and Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court finds, among other things, that the Combined DS and Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests, unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

In addition to the voting requirements, section 1129 of the Bankruptcy Code requires that, in order to confirm the Combined DS and Plan, the Bankruptcy Court must make a series of findings concerning the Combined DS and Plan and the Debtors, including that (1) the Combined DS and Plan has classified Claims in a permissible manner, (2) the Combined DS and Plan complies with applicable provisions of the Bankruptcy Code, (3) the Combined DS and Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Combined DS and Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Combined DS and Plan is "feasible" and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Combined DS and Plan, (7) the Combined DS and Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing such Holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Combined DS and Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Combined DS and Plan provides for the payment of such fees on the Effective Date. The Debtors believe that the Combined DS and Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code (see "Best Interests Test" and "Feasibility" below), other than those pertaining to voting, which has not yet concluded.

E. *Feasibility and Best Interests of Creditors*

1. Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7 of the Bankruptcy Code, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a

plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

2. Liquidation Analysis

Amounts that Holders of Claims or Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the following liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of the Debtors' financial advisors (the "Liquidation Analysis"). As described below, the Debtors developed the Liquidation Analysis based on forecasted values as of an assumed chapter 7 conversion date of September 30, 2025. A copy of the Liquidation Analysis is attached hereto as **Exhibit A**. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process progresses.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and financial advisor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a chapter 7 trustee. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the assumptions reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote under the Combined DS and Plan to make an informed judgment about the Combined DS and Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the Best Interests Test, pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of Securities of, or Claims or interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring after the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Combined DS and Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

Liquidation Analysis

Under a chapter 7 liquidation, no class of claims that is junior to a class of claims may be paid unless the senior class of claims is paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured claimants and priority claimants, it must determine the probable distribution to general unsecured claimants and equity security Holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such claimants and equity security Holders under the Combined DS and Plan, then the Combined DS and Plan is not in the best interests of claimants and equity security Holders and cannot be confirmed by the Bankruptcy Court. The Debtors believe that each member of each class of impaired claims will receive at least as much as, or more, under the Combined DS and Plan than it would receive if the Debtors' Assets were liquidated under chapter 7 as explained below.

a. **Liquidation under Chapter 7 of the Bankruptcy Code**

The Combined DS and Plan contemplates the liquidation of the Estate Assets. To calculate the probable distribution to members of each impaired class of Holders of claims and interests if a Debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Estate Assets if these Chapter 11 Cases were converted to Chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of such Debtor's Assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured claimants would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and these Chapter 11 Cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of one or more chapter 7 trustee(s), as well as of counsel and other professionals retained by the chapter 7 trustee(s), asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, costs associated with maintaining operations, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. The fact that an estate's assets are being liquidated in a chapter 7 case may further depress the value received for such assets. A chapter 7 trustee also may seek to abandon assets that have burdensome obligations. Moreover, the lack of familiarity that a chapter 7 trustee and his advisors would have respecting the Debtors' Assets, business, and Chapter 11 Cases would likely increase the cost of administration. A chapter 7 trustee and its professionals would need to review the entire docket in these Chapter 11 Cases and become familiar with, among other things, (i) the Debtors' books and records, (ii) the Debtors' historical capital structure, and (iii) the historical proceedings of these Chapter 11 Cases, while simultaneously undertaking investigations and valuations that may be duplicative of work already done by the Committee in these Chapter 11 Cases.

The Combined DS and Plan provides for the creation of the Trusts for the purpose of liquidating or otherwise monetizing the Estate Assets for the benefit of the Liquidating Trust Beneficiaries, including General Unsecured Creditors. If the Combined DS and Plan is not confirmed and the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy

Code, there would be no distribution to GUC Convenience Claims and General Unsecured Claims, because there would be no Assets remaining to administer for their benefit. In that scenario, the Assets would not be transferred to the respective Trusts and, instead, would be liquidated or otherwise monetized by a chapter 7 trustee solely for the benefit of Holders of Claims with priorities higher than that of GUC Convenience Claims and General Unsecured Claims.

In light of the foregoing, the Debtors believe that the Combined DS and Plan meets the best interests test of section 1129(a)(7) of the Bankruptcy Code, and that the members of each impaired Class of Claims will receive more under the Combined DS and Plan than they would in a chapter 7 liquidation.

b. **Alternative Liquidating Plan under Chapter 11 of the Bankruptcy Code**

If the Combined DS and Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan providing for an orderly liquidation of the Debtors. The Debtors believe that the Combined DS and Plan described herein allows Holders of Claims to realize the greatest recovery under the circumstances.

3. Application of the Best Interests Test

Because the Combined DS and Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the Best Interests Test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Combined DS and Plan. However, the Debtors believe that, in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case. The Combined DS and Plan effectuates a conclusion and liquidation of the remaining assets of the Estates. Liquidating the Estates under the Combined DS and Plan would provide Holders of Claims with larger, more timely recoveries due to the potential for delay and additional costs that would result from converting to a chapter 7 case at this stage of the Chapter 11 Cases.

As set forth in the Liquidation Analysis, the costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Combined DS and Plan and concluding the affairs of the Debtors. Conversion also would likely delay the liquidation process. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that, based on the Liquidation Analysis, the Combined DS and Plan meets the Best Interest Test. As the Combined DS and Plan and the Liquidation Analysis indicate, Confirmation of the Combined DS and Plan will provide each of an Allowed Claim with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, and therefore, the classification and treatment of Claims and interests in the Combined DS and Plan complies with section 1129(a)(7) of the Bankruptcy Code.

4. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successors to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. Inasmuch as the Debtors are being liquidated and the Combined DS and Plan provides for the distribution of all of the proceeds of that liquidation to Holders of Claims that are Allowed as of the Effective Date, the Debtors maintain that the Combined DS and Plan is effectively exempted from the feasibility requirements in accordance with the express terms of section 1129(a)(11) of the Bankruptcy Code.

F. *Confirmation Without Necessary Acceptances; Cramdown*

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code, which requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims or Interests in Classes 5, 6, and 7 are deemed to reject the Combined DS and Plan, the Debtors will seek Confirmation of the Combined DS and Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those Classes will receive any property under the Combined DS and Plan.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Combined DS and Plan, all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed interests in such Class. Accordingly, the Debtors believe that the Combined DS and Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity Holders, as follows:

1. Secured Creditors. Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with

such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

2. Unsecured Creditors. Either (a) each impaired unsecured creditor receives or retains under the Combined DS and Plan property of a value equal to the amount of its allowed claim or (b) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3. Holders of Interests. Either (a) each Holder of an Interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (b) the Holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

4. The Debtors believe that the distributions provided under the Combined DS and Plan satisfy the "fair and equitable" standard. Accordingly, the Debtors are seeking Confirmation of the Combined DS and Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each rejecting Class of Claims or interests, and the Combined DS and Plan constitutes a motion for such nonconsensual Confirmation.

## ARTICLE XIX
## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and consummation of the Combined DS and Plan are in the best interests of the Debtors, their Estates, and their creditors. The Debtors believe that any alternative to confirmation of the Combined DS and Plan could result in significant delay and additional costs, as well as a reduction in Plan Distributions. **Consequently, the Debtors urge all Holders of Claims eligible to vote on the Combined DS and Plan to vote to ACCEPT the Combined DS and Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Noticing Agent on or before the Voting Deadline.**

November 19, 2025

IDEX Wind Down, Inc. f/k/a Ideanomics, Inc. (for itself and all Debtors)

By: */s/ Alfred Poor*
Name: Alfred Poor
Title: Chief Executive Officer